IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

CASE NO.: 1:18-cv-00038-MW-GRJ

PETER MORGAN ATTWOOD,

          Plaintiff,

v.

CHARLES W. CLEMONS, SR.,

          Defendant.

_____/

WORKING VIDEOTAPED ZOOM DEPOSITION OF
CHARLES W. CLEMONS, SR.

Taken on Behalf of the Plaintiff

DATE TAKEN:            Tuesday, September 22, 2020

TIME:                 9:00 a.m. to 12:53 p.m.

PLACE:                All parties via Zoom


Examination of the witness taken before:

Lisa M. Trombly
Court Reporter and Notary Public
LGT Reporting Company
1060 Woodcock Road
Orlando, Florida 32803
(407) 442-0223

Charles W. Clemons, Sr.   September 22, 2020

```
 1                APPEARANCES FOR THE PLAINTIFF:

 2                  ERIC LINDSTROM, ESQUIRE
                      (Appeared via Zoom)
 3            EGAN, LEV, LINDSTROM & SIWICA, P.A.
                     231 East Colonial Drive
 4                    Orlando, Florida 32801
                         (407) 422-1400
 5

 6                APPEARANCES FOR THE DEFENDANT:

 7

 8                JONATHAN L. WILLIAMS, ESQUIRE
                      (Appeared via Zoom)
 9                   LASH & GOLDBERG, LLP
              100 Southeast Second Street
10                        Suite 1200
                     Miami, Florida 33131
11                       (850) 399-9455

12                       ALSO PRESENT:

13

14                     Morgan Attwood
                      (Appeared via Zoom)
           Daniel Bell, Florida House Representative
15                    (Appeared via Zoom)

16

17

18

19

20

21

22

23

24

25
```

LGT Reporting Company
407-442-0223

Charles W. Clemons, Sr.   September 22, 2020

1                         I N D E X

2    Zoom Deposition of CHARLES W. CLEMONS, SR.      Page No.

3         Direct Examination by Mr. Lev                5
          Cross-Examination by Mr. Williams           145
4
     Certificate of Oath                              148
5
     Certificate of Reporter                          149
6
     Read and Sign Letter to Mr. Williams             150
7
     Errata Sheet                                     151

8                         - - - - -

9

10                 S T I P U L A T I O N S

11             It is hereby stipulated and agreed

12        by and between counsel for the respective

13        parties and the deponent that the reading

14        and signing of the Zoom deposition transcript

15        be WAIVED.

16                      - - - - -

17

18

19

20

21

22

23

24

25

Charles W. Clemons, Sr.   September 22, 2020

```
1                 PLAINTIFF'S EXHIBITS INDEX
2    NO.         DESCRIPTION                    Page No.
3    1   Declaration of Representative Chuck Clemons      5
4    2   Defendant's Response and Objections to
         Plaintiff's First Set of Requests for
5        Admission                                        5
6    3   Defendant's Response and Objections to
         Plaintiff's First Set of Interrogatories         5
7
8    4   E-mail dated February 26, 2018 from
         Chuck Clemons to Andrew Caplan                   5
9    5   Banned Accounts on Facebook                      5
10   6   Blocked Accounts on Twitter                      5
11   7   Facebook Page Settings                           5
12   8   Retweet of Richard Harrison Post                 5
13   9   Retweet of Collin Kaepernick and Richard
         Harrison Post                                    5
14
15   10  Retweet of Richard Harrison Post                 5
16   11  Posts on Campaign Facebook Account             147
17                 DEFENDANT'S EXHIBITS INDEX
18   NO.         DESCRIPTION                    Page No.
19                 **** N O N E ****
20                   - - - - -
21
22
23
24
25
```

LGT Reporting Company
407-442-0223

Charles W. Clemons, Sr.   September 22, 2020

```
 1                P R O C E E D I N G S

 2                     *********

 3   (Plaintiff's Exhibit Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9 and

 4           10 were marked for identification.)

 5           THE COURT REPORTER:  Good morning.  This is

 6       Lisa Trombly, the court reporter; will counsel

 7       please, on the record, stipulate to the swearing of

 8       the witness remotely via Zoom?

 9           MR. LINDSTROM:  I so stipulate.

10           MR. WILLIAMS:  So stipulated for defendant.

11           THE COURT REPORTER:  Thank you.

12           Please raise your right hand.

13           Do you solemnly swear or affirm the testimony

14       you're about to give in this cause to be the truth,

15       the whole truth and nothing but the truth?

16           THE WITNESS:  I do.

17           THE COURT REPORTER:  Thank you.

18               CHARLES W. CLEMONS, SR.,

19   having been first duly sworn via Zoom, was examined and

20   testified under oath as follows:

21                 DIRECT EXAMINATION

22   BY MR. LINDSTROM:

23       Q    Good morning, Representative Clemons, I'm --

24   I'm Eric Lindstrom.

25       A    Good morning.
```

Charles W. Clemons, Sr.   September 22, 2020

1      Q    Good -- good to meet you.  We'll try to get

2   through this as quickly as I can.  I appreciate you

3   taking the day off for us.  I know you've got a busy

4   schedule now.

5           I guess, first of all, I wondered if we could

6   just chitchat a little bit about -- about how you

7   normally communicate with constituents, in your -- in

8   your official capacity as -- as state representative?

9      A    I --

10     Q    What are -- what are the ways -- I guess,

11  first of all, if you could just maybe identify the

12  different ways that you communicate?  How do you

13  communicate with constituents in your role as -- as

14  state representative?

15     A    Certainly.  There are several ways that I

16  communicate with my constituents.  First, we have town

17  hall meetings, on occasion, regularly scheduled.  We

18  probably had seven, eight, maybe more town hall

19  meetings.

20          We have an official website from the

21  myfloridahouse.com, constituents can contact me via that

22  official method.

23          Certainly, I have three offices in the

24  district.  The main office is in Jonesville.  The

25  satellite offices are my appointment in the courthouse

Charles W. Clemons, Sr.   September 22, 2020

```
1    of Gilchrist County and in the city hall of Cross City.
2    And then during the legislative session, the committee
3    weeks, I will be in Tallahassee for six weeks of
4    committee and then 60 days of the session barring any
5    extension.
6             And so people make appointments.  They come in
7    to see me.  And those are the primary ways that I
8    communicate with my constituents.
9        Q    The town halls, tell me a little bit more
10   about those, who -- I guess, first of all, who organizes
11   those generally?
12       A    Well, we --
13       Q    Or are they organized by different people?
14       A    No.  No.  Town -- the -- we haven't had any
15   town halls, we have public hearing.  We have legislative
16   delegations public hearings.
17       Q    I thought --
18       A    Town halls are a campaign -- a campaign
19   effort.
20       Q    Okay.  I -- maybe I misunderstood, I thought
21   the first thing you said was town hall, I don't really
22   know what the -- what the distinction is.
23            What -- what -- are there events that are
24   like -- where a bunch of people come into a room and can
25   ask you questions and -- and listen to you give an
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1   update, is that -- is that a way of -- is that something
 2   you do in your role as a state representative?
 3        A    I think what you may be mentioning or what you
 4   might mean, and I'll correct it if not, is legislative
 5   delegation hearings.  It's historically expected that
 6   prior to legislative sessions beginning, most of the
 7   time it's right at the beginning or in the middle of
 8   committee hearings, that the legislative delegations of
 9   each county in the state historically have gotten
10   together, chosen a -- an amenable date and published
11   that for the local deligation to meet the public.
12             They vary in -- in duration.  They may be an
13   hour and a half.  The Alachua deligation may be a half a
14   day.
15        Q    I see.  Who -- who organizes those typically?
16        A    The chairman of the delegation.
17        Q    The --
18        A    The chair -- chairperson.  I'm sorry?
19        Q    Every county has a deligation or every --
20   every district?
21        A    No.  It's -- it's a county.  It goes county by
22   county.
23        Q    So who -- who would be the -- who would be on,
24   like, the Alachua County deligation?  Is it the
25   statewide representatives that -- that serve district
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1   areas in Alachua County?
 2        A    Yes.  Any member of the House or the Senate
 3   would be a member of the local -- it's called the local
 4   delegation.
 5        Q    And those are called county --
 6        A    They're called legislative delegation
 7   hearings.
 8        Q    Okay.  Where do those typically happen?
 9        A    That's -- that's usually the choice of the
10   chair, the chair of the delegation.
11        Q    Who's the chair?
12        A    Well, there's -- in Alachua County Senator
13   Perry is the chair.
14        Q    He is --
15        A    I --
16        Q    Do you guys just sort of select them among
17   yourselves, among the -- among the --
18        A    Delegation.
19        Q    -- who --
20        A    Yes.
21        Q    -- who will be the chair?
22        A    Yes.  That's correct.
23        Q    Who gets stuck with it, because it's -- it's
24   work?
25        A    It's administrative.  Yes.
```

Charles W. Clemons, Sr.   September 22, 2020

1    Q    Okay.  So the chair just decides and finds a

2  space?

3    A    Yes.

4    Q    Okay.  At -- do you ever participate in

5  other -- well, I -- I guess, let's wrap that up a little

6  bit.

7         How -- how often -- how many deli --

8  legislative delegation hearings do you typically have in

9  a year?

10    A    It depends.  And what I mean by that is, each

11  particular session is different.  We have at least one,

12  at least one prior to the legislative season or session

13  starting.

14         And normally that's where the mayor or the

15  county commission or organizations or the PTA, they come

16  and they let it be known what their legislative ask of

17  their local delegation would be in that particular

18  session.

19         Also probably as many members of the public

20  are there than are interests groups.  And so it just

21  varies.  There have been -- I've -- I've been through

22  four sessions, there have been sessions where we've had

23  more than one legislative delegation hearing --

24    Q    Okay.

25    A    -- called by the chair.

Charles W. Clemons, Sr.   September 22, 2020

1      **Q      Do you ever participate in other -- I guess,**

2  **I -- I tend to want to call them town hall events, but**

3  **as -- as a state representative in that capacity, do you**

4  **ever participate in other events -- other than these**

5  **county delegation things, do you ever participate in**

6  **other events in your capacity as state representative**

7  **where you're in a big room and anybody can come and ask**

8  **you questions?**

9      A      I don't recall participating in anything that

10  would be deemed a town hall meeting (indicating).  You

11  know, you're a state representative and that's a --

12  that's a title that's earned by winning the election.

13  So you're a state representative wherever you go.

14      **Q      Yeah.**

15      A      As far -- as far as meetings, you get invited

16  to speak to various groups.  Sometimes those groups are

17  membership only, sometimes those groups may have an

18  open-door policy.

19          Many times when -- if I accept a speaking

20  engagement or a briefing, I'm not sure whether it's a --

21  it's the member of the architects group or it's member

22  of the teachers, you know, a union or whatever.

23      **Q      Are there -- do you ever -- I guess, maybe**

24  **it's in these -- in these meetings hosted by groups**

25  **then.  Do you ever -- do you ever give a talk from a**

Charles W. Clemons, Sr.   September 22, 2020

```
 1    table with other peopl -- other elected representatives
 2    like -- like local officials, like the mayor or sheriff
 3    or -- or things like that, are you ever speaking at an
 4    event with -- with other local officials, elected local
 5    officials?
 6        A    Of course.
 7        Q    And, I -- I guess, I thought there were more
 8    events like that that were open to the public where
 9    people could come and ask you questions?
10        A    Is that a -- is that a question?
11        Q    Yeah.  Is that wrong?
12        A    I can't speak to what you thought the -- the
13    method or the medium was.  I answered -- I answered,
14    yes, of course, I get invited to various groups all the
15    time.  Every week there's invitations that come in.  The
16    ones that fit my schedule and I say yes to, I go and
17    listen and -- and if they ask questions at that
18    particular event or venue, I do my best to answer.
19        Q    Okay.  Okay.  And is -- is it always clear
20    when you go to these events, is it always clear whether
21    you're there in your capacity as a state representative
22    or as a candidate for reelection?
23        A    I don't know what the motive would be for
24    whoever extends the invitation to me.
25        Q    Yeah.
```

Charles W. Clemons, Sr.   September 22, 2020

1      A    Most of the ti -- most of the time, if the

2  invitation comes in, it comes in through the legislative

3  office and they're asking me.  And I would -- I don't

4  want to presume anything, but I'm presuming they want to

5  hear from Representative Chuck Clemons, if they send the

6  invitation to my legislative office.

7      **Q    Okay.  You have three district offices and**

8  **your office in the capitol; is that right?**

9      A    That's correct.

10     **Q    And can anybody schedule a meeting with you**

11 **in -- in one of those offices?**

12     A    Anyone is free to schedule a meeting in one of

13 those offices, depending on availability with me.  But

14 my office staff is available for anyone to even walk in

15 off the street and let their concerns be known.

16     **Q    And each of the offices, does -- do all four**

17 **of those offices have a separate phone number?**

18     A    No.  I don't think so.  I don't think so.

19 The -- the phone rotates or we can forward the phones,

20 because we only have two staff members.

21     **Q    I see.**

22     A    And the Gilchrist and the Dixie office is

23 scheduled one day every other week and then we can make

24 special arrangements, if we need to.

25     **Q    What is the phone, is it a landline or is it a**

Charles W. Clemons, Sr.   September 22, 2020

```
 1   cell phone?
 2        A    No.  It's a landline.
 3        Q    Okay.  And the landline -- I guess, there must
 4   be a landline in every office, right?
 5        A    Yes.  I misunderstood, I'm sorry.  Of course,
 6   there is.  Yes.
 7        Q    I -- I don't even understand.  There's must
 8   be -- so there's a landline in every office, you're
 9   saying there's a district phone number, though, that can
10   be reassigned to the different -- to ring in a different
11   place?
12        A    Well, what I -- I'm sorry.  What I mean to say
13   is that no matter where the office employees are, the
14   district employees, they answer the same phone number.
15        Q    Oh.  The phone actually rings in three
16   different places at the same time, is --
17        A    When -- when it's forwarded.
18        Q    I see.  It's one phone number and -- and it
19   can be set to -- to ring in a -- in a particular office?
20        A    Yes, I presume.  My -- my answer is, no matter
21   where the employee inquire, whether it's the city hall
22   in Cross City or the courthouse in Gilchrist County, we
23   have one district person and then we have a legislative
24   person.  So because of the scarcity of the employees, we
25   are accessible no matter where the constituent may live.
```

Charles W. Clemons, Sr.   September 22, 2020

1 And we'll make arrangements to meet with them then.

2   **Q Are there computers at every office?**

3   A Yes.  Well, the -- there's ability to hook up

4 computers.  Our -- our district staff has a portable

5 laptop that they take with them and then plug in

6 wherever they are, Tallahassee or one of the exterior

7 offices.

8   **Q Is there -- is there a computer that stays in**

9 **your office at the capitol?**

10   A No.

11   **Q It's a laptop?**

12   A Yes.

13   **Q So how -- how many laptops, I guess, are**

14 **considered, like, official district property?  Are -- I**

15 **guess, you have -- do you have a laptop that's, like,**

16 **public -- district property?**

17   A Yes.

18   MR. WILLIAMS:  Object to the form of the

19  question.  I...

20 BY MR. LINDSTROM:

21   **Q Yeah.  I guess I'm not -- I'm not even sure**

22 **what -- how to ask that.  Is it -- do you consider --**

23   MR. WILLIAMS:  You're asking if it's House

24  purchased or what?

25 BY MR. LINDSTROM:

Charles W. Clemons, Sr.   September 22, 2020

1      **Q    Is it -- is it -- when you -- I think you said**
2  **district property, what do -- what do you mean -- what**
3  **does that actually mean?  Is it -- you have -- I guess,**
4  **do you -- you have funding through -- through an account**
5  **as a state representative to buy stuff?**
6      A    May I attempt to answer your question?
7      **Q    Yeah.**
8      A    Okay.  And if I -- if it's not the question
9  that you're asking, please stop me.
10          The state House Sergeant at Arms or whomever
11 issues each state representative a laptop computer with
12 a property number that's assigned to you.  There are --
13 there is a docking station that when you are in that
14 office, it docks into that particular -- that goes into
15 the secure House of Representatives -- what's it called,
16 network.
17     **Q    Uh-huh.**
18     A    Does that -- does that answer your question?
19     **Q    Yeah.  In addition to that one -- it -- so the**
20 **Sergeant at Arms issues you one laptop, right?**
21     A    That's correct.
22     **Q    In addition to that, do you have a pod of**
23 **money as a state representative to buy, like, office**
24 **equipment?**
25     A    Yes, we do.

Charles W. Clemons, Sr.   September 22, 2020

1    **Q    And from that money, every -- how does that**
2    **work, every state representative gets X amount of money**
3    **to use as office supplies from the state?**
4    A    That's my understanding.  Yes.
5    **Q    How -- how much is it?  Is it very much?**
6    A    I can't -- I can't answer.  I don't -- I don't
7    deal with that on a regular basis.  It's allocated, I
8    believe, quarterly.
9    **Q    And do you use that money to buy things like**
10   **laptops for your staff?**
11   A    No, sir.
12   **Q    Are -- does your staff have laptops that are**
13   **considered public resources, office -- property of the**
14   **state or of your district?**
15   A    Yes.  Perhaps you misunderstood, the
16   employees, the two employees, get treated the same.
17   They --
18   **Q    Oh, I see.**
19   A    Yeah.
20   **Q    So it's not --**
21   A    No.  It's not -- no, sir, it's not one per
22   office, the employee has their one.
23   **Q    I see.  The Sergeant at Arms issues a --**
24   **issues a computer to every employee?**
25   A    Yeah.  I don't know if it's the Sergeant, but

Charles W. Clemons, Sr.   September 22, 2020

```
 1   they -- they have their -- their own laptops.
 2        Q    I see.  So you --
 3        A    Is the way I understand it.
 4        Q    So you got issued one, and you have two staff
 5   that were issued computers or more?
 6        A    I only have two staff (indicating).  And I --
 7   I know that the district person has a laptop for the
 8   very purpose of taking it to the other two offices.
 9        Q    The two staff you consider one is a district
10   person and one is a legislative person?
11        A    That's correct.
12        Q    Okay.  And who are -- I guess, who are their
13   names right now?
14        A    The two staff members that are state
15   employees, the district secretary is Robin Steele.
16   She's been -- she worked in consistently for the past
17   four years.  The legislative director is Ellen Boukari.
18   And she has worked consistently with for -- with me for
19   four years.
20        Q    Okay.
21        A    Those are the only staff that the state has
22   provided to me.
23        Q    I'm just comparing that with -- with the
24   charts.  Are you familiar with the chart at the end of
25   your response to the interrogatories that list the names
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1   of people who have access to your social media accounts?
 2        A    If you'll please show me, that would remind
 3   me.  Those -- those -- you asked me who my staff was,
 4   those are the only two staff members that the state
 5   funds.
 6        Q    Right.  Right.  I know.
 7             So the other -- the other people that are --
 8   so David Allen, Courtney Anderson, Jane Adams -- Jane
 9   Clemons, Brian Graham, Cale McCall and Kelli Thompson,
10   they have never been state employees, is -- is that
11   right, for your -- they've never held this district
12   secretary or legislative office position; is that right?
13        A    That's correct.
14        Q    And they don't have computers issued by the
15   Sergeant at Arms?
16        A    That's correct.
17        Q    Does the Sergeant at Arms issue cell phones?
18        A    Not to my knowledge.
19        Q    Okay.  Do -- do Robin and -- it's Robin and
20   Ellen, right?
21        A    Yes.
22        Q    Do Robin and Ellen have district cell phones
23   as employees?
24        A    Not to my knowledge.
25        Q    Okay.  Do you -- do you have -- do you send
```

Charles W. Clemons, Sr.   September 22, 2020

1   out a newsletter to your consti -- is that -- is that a

2   way that you communicate with people in your role as a

3   state representative?  Do you send out a newsletter?

4        A    I do not.

5        Q    Do you have a -- as a state representative, do

6   you have -- in that capacity, do you have, like, a

7   mailing list or, I guess, an e-mail list?  Do you push

8   out e-mail notices as a representative as a way of -- of

9   getting people ever?

10       A    No, I do not.

11       Q    And in your capacity as a representative, do

12  you operate any -- any Facebook or Twitter or other

13  social media accounts?

14       A    No.  There is no official social media or

15  Facebook accounts, that I know of.

16       Q    In your -- when people communicate with you in

17  your -- in your role as representative, do you -- do you

18  provide them -- what services can people get when

19  they -- when they contact you or your offices in your --

20  in your official capacity?

21       A    Can you clarify what you mean by "services"?

22  I'm not -- that's not clear for me.

23       Q    Yeah.  And it -- I -- I imagine you're

24  probably overwhelmed with weird requests and maybe --

25  maybe that's part of the problem.

Charles W. Clemons, Sr.   September 22, 2020

1          I mean -- for example, can somebody contact

2     your office and say, I need help processing my

3     application for unemploy -- unemployment benefits?

4          A    Yes.

5          Q    And your -- would your office help them try to

6     file their application or whatever assistance they need?

7          A    Yes.

8          Q    I guess, that -- that's in my mind kind of

9     what I mean by a service that your office would offer.

10    Are there other kinds of services like that that you can

11    identify that -- that a constituent can contact you or

12    your office to get help with?

13         A    Well, our office is open on a daily basis to

14    entertain requests from constituents and sometimes

15    people who aren't constituents, they're just looking to

16    try to find where they go or where -- who they would

17    need to contact to answer the specific question or

18    dilemma that they may find themselves in.

19         Q    It's probably all -- you know, all over the

20    map, right?  People contact you about, I guess -- I

21    guess, you must get questions about, like, the session

22    and what's going on with bills and things like that?

23         A    We -- we get all kinds of questions.

24         Q    And if somebody asked your district a question

25    like that, you would, you know, I -- obviously answer

Charles W. Clemons, Sr.   September 22, 2020

Page 22

```
 1   that, right, you would try to provide them an update
 2   about what's going on in the session or with a
 3   particular bill?
 4        A    It -- yes.  It depends.  Sometimes the -- if
 5   there's controversial bills, we can receive, and have
 6   received, in excess of seven, eight thousand contacts in
 7   a day.
 8        Q    How about, like, applying for -- for, like,
 9   federal benefits; does your office in -- in your
10   capacity as representative, help people apply for
11   benefits offered by, like, the Department -- USDA or --
12   or things like that?
13        A    We have entertained all types of inquiries.
14   Federal benefits have been -- I've personally known of
15   people that have had challenges with federal benefits.
16   We refer them to the appropriate federal jurisdiction,
17   whether it be Congressman Dunn who represents part of
18   District 21, or currently Congressman Yoho, who
19   represents the Alachua County portion of the district.
20             So the answer that I believe that you've asked
21   is, yes, we -- we try to help, if we can, to provide a
22   contact for -- to get the answers that -- that they may
23   need, when -- when we can.
24        Q    With -- with COVID, school closures,
25   government closures, best safety practices, you -- as
```

Charles W. Clemons, Sr.   September 22, 2020

1  **a -- in your official capacity, you must get a lot of**

2  **inquiries about -- about those kinds of issues; is that**

3  **something you provided constituent information and**

4  **service on?**

5      A    I can't speak specifically to that, Robin

6  answers the day-to-day questions.  She's there on the

7  other end of the phone (indicating) when -- when people

8  are calling.  She summarily helps and answers many of

9  those questions.  It -- it only elevates to me when

10 it's -- when she's uncertain who to refer that to or if

11 it's specifics that -- that would need my council or

12 guidance.

13     Q    **Have you -- have you had to field any --**

14 **has -- has Robin given you anything to field**

15 **regarding -- regarding COVID in the last six months?**

16     A    I can't recall any specifics that she has

17 asked me about regarding COVID.

18     Q    **In your capacity as representative, have you**

19 **provided any constituent services regarding COVID in the**

20 **last six months?**

21     A    I don't recall specifically.  You know, it's

22 certainly the topic of conversation, school closures,

23 certainly topic of conversation, colleges and

24 universities, how people with -- maybe I can recall

25 where there's been businesses that have been closed by

Charles W. Clemons, Sr.   September 22, 2020

```
 1   county ordinances --
 2        Q    Uh-huh.
 3        A    -- and perhaps people have inquired into the
 4   legislative office, what can you do?  The county
 5   commission has done this or this or this.  And I do
 6   recall calling the governor's office about one
 7   particular situation and -- and responding back to
 8   the -- to the person who inquired.
 9        Q    You contacted --
10        A    And there may be -- there may be others.
11   There may be others.
12        Q    You contacted the governor's office about a
13   local business that had been impacted by a county
14   ordinance requiring their hours -- regulating their
15   hours or something?
16        A    Well, I didn't contact the governor's office
17   specifically for that inquiry, I contacted the
18   governor's office as to was there -- is this a proper
19   way to interpret an ordinance from a state -- a
20   statewide view.
21        Q    Right.
22        A    Uh-huh.
23        Q    Did you then -- after you got information from
24   the governor's office report that back to your -- to the
25   constituent?
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1       A    Yes.
 2       Q    What about -- do you ever release statements?
 3  Are there ever official statements that you release in
 4  your capacity as a representative?
 5       A    No.  The only statements we have ever released
 6  in an official capacity is the notice for the public
 7  hearings for the county legislative delegation.
 8       Q    That's kind of surprising to me.  You --
 9  you've never had a representative ever issued a -- what
10  I would call a press release?
11       A    No, I have not.
12       Q    Okay.  Could you ever ban somebody from
13  scheduling an appointment in one of your offices because
14  you don't like their politics?
15       A    No.
16       Q    It's kind of funny even to think about that,
17  because it's so absurd; but you -- you never -- you
18  would never do that, right?
19            MR. WILLIAMS:  Object to the form of the
20       question.
21  BY MR. LINDSTROM:
22       Q    I didn't -- I think you can answer that still.
23            MR. WILLIAMS:  Yes, you can answer.  I was
24       just stating my object.
25            THE WITNESS:  No.
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1   BY MR. LINDSTROM:
 2        Q    And why not?
 3        A    Well, because in my official capacity, I
 4   represent all of the constituents, and you have to
 5   remember as an elected official, that probably at best
 6   51 or 52 or 54 percent supported you from the beginning.
 7            So there were people that didn't support you,
 8   which means that they didn't believe in the platform
 9   that you stand on.  I find most of the time that I learn
10   more from people that don't agree with me and that
11   allows me to grow.
12        Q    Let's move on to talk about the social media
13   accounts then themselves, the -- so you have the Twitter
14   account and a Facebook account -- I -- I guess, let's --
15   let's back up.
16            You have a Twitter account called
17   chuckclemons21; is that right?
18        A    That's correct.
19        Q    And there's a Facebook page, I guess, called
20   also chuckclemons21; is that right?
21        A    That's correct.
22        Q    And you consider those both to be campaign
23   accounts or pages?
24        A    I do.
25        Q    And in addition to that, you have a personal
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1    account for Facebook; is that right?
 2         A     That's -- that's true.
 3         Q     Why -- you -- as state representative you
 4    represent House District 21, right?
 5         A     That's correct.
 6         Q     Why did you choose -- I mean, it seems like
 7    kind of a stupid question to even ask; but why did you
 8    choose chuckclemons21 as the name for your Facebook page
 9    and your Twitter account?
10         A     Well, first, I don't think your question is
11    stupid at all, it's -- it's a good question.  When I
12    decided to run for the State House District 21, not
13    being an expert on social media and not being familiar
14    with social media, my campaign consultant said, you have
15    to have a campaign Facebook page and you have to have a
16    campaign Twitter page.
17               And, you know, I followed the recommendations
18    of Brian Graham.  And -- and Brian developed both of
19    those on behalf of the campaign, probably, you know, in
20    the first part of 2016.
21         Q     So why -- 21 -- why 21 then?  I...
22         A     Well, that's the district that I was trying to
23    earn votes towards to get elected to to serve in.
24         Q     Right.  Right.
25         A     And, furthermore, the handle, which I've been
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1    taught that that's what it's called, chuckclemons had
 2    already been taken.
 3          Q    Oh, that's...
 4          A    And so my campaign consultant had to think on
 5    his feet and he just put the 21, because that was the
 6    district that we were running to win.
 7          Q    Both the page -- the Facebook page and the
 8    Twitter account -- I would like, if -- if we can going
 9    forward, I wonder if I could just call those the social
10    media accounts; does that make sense to you if we use
11    that as shorthand going forward?
12          A    Sure.
13          Q    If you're ever not clear on what I'm asking,
14    just let me know, but sometimes I think I'll say just
15    social media accounts rather than saying Twitter pag --
16    Twitter account and Facebook page.
17          A    (Nods head.)  And you're not meaning to infer
18    anything on my Chuck Clemons personal account, correct?
19          Q    Right.  Right.
20               I don't intend -- I won't intend that going
21    forward, but if you're ever confused, feel free to ask
22    me.
23               On your social media accounts, when they were
24    initially set up, is it right that -- well, let's back
25    up.
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1          Is it right that the social media accounts
 2    have, what I call, interactive spaces where anybody can
 3    post a comment?
 4        A    Yeah.  Look, I didn't set the accounts up.
 5    And I think I mentioned previously, I'm not certain what
 6    the parameters or the guidelines are for the operation
 7    of the social media accounts, and that's -- that's
 8    how -- I don't know the -- I don't know the parameters
 9    of that.
10          Social media, depending on if it's Twitter or
11    if it's Facebook, there are, I think, controls and
12    guidelines that each owner of the account can set them
13    up, monitor, adjust, amend, as they see fit for that
14    particular account.  That's all I know.  I -- I didn't
15    set the account up.
16        Q    I see.  Have you ever edited the settings?
17        A    I don't recall editing -- I don't recall
18    editing the settings.
19        Q    When the accounts were created then, you're
20    saying they were -- you're saying they were created by
21    Brian Graham?
22        A    Correct.
23        Q    And so has Brian -- is Brian Graham still your
24    -- was he your consultant until February 2020?
25        A    No.  He's not currently my consultant.  He was
```

1  my consultant -- one of the consultants in the 2016

2  campaign and then he was the primary consultant in the

3  2018 campaign.

4       Q    **Was he actually managing the accounts or did**

5  **he just set them up and then he let other people manage**

6  **them?**

7       A    He controlled the passwords.  He controlled

8  the access for others to have the passwords, until -- I

9  don't know exactly what date he turned it over to Cale

10 McCall, for this particular 2020 campaign season.

11      Q    **Did Brian ever post anything?**

12      A    I can't speak to that.

13      Q    **So now -- and so now Cale is -- has -- has**

14 **Cale ever posted anything?**

15      A    Yes.  Cale has posted.

16      Q    **I guess, with both accounts, initially when**

17 **they were first created, was anybody postings stuff**

18 **other than you?**

19      A    I'm certain -- I'm certain that -- that I was

20 not the only one who posted.

21      Q    **Who was -- who else was posting initially?**

22      A    Brian Graham.

23      Q    **Oh, okay.  I -- I thought you said you weren't**

24 **sure if he ever posted anything, but --**

25      A    What I said was -- you asked me, did I know

Charles W. Clemons, Sr.   September 22, 2020

1   that he post.  He was control.  He issued the control

2   for everyone else.  And he was the campaign consultant.

3   So he had full access to the account.

4        **Q    Do you know whether he posted stuff, though?**

5        A    Let's just say, I'll assume that he probably

6   did, he was the campaign consultant, and this was the

7   campaign account.

8        **Q    Okay.  So other than Brian, did -- did anyone**

9   **else initially post anything?**

10       A    Again, there were -- we are subject to

11  everyone who had access to be able to post.

12       **Q    Okay.  Tell me about David Allen; is it right**

13  **that -- did he start out as your legislative aide?**

14       A    No.

15       **Q    What -- what was his position when he started**

16  **out?**

17       A    Well, David Allen was a -- a friend and

18  acquaintance of my son who worked at the same place.

19  David volunteered.  He was a student at the University

20  of Florida and volunteered for many of my campaign

21  activities.

22            And as a student taking political science

23  class at the University of Florida, asked me if he -- if

24  I would sponsor him as an unpaid intern for course

25  credit through the University of Florida.

Charles W. Clemons, Sr.   September 22, 2020

1      **Q      I got it.**

2      A      So you asked me at the beginning, so, no, he

3      was a campaign volunteer first.

4      **Q      When he was a campaign volunteer, did he ever**

5      **have access to your social media accounts?**

6      A      Yes.

7      **Q      Did he ever post anything?**

8      A      You would have to ask David.  I would assume

9      that the answer would be yes.

10     **Q      When he was your intern, then, did he ever**

11     **post anything?**

12     A      I would assume the answer is yes.

13     **Q      When he was -- was he your intern for one**

14     **semester or more than a semester?**

15     A      I'm unsure.  I don't think that it was but

16     just for a -- several weeks.  It was for course credit.

17     I -- I remember I had to authorize and submit to the --

18     the House for any sort of unpaid internship, we have to

19     get approval for that.

20            So if I'm guessing, you know, if my -- if my

21     memory is correct, it'll be somewhere from maybe January

22     to the end of session or something like that.  And he

23     wasn't -- he wasn't in Tallahassee but for several days,

24     and then he volunteered in the -- one of the local

25     offices.

Charles W. Clemons, Sr.   September 22, 2020

```
 1        Q    After he was your intern, then, did he
 2   continue on in some other capacity?
 3        A    Oh, yes --
 4             MR. WILLIAMS:  Object to form.
 5             THE WITNESS:  -- absolutely.
 6   BY MR. LINDSTROM:
 7        Q    What did his capacity become after he was the
 8   intern?
 9        A    He became the campaign manager for the 2018
10   campaign.
11        Q    When did that begin -- when did he -- when
12   would you say he got that title of campaign manager for
13   the 2018 campaign?
14        A    My best recollection would be May of 2018.
15        Q    So there would have been a break; is that --
16   is that fair to say?  There would have been a break
17   between the time when he was your -- what was his title,
18   legislative intern?
19        A    It's an unpaid internship based upon a
20   sponsor.  The University of Florida was the -- was the
21   underwriter and he had to have a requisite number of
22   hours to receive college credit.
23        Q    Between his internship with your office and
24   him being campaign manager, was there a break in time at
25   all?
```

Charles W. Clemons, Sr.   September 22, 2020

1       A    I -- I don't recall.  He was, let's just say,

2   a volunteer since before he began the internship and he

3   maintained that volunteer status working for the

4   campaign until he became the campaign manager.  And

5   thus -- thus he was not unpaid, he -- he began receiving

6   remuneration for -- for that level of responsibility.

7       **Q    When he -- when he was your -- when he was**

8   **doing the internship, then, was he also -- did he also**

9   **have, like, a dual title?  Was he also still**

10  **volunteering for your campaign?**

11      A    There -- there was no dual title.

12      **Q    Was -- when he was your intern, he was just**

13  **your intern in other words and then --**

14      A    Are you asking me was he still volunteering

15  for the campaign during that time?

16      **Q    Right.**

17      A    I would assume the answer is yes.

18      **Q    Does the campaign ever stop?  I thought that**

19  **there was kind of a campaign season; are you saying that**

20  **David Allen has, like, been volunteering for your**

21  **campaign nonstop for the last four years or something**

22  **like that?**

23      A    Well --

24           MR. WILLIAMS:  Object to the form of the

25           question.

Charles W. Clemons, Sr.   September 22, 2020

```
 1            THE WITNESS:  -- is -- do my best to answer
 2       your question.  When you have two-year election
 3       cycles, it's -- for all intents and purposes, it is
 4       nonstop.
 5   BY MR. LINDSTROM:
 6       Q    There is a point where you have to file
 7   something, though, right, declaring your candidacy?
 8       A    That's correct.
 9       Q    When do you file that, do you know?
10       A    When you -- when you choose to become a
11   candidate for the next election cycle.
12       Q    So you were elected initially in November
13   2016, right?
14       A    Corre -- that's correct.
15       Q    Do -- do you know when you filed to be a
16   candidate for the 2018 election?
17       A    Yes.  January 2017.
18       Q    January 2017.
19            So between November -- I guess, you've got
20   part of November and December there where you're not
21   filed to be a candidate?
22       A    No, you are filed.  You have -- you have to
23   retire the previous campaign.  They are termination.
24   You have to file -- you have to file to terminate and
25   disperse, according to Florida statutes.  And the
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1    secretary of state maintains the auspices of making sure
 2    that that paperwork, and so there has to be a --
 3         Q    I see.
 4         A    I'm sorry?
 5         Q    I see.  Yeah.  Thanks for clarifying that.
 6              So your -- your -- the campaign actually
 7    continues after the election for a little bit?
 8         A    The campaign policy processes aren't completed
 9    until you terminate that particular campaign for that
10    cycle.  So the termination papers, I couldn't tell you
11    when they are filed, but there's a deadline, and you
12    must file the termination note, that campaign structure,
13    before the requisite deadline.
14         Q    You would have filed the termination
15    paperwork, though, before you filed the next candidacy
16    declaration paperwork, right?
17         A    I believe we did, I don't believe it's
18    required.
19         Q    There -- so there would have been a short -- a
20    short gap, I guess, maybe in December or January, right?
21         A    Well, there has to be, because you have to
22    create --
23         Q    Right.
24         A    -- a new bank account and it takes -- it can't
25    be simultaneous, because it takes time --
```

Charles W. Clemons, Sr.   September 22, 2020

1    **Q     Right.**

2        A     -- to create and go down and open a bank

3    account and get a new credit card and -- and get the new

4    mailing address and all those types of things.

5        **Q     But during that break your -- your social**

6    **media accounts are still posting stuff, right?**

7        A     Well, they are.  Yes, probably.  Because those

8    social accounts don't come under the auspicious of the

9    secretary of state, because they don't have anything to

10   do with, you know, being a state representative.

11       **Q     I wonder if we can turn to your declaration**

12   **now.  Is that one of the things you have printed out in**

13   **front of you?**

14       A     Yes.  I have three things printed out, the

15   declaration is one.  Yes.

16       **Q     Let's start with the declaration.  I think I**

17   **marked this as Exhibit 1, just for the deposition**

18   **record.**

19            **But, I guess, first of all, have you reviewed**

20   **this lately?  Did you review it before today?**

21       A     Yes.  Uh-huh.

22       **Q     Is there anything in it that's wrong now?  I**

23   **mean, is there anything that needs to be -- is**

24   **everything in here still accurate from when you signed**

25   **it before?**

Charles W. Clemons, Sr.   September 22, 2020

```
 1        A    I -- I believe it is.
 2        Q    Let's go -- I wanted to go through just a few
 3   things, then.  So in -- in No. 4, you said, only my
 4   political consultant and I have ever had login access to
 5   my Twitter account; is that -- is that -- that's not
 6   still true, though, is it?
 7        A    There -- there are several people that have
 8   access to the Twitter account based upon the political
 9   campaign itself.  And we provided, I believe, you with
10   all of the individuals who have at some time had access
11   to this -- to these two accounts.
12        Q    Right.  And, again, did David Allen have
13   access to the Twitter account?
14        A    I believe that David accessed -- gained access
15   of the Twitter account as he moved into the
16   representative campaign.  I can't tell you when, but
17   he -- I can tell you that Brian Graham provided him with
18   the requisite passwords to have access to post and
19   manage the account as the campaign saw fit.
20        Q    Do you know whether he had access to your
21   Twitter account when he was your legislative -- when he
22   was doing that internship?
23        A    Given the time frame, I would -- if I was to
24   say yes, I think I would be correct, because that was in
25   the whole time frame that he probably received the
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1   access to the account sometime early in 2018.

 2        Q    Moving to the middle of 6.  I don't really

 3   need you to find this, I just want you to know that this

 4   is where I'm -- I'm reading from.

 5             Towards the bottom of 6 you say -- you say

 6   that you don't use the Facebook page to debate issues or

 7   to provide a public forum; is that -- is that still

 8   right, you don't use the Facebook page to provide a -- a

 9   public forum?

10        A    Well, the Facebook page -- again, we're

11   talking about the campaign Facebook page and the

12   campaign Twitter page, you refer to them as the social

13   media, they were created specifically and exclusively

14   for the Chuck Clemons campaign to provide my platform

15   and my views and telling -- and sharing with people in

16   my community why they should vote for me.

17             So that was the purpose of setting up the

18   social media accounts and that's still the purpose of

19   maintaining the social media accounts.

20        Q    But there -- there is debate that occurs in

21   the comments section on your Facebook page; isn't there?

22        A    What do you mean specifically about "debate"?

23        Q    Well, not every -- not every post, but some of

24   the posts generate a number of comments, and sometimes

25   there's comments on the comments, and people are -- are
```

Charles W. Clemons, Sr.   September 22, 2020

1  sharing opinions, sometimes different opinions with each

2  other, right?

3      A    What I would say is that people post on the

4  campaign account, I -- I can agree to that.  Yes.

5      Q    You're not willing to say, though, that people

6  are sharing opinions and sometimes contrarian opinions

7  in the comment section under your posts?

8      A    I think that there's a -- a diverse set of

9  posts that are placed on the campaign account.

10     Q    And -- and that's allowed?  You allow that,

11 right?

12     A    Allow it to a certain -- to a certain level.

13 Yes.

14     Q    What -- what is the certain level?  What --

15 what's the threshold, I suppose?  When would you not

16 allow it?

17     A    Well, I wouldn't allow -- again, back to the

18 reason that it was put out on the -- in the public to

19 begin with, is to -- for me to put my views out for

20 people to see my views.  It wasn't intended to provide a

21 forum for everyone to put their views on my campaign

22 account.

23          Certainly it's a matter of personal

24 preference, because the tools that Facebook and Twitter

25 provide for you for managing your account.  But what you

Charles W. Clemons, Sr.   September 22, 2020

```
 1   asked me specifically was, what do I measure for whether
 2   or not someone is allowed to put their post on my
 3   campaign page.
 4           And that is the demeanor, whether or not it's
 5   combative, whether or not they have, in my opinion, a
 6   history of using decorum in their interaction with
 7   others on their own personal pages.  And so it's
 8   subjective and -- and -- and it's me that decides.
 9       Q    Have you articulated any rules or policies on
10   what the standard is?
11       A    No, I have not.  That's not a -- that's not
12   required to operate a -- a Facebook page.
13       Q    You -- you just use your subjective
14   decision-making on a -- kind of a case-by-case basis,
15   sounds like?
16       A    Yes.  I'm -- you know, it's my page.  And I --
17   I use the tools that the platform allows me and guides
18   me to use, and -- because it's my space, it's like my
19   front porch.  So I kind of control it based upon --
20   based upon that.
21       Q    Yeah.  And you have banned people from your
22   Facebook page or blocked people from your Twitter
23   account that exceed your standard; is that also right?
24       A    I have banned or blocked people on both of
25   those platforms.  Yes.
```

Charles W. Clemons, Sr.   September 22, 2020

1      Q    Going back to your declaration, then.  In 7

2   you said, I have not and do not utilize Twitter, dot,

3   dot, dot, or Facebook, dot, dot, dot, to engage in

4   dialogue with my constituents or to provide constituents

5   services; is that still true?

6      A    I've made this declaration purposely to

7   distinguish between official correspondence that is

8   through the My Florida House, there is come into my

9   office, to come into the capitol or sending me -- or

10  calling the official offices, those are constituent

11  provided services by the district and -- and are

12  sanctioned by the House of Representatives.  My campaign

13  Facebook page and the campaign Twitter page are

14  assuredly not constituent services platforms.

15     Q    You do communicate with people on Facebook and

16  Twitter, though?

17     A    All the time.

18     Q    And it's often people who live in your

19  district?

20     A    Yes.  I would agree, oftentimes, but not

21  exclusive to that, but yes.

22     Q    And it's often the same subject matter that

23  people might communicate with you if they called your

24  district office or -- or used -- used one of your --

25  what you say is your official means, right?

Charles W. Clemons, Sr.   September 22, 2020

1    A    Well, what I can say is, I don't have control
2  for what people ask or post on those social media
3  accounts.
4    **Q    So if somebody on your Facebook page, for**
5  **example, asked -- asked you a question about what's in a**
6  **bill, you might respond to that, right?**
7    A    I might, yes.  I might.  Depends on the
8  situation, the circumstances, it -- is it something
9  that's easy to summarily answer, yes, I'm subject to
10  doing that.  Yes.
11    **Q    Or if somebody says, is there going to be a**
12  **special session, you might respond to that?**
13    A    Perhaps.
14    **Q    Or if somebody asks about government**
15  **assistance programs, you might -- you might respond to**
16  **that?**
17    A    Perhaps.  On the campaign page we have placed
18  public announcements from agencies and such on that as a
19  public service and part of the campaign platform to get
20  information out.  Yes.
21    **Q    As a state representative, do you get -- well,**
22  **I -- for example, if you've got a -- you've posted on**
23  **the Facebook page, for example, information about -- I**
24  **call it unemployment, but it's actually called**
25  **reemployment assistance; is that right?**

Charles W. Clemons, Sr.   September 22, 2020

1      A    I'm -- I'm uncertain what specifically you're

2   speaking of.  I have posted -- not posted, but reposted

3   public announcements from agencies or state agencies or

4   federal agencies or -- what do you call the emergency

5   operation center during hurricanes and things that would

6   be of interest to supporters and people in the

7   community.

8      **Q    And when you're -- when you are reposting that**

9   **information, where do you get that information from**

10  **initially?**

11     A    It could be from a variety of places.  When I

12  reposted it, I'm taking it from some place that has

13  already put on the public domain.  So it may be

14  something that has been sent out by the Department of

15  Economic Opportunity and it hit the social media

16  airwaves.  I may capture that and repost it on my

17  campaign page as a -- as a service to people in my -- in

18  my area.

19     **Q    Do -- do people ever send you information in**

20  **your capacity as state representative that you then**

21  **repost on the Facebook page?**

22     A    I -- I don't recall, but it's very well that

23  that could be.  But when it come to my -- my -- into my

24  purview, it has already been made public, so I

25  haven't -- I'm not creating these, I am disseminating

Charles W. Clemons, Sr.   September 22, 2020

```
 1    these from some -- some source.
 2         Q    Right.  When you say "public," you mean -- you
 3    mean anything that comes into your official e-mail is a
 4    public record?
 5              MR. WILLIAMS:  Object to form.
 6              THE WITNESS:  I'm not certain -- I'm not
 7         certain.  I won't rule where I get it from, but
 8         most of the time it has been posted on someone
 9         else's site, and I'm like, that is a good piece of
10         information and I'm certain that -- that my
11         neighbors would want to -- to make sure that they
12         know where the evacuation routes are.
13              It may have come out from, you know, the
14         governor's office and they put out a press release
15         with a graphic, and I will take a picture of the
16         graphic on my iPad or phone and then I will prepare
17         it and send it out on my social media account.
18    BY MR. LINDSTROM:
19         Q    Moving on to 10, then.  In the middle of 10
20    you said that, any photos or information regarding my
21    work as a representative included on my Twitter account
22    or Facebook page were derived from publicly available
23    sources; is that still true?
24         A    Where is that on 10?  I'm sorry.
25         Q    Yeah.
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1        A    What -- what number.
 2        Q    But --
 3        A    I'm on 10.
 4        Q    Bottom of Page 6, I think it's the third
 5   sentence in Paragraph --
 6        A    I do not utilize House staff or state
 7   resources to operate.
 8        Q    Yeah.
 9        A    Any photos or information regarding my work --
10   any photos or information regarding my work as a
11   representative included on my Twitter were derived from
12   publicly avail -- yes, I believe that's correct.
13        Q    But isn't it right you've taken photos -- I
14   guess, there are -- there are images of you working,
15   like, on the House floor that don't look like they've
16   been posted anywhere else beforehand; is that a fair
17   statement?
18        A    You would have to show me --
19             MR. WILLIAMS:  Object to form.
20             THE WITNESS:  -- the photograph.
21   BY MR. LINDSTROM:
22        Q    You don't remember anybody ever taking your
23   picture on the House floor and then that getting posted
24   on your Facebook page?
25        A    You're talking about another member taking my
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1   picture?
 2        Q    I'm not sure who it would be, whether it's a
 3   selfie or whether it's anybody else; you don't remember
 4   anybody taking a picture or taking a selfie on the -- on
 5   the House floor?
 6        A    I've taking selfies on the House floors.
 7        Q    And I guess -- that's -- this isn't a gotcha
 8   or anything, I just wanted to clarify; when you take a
 9   selfie or when there's an image on the House floor -- I
10   mean, that's not an image that a member of the public
11   could capture, right?
12             I mean, I couldn't go and stand on the House
13   floor and take a picture of myself during session,
14   right?
15        A    I'm not understanding your question.
16        Q    Well, I -- I just wanted to -- that seems to
17   me like a photo that I -- I wouldn't say is derived from
18   a publicly available source.
19             When you take a picture of yourself on the
20   House floor, that's not, like, a picture I could Google
21   before you took it.  I guess, that -- that's all I'm
22   trying to clarify; are you -- when you take a selfie
23   or -- how is that a publicly available source, when you
24   take a selfie on the House floor?
25        A    As soon as I --
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1            MR. WILLIAMS:  Objection to the form of the
 2       question.  Here, let me just state my objection and
 3       then you can answer.  Just objection to the form of
 4       the question.  You may answer now.
 5            THE WITNESS:  Here is my answer, and it's the
 6       answer I've always had, it says, that were derived
 7       from publicly available sources.  I'm the one that
 8       took the picture or I asked someone to take the
 9       picture of me, it's publicly available as soon as I
10       mash send on my social media accounts, it's
11       publicly available.
12  BY MR. LINDSTROM:
13       Q    Right.  I unders --
14       A    And it was -- it was not done with -- whatever
15  it says here, not done with House staff or state
16  resources, which is also correct still.
17       Q    Right.  You've -- you've taken selfies or
18  other people have taken pictures of you on the House
19  floor during session; is that -- is that right?
20       A    Absolutely.  Correct.
21       Q    I think that there's a picture of you with
22  the -- with the gavel, were you, like, the -- were
23  you -- what's it called, you're chairing or presiding
24  over the House, who -- who holds the gavel, is that
25  person presiding?
```

Charles W. Clemons, Sr.   September 22, 2020

Page 49

```
 1        A    Yeah.  I'm not -- I'm not under --
 2             MR. WILLIAMS:  Object to the form of the
 3        question and it's a compound question and I'm not
 4        sure if it's referring to a specific image or what.
 5             THE WITNESS:  I'll do -- I'll do my best to
 6        answer.  It would help if you showed me the picture
 7        and I could give you the context.  Speaker Oliva
 8        gave several chairman gavels at a special ceremony
 9        at the end of his tenure that took up, I don't
10        know, an hour or something like that, when he gave
11        a speech and he presented each of the chairs the
12        gavel with our name on it.
13             And I -- I -- I remember vividly, I took a
14        picture of that gavel on the desk of my floor -- on
15        the desk -- on the floor that's for Chuck Clemons
16        and I'm very proud of that, and I posted that on
17        social media.  I'm very proud of that.
18   BY MR. LINDSTROM:
19        Q    I see.  That's probably what I was thinking
20   of.
21        A    Okay.
22             MR. WILLIAMS:  Mr. Lindstrom, we've been going
23        about an hour, can we take a break soon?
24             MR. LINDSTROM:  Yeah.  Let me -- can I try to
25        get through the -- the affidavit?  I think we're
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1        almost --
 2              MR. WILLIAMS:  Yeah.
 3              MR. LINDSTROM:  Maybe another 10, 15 minutes,
 4        is that okay or do you -- do you need a break now?
 5              MR. WILLIAMS:  If that's okay with
 6        Representative Clemons, you can go another 10 or
 7        15.
 8              THE WITNESS:  Yeah.  Yeah.  Ten minutes is
 9        good, if we can get through this maybe --
10              MR. LINDSTROM:  Yeah.
11              THE WITNESS:  -- I'll take a break
12        (indicating).
13   BY MR. LINDSTROM:
14        Q    Yeah.  The ga -- the gavel in other words
15   wasn't the actual House gavel, that was just a -- like a
16   token?
17        A    No, I don't think they let me touch the House
18   gavel.
19        Q    I see.
20              Okay.  I may have already asked this, though,
21   and you answered, I just want to clarify, though, to go
22   back; you've taken images of yourself while the House is
23   in session, images of you in the chamber; is that right?
24              MR. WILLIAMS:  Objection.
25              THE WITNESS:  Absolutely.  That's correct.
```

Charles W. Clemons, Sr.   September 22, 2020

1  BY MR. LINDSTROM:

2      Q    So now -- now going to 11, Paragraph 11 in the

3  affidavit -- in the declaration.

4      A    Okay.

5      Q    Do you remember -- do you still remember

6  reading Mr. Attwood's Tweet and then blocking him?

7      A    Because of this action I do remember it --

8      Q    Right.

9      A    -- specifically now.

10     Q    Right.  I think the -- the timing was that

11  there was this -- there was the vote on February 20th

12  and that was when the students from Stoneman Douglas

13  were in the gallery; do you remember that?

14     A    I remember vividly, it was a circus-like

15  atmosphere in the capitol that day.

16     Q    And then the next day, I think, is when you

17  posted a -- you posted a statement on your Facebook page

18  and your Twitter account regarding -- regarding the gun

19  -- the gun bill, regarding the bill from the day before

20  is that -- is that right?

21     A    Yes.

22     Q    When -- when did you actually read

23  Mr. Attwood's Tweet, was it -- was it on the 20th, the

24  day of the vote or was it the next day?

25     A    I don't recall the date that I read

Charles W. Clemons, Sr.   September 22, 2020

 1  Mr. Attwood's tweet.

 2      **Q     Do you know where you were when you saw his**

 3  **tweets?**

 4      A    I do not.

 5      **Q     You don't know what time or -- do you know any**

 6  **other circumstances around -- around it?**

 7      A    If you're talking about the timing of it, I

 8  have no idea.  I get hundreds of e-mails from the

 9  accounts that I have.  In that particular time horizon,

10  I think I mentioned earlier, we probably got -- "we"

11  meaning my office and my office staff, I would assume

12  the other members of the legislator received seven,

13  eight, nine thousand contacts in a very short period of

14  time.  So I can't with specificity tell you where I was

15  or what I was doing when I read this particular tweet.

16      **Q     You wrote that Mr. Attwood's -- Mr. Attwood's**

17  **feed seemed unnecessarily aggressive towards you; do you**

18  **remember what seemed aggressive?**

19      A    I'll give it to you in context, given the

20  circus-like atmosphere that went on during that very

21  heated time, when an unexpected bill that no one got a

22  notice of, even Representative Jared Moskowitz who

23  wasn't in the chamber, he was -- he was attending a

24  funeral for one of the MSD students, was not given a

25  heads up that this particular -- let me see, I'm trying

Charles W. Clemons, Sr.   September 22, 2020

```
 1   to think exactly -- it was called to suspend the rules.
 2          So the motion was to suspend the rules and
 3   bring this House bill to the floor at that particular
 4   time for discussion.  And that bill would take
 5   two-thirds majority to suspend the rules and then it
 6   would have been brought up had the two-thirds said yes.
 7          Very heated time.  There was a lot going on.
 8   The pressure.  Someone had organized probably 20 buses
 9   of -- of students from South Florida to come up, and
10   they filled the chamber, the galleries in both the House
11   and the Senate on that particular day.
12          So taking Mr. Attwood's tweet singularly,
13   singularly, on any other day probably wouldn't have had
14   the scrutiny that it did on that particular time that I
15   received it.
16          The first trigger was when he says, which is
17   highly unusual, "I am your constituent".  We receive
18   hundreds and hundreds and hundreds of correspondence,
19   most of the time when you have "I am your constituent",
20   I look at it a little bit closer.  And what I found was
21   it was a retweet of -- I th -- I can't remember her
22   name, Ms. Gonzalez, I think.
23      Q    Emma Gonzalez?
24      A    Yeah, Ms. Gonzalez.  And so okay, so I -- I
25   want to say, I don't know Mr. Attwood.  I never met
```

Charles W. Clemons, Sr.   September 22, 2020

1   Mr. Attwood.  And so, you know, the next step, no matter

2   when I was or where I was, I Googled Mr. Attwood's name.

3   I just put his name in Google and mash send.  And then

4   what -- what came up was a -- a total surprise to me,

5   would be tweets and other correspondence he's had on

6   social media that just basically surprised and shocked

7   me.

8            MR. LINDSTROM:  Jonathan, I probably made a

9       mistake, we're -- it's going to take -- I didn't --

10      I forgot that the -- the -- this incident was at

11      the end of the -- at the end -- at the end of the

12      declaration.  So I -- I probably do have more --

13      more questions about -- we can take a break if --

14      if you want to take five minutes?

15           MR. WILLIAMS:  Yeah.  Let's just take a little

16      five-minute break and then we can reconvene.  So

17      around, what, 10:17, 10:20?

18           MR. LINDSTROM:  That's fine.  See you in a

19      bit.

20           MR. WILLIAMS:  Thank you.

21       (A brief break was taken at 10:12 a.m.)

22     (The Zoom deposition was resumed at 10:18 a.m.)

23   BY MR. LINDSTROM:

24       Q    Okay.  I -- during the break, I thought it

25   would be helpful just to pull up Mr. Attwood's original

Charles W. Clemons, Sr.   September 22, 2020

1    tweet; can you -- can you see that okay?

2        A    Yes, sir.

3        Q    I'm showing you Mr. Attwood's original tweet,

4    dated February 20th, 2018, which is a retweet of Emma

5    Gonzalez, and Mr. Attwood is added, hello,

6    @chuckclemons21, I'm a constituent, please explain this

7    vote, please.   Thank you.

8            So Representative Clemons, this -- this is the

9    tweet that you remember seeing from Mr. Attwood, right?

10       A    That's correct.

11       Q    And is there anything aggressive about this

12   tweet itself?

13       A    As I explained earlier on its face, no, but

14   the doubt comes when this person sends me a tweet that

15   says, I'm a constituent, please explain your vote, and

16   then attaches what is a tweet from a -- a well-known

17   strong advocate for the positions that she holds, and I

18   wanted to know more about this person that was making

19   the inquiry on my campaign social media.

20           So I looked Mr. Attwood up, very quickly and

21   summarily putting his name in -- in the Google search

22   and mashing return.   And that's when I'm going like,

23   this is a very aggressive person.   They use social media

24   to express theirselves in a way that's not applicable or

25   it's not appropriate, according to me and the standards

Charles W. Clemons, Sr.   September 22, 2020

```
 1   that I have, for the social platforms that I have that
 2   are intended for my campaign use.
 3        Q    Do you know who Emma Gonzalez was at this
 4   time?
 5        A    Yes.
 6        Q    She's -- she's a -- she's one of the surveying
 7   students at Marjory Stoneman Douglas High School, right?
 8        A    That's how I know her is through the media.
 9   And I believe that she was in the capitol during this
10   tumultuous time.
11        Q    And she has been an outspoken -- I mean, even
12   as of this time, had -- had already become an outspoken
13   student advocating for gun regulation, right?
14        A    That's what I understand.
15        Q    And so when you received Mr. Attwood's tweet,
16   did you appreciate it like that?  I mean, did you
17   appreciate that he was wanting you to explain -- you
18   know, wanting you to respond to Ms. Gonzalez' concern
19   about the vote that had happened that day?
20        A    No.  I think I've explained, this tweet came
21   on my platform, it -- it was concerning to me.
22        Q    Uh-huh.
23        A    I investigated it very quickly by searching
24   the name of the individual that sent me this -- sent me
25   this message on my campaign platform, that's -- that's
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1   the answer.
 2        Q     So walk me through that a little bit, because
 3   this is Mr. Attwood just posting a -- a tweet, when
 4   he -- when he uses the @chuckclemons21, though, are you
 5   saying by making that link it, quote, unquote, appears
 6   on your platform?
 7        A     He sent me the tweet.  I mean, that -- that --
 8   he's tagged me.  It comes to my platform --
 9        Q     Right.
10        A     -- by putting @ -- @chuckclemons21, he's
11   directing that at my social media platform that's for my
12   campaign purposes.
13        Q     And when someone tags you in a tweet like
14   that -- so you -- you get a notification when somebody
15   tags you like that?
16        A     It's my understanding that everyone gets a
17   notification if their handle is put on someone else's
18   tweet.
19        Q     And if somebody -- if one of your followers
20   goes to your Twitter page, they can see the other public
21   comments that mentioned you; that right?
22        A     I'm sorry.  Please -- please restate that one
23   more time for me to follow, if -- if --
24        Q     When --
25        A     I'll let you talk.  What?
```

Charles W. Clemons, Sr.   September 22, 2020

1   Q    When someone tags you like this, is it right

2   that that causes the rest of the public and your

3   followers to -- to see that you have been tagged?

4   A    I think -- if I understand your question, if

5   my Twitter handle is put into someone else's tweet, it

6   is then placed on my platform as well as the person who

7   tweets its platform.

8   Q    You say it better than I can.  It's hard to --

9   it's simple technology, but it's hard to describe in

10  words what -- what happens there.  You did it better

11  than I can.  Thank you.

12        Okay.  The -- do you remember what you Googled

13  then -- what did you -- what did you Google when -- when

14  you said that you saw he was a constituent and that

15  interested you or concerned you so you Googled him; is

16  that right?

17  A    That's correct.

18  Q    What -- what -- do you remember what you

19  Googled?

20  A    I -- I do not.

21  Q    And what -- what did you find when you

22  Googled; do you remember that?

23  A    It's in the exhibits.  Yes, there were some --

24  Q    Right.

25  A    -- posts -- there was some posts that were,

Charles W. Clemons, Sr.  September 22, 2020

```
 1    based upon my standards, not acceptable for social media
 2    in my standards --
 3         Q    Right.
 4         A    -- and I was -- I was not -- not -- not
 5    pleased with the types of interaction that I've seen --
 6    that I've seen there.
 7         Q    It -- so in your declaration -- in your
 8    declaration you said the mention on Morgan Attwood's
 9    feeds seemed unnecessarily aggressive towards me, so I
10    looked up Morgan Attwood on the Internet and I noticed
11    at least one tweet from the same handle, Morgan Attwood,
12    that contained an expletive, and a substantially similar
13    image of that tweet is attached hereto as Exhibit 4.
14              I didn't -- I didn't attach in what I sent you
15    for today Exhibit 4, but I'm -- I'm sharing it on the
16    screen now (indicating).  This is what was Exhibit 4 to
17    your -- your original declaration.  So this is the tweet
18    that you initially found that was concerning to you?
19         A    That was a -- the first one that came up and,
20    of course, yes, that in -- in addition to the others
21    made me -- made me quite concerned.
22         Q    And are you saying that you found this prior
23    to the time that you banned him, you had found this
24    tweet?
25              MR. WILLIAMS:  Object to the form.
```

Charles W. Clemons, Sr.   September 22, 2020

1           THE WITNESS:  As far as I recollect, yes.
2        This was -- this was part of the decision process
3        for this -- this person to be banned from my
4        platform.
5           MR. LINDSTROM:  Jonathan, you're a stickler
6        for the banned and blocking, I -- I...
7     BY MR. LINDSTROM:
8        **Q      Representative Clemons, I -- I sometimes use**
9     **those terms interchangeably, but your counsel is**
10    **correct, the term on Twitter I think is blocked, not**
11    **banned.**
12       A    Okay.  Yeah.  I'm sorry, I use them
13    synonymously.  Let -- let me rephrase the answer, that
14    would cause me to choose -- choose -- how would I say
15    this, this caused me to make my platform not available
16    for this person's postings.
17       **Q    Right.  And I -- what -- what I wanted to**
18    **clarify, though, is that you found this tweet prior to**
19    **when you blocked Mr. Attwood; is that right?**
20       A    I can't speak factually on that, either in
21    the -- in the same time frame, I can speak to
22    definitively.
23       **Q    Did --**
24       A    It was part of the decision-making process.
25    Yes.

Charles W. Clemons, Sr.   September 22, 2020

```
 1        Q    Is this -- and are you saying you would have
 2   found this tweet on Goggle?
 3        A    Yes, I would say that.  Yes.
 4        Q    And you don't -- you don't have any idea what
 5   you searched for to find this?
 6        A    I plugged in -- plugged in the name or
 7   variations of -- of names and it didn't take but five
 8   seconds or something and it comes up.  And there's a lot
 9   more in addition to this one that made me even more
10   concerned.
11             It seems that this individual has a -- a
12   history of -- of transacting posts on his page, which he
13   has a right to and I support his right to post whatever
14   he chooses on his page.  But that -- it was a quick
15   summari -- summary judgment for me that I would not
16   allow this person to post on the pages or the platforms
17   that I had control and care of.
18             MR. WILLIAMS:  Just for purposes of the
19        transcript, would it be okay if we just read this
20        tweet into the record, so it's --
21             MR. LINDSTROM:  I mean, I can --
22             MR. WILLIAMS:  -- clear what we're talking
23        about.
24             MR. LINDSTROM:  -- make it another exhibit, if
25        you want.  I mean, it's already -- this is already
```

1    an exhibit, it's already in the filings.  But if --
2    you want to make this an exhibit, Jonathan?
3         MR. WILLIAMS:  Well, at least so -- either
4    make it an exhibit or -- or read it into the record
5    so --
6         MR. LINDSTROM:  I mean --
7         MR. WILLIAMS:  -- that it's clear what the
8    transcript is discussing.
9         MR. LINDSTROM:  Sure.  I mean, for purposes of
10   the transcript, this is Exhibit 4 to
11   representative's declaration that was filed at
12   Docket 15-1, which it says on the top there.  Is
13   that -- is that clear enough for the -- for the
14   record?
15        MR. WILLIAMS:  That's fine.  Thank you.
16   BY MR. LINDSTROM:
17        Q    Representative Attwood [sic], the -- the posts
18   from Mr. Attwood that you found exceeding your
19   standards, did any of them mention you?
20        A    No.
21        Q    Were -- were any of them connected to you in
22   any way?
23        A    No.
24        Q    And like this post, for example, is from
25   October 2017, which is, you know, several months prior

1    to when -- when you blocked him, right?

2         A    What -- your statement is correct and -- your

3    statement is completely correct.

4         Q    Okay.  So if -- okay.

5              Do you -- I think I asked it, if you knew

6    whether you had found this before you blocked

7    Mr. Attwood, and I think you weren't sure; are -- are

8    you sure about what information you had before you

9    blocked Mr. Attwood?

10        A    What I'm sure of is that I conducted the

11   search, what I'm sure of is the results of those -- that

12   search or those searches caused me to come to the

13   conclusion that this individual would not have the

14   privilege of posting on my platforms.

15             Certainly, I said previously, that I support

16   this individual's posting on his platform of whatever

17   content that he would choose or thought was in his best

18   interest, that's my decision tree and that hasn't

19   changed.

20        Q    Did Mr. Attwood's politics have anything to do

21   with it?

22        A    No, his use of pejoratives had a lot to do

23   with it.

24        Q    Pejoratives, meaning not necessarily cursing,

25   but the cursing directed at people?

Charles W. Clemons, Sr.   September 22, 2020

1      A      Counselor, he said, because he's a fucking

2    asshole, and that along with several other things that I

3    choose in my day-to-day life not to repeat, but I

4    repeated it for your -- for your purpose, those aren't

5    acceptable to me.

6      **Q      The -- the cursing you mean is not acceptable?**

7      A      Yes.  That's correct.  In the -- in the

8    totality.  It's not just one post from this individual,

9    this individual had many posts that I found

10   objectionable, which would cause me to terminate his

11   ability to post on my platform.  Again, he's free to

12   post on his platform anything that he chooses.

13     **Q      In your declaration again, you have Exhibit 4,**

14   **which I'm showing you (indicating), and then if you -- I**

15   **don't know if you still have the declaration in front of**

16   **you, but in Paragraph 12 you then go on to say, that**

17   **there are other tweets from Mr. Attwood's handle like**

18   **the ones attached in Composite Exhibit 5 that I find**

19   **offensive, and I do not want to have any association,**

20   **dot, dot, dot.**

21          **Is it right that you -- you -- is it right**

22   **that you blocked Mr. Attwood and then discovered**

23   **additional tweets by him that you found offensive?**

24     A      What's right is I found the communication that

25   Mr. Attwood utilizes offensive to me and I blocked him.

Charles W. Clemons, Sr.   September 22, 2020

```
 1        Q    Yeah, my question is a little different,
 2   though.  I -- I wanted to just clarify what the
 3   differences are between Exhibit 4 and Exhibit 5.
 4            Are Exhibit 5 the -- the tweets -- the content
 5   that you found after you had already blocked
 6   Mr. Attwood?
 7        A    I think I testified earlier that I don't
 8   recall the sequence or the timing of when the exhibits
 9   [sic] were discovered by me.  But I think I fully
10   explained that the content of what I have discovered was
11   enough for me to remove this person from my platform.
12        Q    Is it right that after you blocked Mr. Attwood
13   you continued to Google him?
14        A    Is it right?  What do you mean by is it right?
15        Q    Well, I'm not asking like morally, I'm just
16   asking is it factually correct that after you blocked
17   Mr. Attwood you continued to Google him?
18        A    I can't speak to that, but if I chose to
19   Google this individual or anyone else, that's solely my
20   right to Google anyone that I choose.  So that's what's
21   right, it's my prerogative.
22        Q    Yeah.  I'm not asking whether or not it's
23   your -- your right or anything about the morality, I
24   just want to know as a factual matter; is it -- is it
25   factually correct that after you blocked Mr. Attwood you
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1    continued to Google him and catalog the posts that you
 2    found offensive?
 3         A    If you're asking me, did I make screen shots
 4    of Mr. Attwood's posts, the answer is yes.  I've
 5    answered repeatedly, I do not remember the time sequence
 6    of when I Googled this individual or the time that I
 7    assembled those.
 8              I admit, I inquired, I Googled and I made
 9    screen shots of this before they perhaps would disappear
10    in the future, if that could occur.
11         Q    And you made those screen shots after you had
12    blocked Mr. Attwood, right?
13         A    Can't speak to -- for the third time,
14    Counselor, I can't speak to when I made the screen
15    shots.  I admit, I made the screen shots.
16         Q    Have you blocked anybody else or banned
17    anybody else from your social media pages from using --
18    I -- I think the word you used was pejorative, but -- I
19    mean, I'll say pejorative or cursing; have you blocked
20    anyone else for cursing?
21         A    Let me answer your questions maybe
22    sequentially.  You asked me have I banned or blocked
23    anyone else, yes, I have, probably several.  There are
24    probably others that have been banned or blocked by
25    other people who have had control or available to -- to
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1   do the banning or blocking.
 2            I admit, I banned or blocked Mr. Attwood.
 3   I've -- I will admit that I've banned or blocked several
 4   other people, and it may or may not be for the same
 5   reasons that Mr. -- Mr. Attwood will no longer have the
 6   use of my platform.
 7        Q    Yeah, my -- my question was a little
 8   different, though.  Have you ever banned or blocked
 9   someone because they used cursing or pejorative content?
10        A    Perhaps.  I've tried to answer your question
11   the best that I can.  There are many people that don't
12   have the use of my platform that have been banned or
13   blocked, most of those I don't remember.  So it's
14   possible.  Yes.
15        Q    It -- do you remember any users specifically
16   that -- do you know -- more than is it a possibility;
17   do -- do you have any knowledge that anybody else
18   actually was blocked or banned because they used
19   offensive pejorative or cursing speech content?
20        A    Well, to my knowledge and my memory, I've
21   banned my son from various platforms that I have for
22   using pejoratives and -- and speech that I find
23   offensive.  There's probably others, but my son's
24   probably the one that I care about the most.
25        Q    You -- you banned your son from your --
```

Charles W. Clemons, Sr.   September 22, 2020

1   which -- which page was that?

2        A    I -- I think it was one of my Facebook pages,

3   because of -- he's got the same name as I do.  And, you

4   know, I had a -- had a discussion with him and he said

5   that that was his page.  And I said, yes, sir, it's your

6   page and you have a right to do it, but I have the right

7   to not let you get onto my platform.

8        Q    This is your chuckclemons21 Facebook page?

9        A    No, I think that that was the -- I think that

10  was the other page that I have, chuckclemons.

11       Q    Your personal page?

12       A    Yes.

13       Q    Your -- your individual page?

14       A    Yes.

15       Q    Yeah.

16       A    Yes.  Because of posts that he -- he has made

17  in -- in and about topics in the community.  I believe

18  my son-in-law is probably banned from the Twitter and

19  the campaign Facebook page as well, but those -- those

20  are reasons that haven't come up.

21       Q    If -- if you were aware that someone else

22  mentioning you had used, you know, F bombs on their own

23  Twitter or Facebook pages, would you also block them or

24  ban them?

25       A    Perhaps, but perhaps not.  It depends on the

 1   situation.  It depends on the circumstance.

 2        Q    Why would not -- why would you not ban

 3   somebody else who -- or block somebody else who used --

 4   used the F word a lot?

 5        A    Again, in totality, it depends on the

 6   situation.  I would have to read -- read and -- and

 7   determine for myself.  I've got thousands of either

 8   followers or thousands of Facebook friends, I certainly

 9   don't look at everyone, I don't even look at a smidgen

10   of them.  But I do maintain the prerogative to use the

11   tools that Facebook allows me to use and to use them at

12   my discretion.

13        Q    Can -- can you remember anybody else,

14   though -- from the chuckclemons21 pages, can you

15   remember a single other person besides Mr. Attwood that

16   you have blocked for using offensive language or banned?

17        A    No.  But I can most assuredly state factually

18   that Mr. Attwood and the post that came up on

19   Mr. Attwood's behalf that he has posted publicly was the

20   most egregious that I've seen.  Not only was there

21   profanity, but descriptive of penises and other types of

22   things that it's just not going to be on my social media

23   platforms.  It's plain and simple.

24        Q    Did you block anybody else on the same day or

25   ban anybody else?

Charles W. Clemons, Sr.   September 22, 2020

1      A    I don't recall.

2      Q    **You don't recall that?**

3      A    No, sir.

4      Q    **I'm showing you what's been marked Exhibit 5**

5   **for today; can you see this (indicating)?**

6      A    You'd have to make it a little bit larger,

7   please.

8      Q    **Yeah, it's -- this is how it was produced.**

9   **Sorry.  It's -- can you see that (indicating)?**

10     A    Yes.  Yes, I can.

11     Q    **Do you recognize this?**

12     A    I've seen -- I've seen that exhibit screen

13  shot of the campaign Facebook page.

14     Q    **Right.  So this is a list, I think, of the**

15  **users that were banned from your Facebook page --**

16     A    Okay.

17     Q    **-- and the -- and the date that they were**

18  **banned.**

19     A    Okay.

20     Q    **It's -- it's two pages.  And, you know, the**

21  **first thing that I noticed is that there's one, two,**

22  **three, four, five, six, seven, eight people that were**

23  **all banned on 2/21/18, the same day that it looks like**

24  **you banned Mr. Attwood.**

25          **Do you have any idea why you would have banned**

Charles W. Clemons, Sr.   September 22, 2020

1   **eight people that day?**

2       A    Sir, I don't know if I banned those people or

3   not.  I've admitted to banning Mr. Attwood.  Those names

4   aren't familiar to me.  It's very possible that I did,

5   but those names aren't recognizable to me.  So I have no

6   recollection on the 21st of February, it's -- it's

7   possible that I did.  But it's also possible that

8   someone else who had access to the account banned those

9   as well.

10      **Q    Have you ever talked with your other -- your**

11  **other, I guess, assistants and staff, have you ever**

12  **talked with them when it would be appropriate to ban or**

13  **block somebody or what the standard is?**

14      A    Are you asking me, have I ever discussed with

15  my campaign staff the banning of anyone on the platform?

16      **Q    Yeah.**

17      A    I don't think I've had a direct conversation

18  with -- with the campaign staff about it at all.

19      **Q    You had an indirect conversation?**

20      A    I don't think I've had any conversation, but I

21  may have.  What -- what I'm saying to you today is, I've

22  admitted I am personally responsible for removing

23  Mr. Attwood, but the other names that you've mentioned

24  on the 21st, I have no recollection of banning those

25  individuals.

Charles W. Clemons, Sr.   September 22, 2020

Page 72

1      Q    Do you have any recollection of banning
2   anybody else?
3      A    On this page, yes, Mr. Mike Ridlon.  Katy
4   Davis, I know that I've -- she was a campaign manager
5   for one of my opponents.  Those are the only ones --
6   Lauren Poe is the mayor of Gainesville, endorsed my
7   opponent in -- in -- and every opponent that I've ever
8   had, he doesn't have access to my campaign platform.
9      Q    Why did you ban Mayor Poe?
10     A    Because he -- he's endorsed my opponent.  This
11  is a campaign page.  I certainly don't want the campaign
12  manager or other people who have publicly endorsed my
13  opponents to be able to place their statements on my
14  platform that's used to get my campaign message out.
15     Q    You banned the mayor because he endorsed your
16  opponent and you said you banned the campaign manager
17  for your opponent?
18     A    Absolutely.  I've explained that twice.  This
19  is my campaign page.  It's my campaign platform.  Why in
20  the world would I have people who are working for my
21  opponent on my campaign platform, that makes no sense to
22  me.
23     Q    What do you remember about Mike Ridlon?  What
24  were the circumstances there?
25     A    Just -- there's some personal things going on

Charles W. Clemons, Sr.   September 22, 2020

```
 1   in the community and I didn't -- didn't want this
 2   individual to be able to post on my account.
 3       Q    Was he -- did he post anything offensive or
 4   post anything that -- that violated your -- your
 5   standards?
 6       A    No.  But I used my prerogative to use the
 7   tools that Facebook allowed me to -- to not have this
 8   person on my campaign platform.
 9       Q    Okay.  So you -- I mean, it sounds like you
10   admit, then, that you ban people sometimes just based on
11   politics?
12       A    No, sir, that's not what I said.
13       Q    I thought that that's -- I thought that's why
14   you banned the mayor?
15       A    Counselor, that's your words.  What I said
16   was, people who have endorsed my opponent, that is
17   working hard to elect my opponent have every right to
18   post on their platforms and my opponent's official
19   campaign platforms.  Facebook gives me the right to not
20   allow those people who are working against my campaign
21   to be on my campaign account.  That's seems reasonable
22   to me.
23       Q    I -- I'm not sure why -- I mean, I'm not
24   saying -- when I say that sounds like politics, I don't
25   mean that to be pejorative, I mean, you're -- are you
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1   saying that that's not based on politics?
 2        A    I th -- what I've said is -- I've already
 3   answered that question.
 4        Q    Well, but I -- I asked if it's based on
 5   politics and I -- it sounds like you said no, so I guess
 6   I want to know why you don't think that that's based on
 7   politics?
 8             Can you -- can you answer that, why -- you
 9   banned the mayor and I -- I'd like to know why you don't
10   think that that banning was based on politics?
11        A    Sir, I've answered your question, and I've
12   answered it in depth.
13        Q    I'm not sure that you did, though, I think you
14   maybe answered another question; I -- again, why was
15   banning the mayor not based on politics?
16        A    Let me try to answer this again, perhaps
17   you'll be satisfied with the answer.  This is the Chuck
18   Clemons campaign social media platform.  Its sole
19   existence is to put forward Chuck Clemons' vision, to
20   put forward my image and to put forth Chuck Clemons'
21   view and why people should vote for Chuck Clemons.
22             I would no more invite people to have access
23   to my campaign page or post on my campaign page that
24   have publicly avowed that they would support my not
25   being elected, that they would support my direct
```

Charles W. Clemons, Sr.   September 22, 2020

1    competition for that same public office.

2            That, I don't think needs explanation to me.

3    I've utilized the tools that the platform has provided

4    for me to utilize as the owner of this account, and it's

5    as simple as that to me.

6        Q    **Now I'm showing you Exhibit 6 for today.**

7        A    Have we moved on from that question,

8    Counselor?

9        Q    **Yeah, I'll move on.**

10           **I'm showing you now Exhibit 6, this, I think,**

11   **is the blocked account from your Facebook page; does**

12   **that look right?**

13           **Sorry, Twitter page, I misspoke.**

14       A    Yeah.  I -- I would accept that that's

15   probably the blocked account from the Twitter page, from

16   the campaign Twitter page.

17       Q    **Again, it looks like it's about -- it's two**

18   **pages, and do you remember anything about the**

19   **circumstances of anybody on this list, besides**

20   **Mr. Attwood?**

21       A    Ms. Cook is the only one I remember, the

22   others, I have no recollection of.

23       Q    **Why did you block Ms. Cook?**

24       A    Well, the reason that I have recollection of

25   Ms. Cook is she's a party to this action.  Ms. Cook is

Charles W. Clemons, Sr.   September 22, 2020

1   very -- she's very outspoken.  She's a wonderful

2   advocate for her teachers union.  I think she is a -- I

3   think she's a media specialist, perhaps, I don't know,

4   she works for Alachua County School Board, hence her

5   school board connections.

6          And Ms. Cook has had a plethora of sometimes

7   controversial, at least for me, and I blocked -- I

8   blocked her outright from my Twitter.  I don't think

9   she's blocked from any other -- any of the other social

10  media accounts, but she's certainly blocked from this

11  one.  And -- and, yes, I -- I did this.

12      Q    When you say controversial, did she say any --

13  did she ever say anything offensive?

14      A    I -- I don't -- I don't know.  I don't think

15  so.  So the answer is probably, no, I don't think she's

16  used curse words or pejoratives, she just is a very

17  active participant and this is my campaign page and so

18  she's -- she's not on the campaign Twitter account.

19      Q    Why did you -- do you remember the -- the

20  specific thing that got her blocked?  I mean, was there

21  a specific tweet or something that was over the line or

22  do you remember when you blocked her and exactly why?

23      A    I don't remember the time.  I just remember

24  that she was a very good keyword warrior, is what I call

25  them, people who take extra time to spend a lot of time

Charles W. Clemons, Sr.   September 22, 2020

1   on social media to put forth whatever grievance that

2   they may have or whatever ideas that they may have, and

3   it was pretty excessive at that time.

4        Q    **What was excessive?  I mean --**

5        A    It may --

6        Q    **Did she ever --**

7        A    It may have been the number of tweets.  It may

8   have been the tenure or the tone.  I think probably

9   she -- she never used curse words, but I think she -- if

10  I recalled correctly, called me a misogynist and that I

11  perhaps indicated that I -- that I did not like women or

12  something like that.

13       It's okay for her to say that on her platform

14  all day long and I support that, I'm just not going to

15  support that sort of thing on my campaign platform.

16       Q    **I think she was blocked on the same day that**

17  **she criticized your vote for an anti-union bill, I**

18  **forgot which one, may -- maybe the -- like the**

19  **50 percent -- I think there was a bill that required**

20  **teachers unions to certify that they had 50 percent**

21  **density --**

22       A    Yeah, that's it.  That's the bill.  That's the

23  bill.  And Ms. Cook has also praised me for votes that

24  I've taken as well.

25       Q    **Well, I think that was the issue, at first she**

Charles W. Clemons, Sr.   September 22, 2020

```
 1   praised you, I think for voting against that bill, but
 2   then she found out that you actually voted for another
 3   bill that required passing of the anti-union bill, and
 4   so she -- she was accusing you of, I think, hypocrisy
 5   for voting for one but not the other, I think that was
 6   the day that she ended up being blocked.
 7        A    Well --
 8             MR. WILLIAMS:  Is that a representation you're
 9        making to him or a question, I'm just -- it's
10        unclear for the record.
11   BY MR. LINDSTROM:
12        Q    I -- I think we were -- I'm not -- I'm not
13   testifying that -- Mr. -- Representative Clemons, so
14   anything you hear from me is not -- not tes -- don't --
15   don't take it as testimony.
16             You were going to answer, though, the
17   circumstances of her blocking, I think.
18        A    Sure, I was going to provide context for that.
19   I've been supportive of issues that Ms. Cook has
20   proffered.  I have been opposed to issues or positions
21   that Ms. Cook has stood strong for.
22             To clarify, I believe what Ms. Cook may be
23   misunderstanding is, I voted against the education bill
24   that she was lobbying for me to vote against.
25        Q    Right.
```

Charles W. Clemons, Sr.   September 22, 2020

1     A     There were other members of the Alachua County

2   School Board that visited me in and around that

3   particular date of the vote.  And them, along with

4   Ms. Cook, provided me with, I guess, enough information

5   to weigh my vote in the negative, and I cast that vote

6   in the negative.

7          What Ms. Cook is confused about and what she

8   has conflated is that vote on the budget.  At no time

9   was I going to oppose the budget, and the reason for

10  that is that I'm advocate for many -- many

11  appropriations requests that I bring to Tallahassee on

12  behalf of my constituents that are in the budget.

13         So it would make no sense, to me, or I think

14  any reasonable person to think that I wouldn't vote for

15  the appropriations that I've fought really hard to keep

16  in the budget.

17         So I'm not certain of the connection between

18  the education, unless there was funding in that

19  education bill that -- that would -- funding in the

20  education bill that I voted against that they wouldn't

21  get if somehow the budget was not passed.

22         If the budget was not passed, no state workers

23  would get paid, no appropriations requests would get

24  funded, no roads would get built, so you see the point

25  that I'm trying to make.

Charles W. Clemons, Sr.   September 22, 2020

1     I voted with Ms. Cook on that education to
2  fail it, even though it passed without my vote, I was
3  one of a very few republicans, I think there were two to
4  three, maybe four of the Republican caucus that voted
5  with Ms. Cook's issues.  And then the budget was
6  overwhelmingly passed.
7     So that's the clarification that I wanted to
8  bring forth about those two issues that Ms. Cook has
9  raised.
10    **Q    I -- I think Ms. Cook's criticism, though, was**
11 **that the appropriation bill, I think, was contingent on**
12 **the anti-union bill passing, and so I think Ms. Cook was**
13 **criticizing you for that, she found that that was -- I**
14 **think she used the word hypocrisy, and I -- I think I**
15 **understand, what you're saying is, this is your campaign**
16 **page, you don't want to be associated with that kind of**
17 **criticism on your campaign page?**
18    MR. WILLIAMS:  Object to the form of the
19    question.  You can answer.
20 BY MR. LINDSTROM:
21    **Q    Is that -- is that a fair summary?**
22    A    Would you -- I'm sorry, it was very long.
23 Would you repeat the question to me?
24    **Q    I -- I think -- she was blocked on the day**
25 **that she accused you of hypocrisy, and I think I**

Charles W. Clemons, Sr.   September 22, 2020

1   understand you to be saying that, yeah, you blocked her,

2   because this is your campaign page and you don't have a

3   right to be associated with that kind of criticism on

4   your campaign page; is -- and I'm just trying to ask, is

5   that a fair summary of what happened?

6           MR. WILLIAMS:  Object to the form of the

7       question.  I think you said that he didn't have --

8       his position is that he didn't have a right to not

9       be associated with the criticisms, which I don't

10      think is what you intended to say.  That's my

11      objection.

12          THE WITNESS:  Oh.

13  BY MR. LINDSTROM:

14      Q    You can answer that question, though,

15  Representative Clemons?

16      A    I'm sorry.  With -- with the -- the hearing,

17  I'm not -- I'm not following you.  I'm confused.  And I

18  promise you I will give you an answer, if you would just

19  succinctly ask me the last question again.

20      Q    She called you a hypocrite, I think.

21      A    Okay.

22      Q    And then -- and then she was blocked --

23      A    Okay.

24      Q    -- is that right?

25      A    The way that you've explained it, that

Charles W. Clemons, Sr.   September 22, 2020

```
 1   probably is the sequence that happened.  I -- I did I --
 2   I am the one that blocked Ms. Cook on the Twitter
 3   account.  Yes.
 4        Q    Did you block her because she called you a
 5   hypocrite?
 6        A    I -- I think it was more the misogynist, more
 7   than the hypocrite, but the combination.  Yeah.
 8        Q    Okay.  Do you remember anybody else that
 9   you've blocked on the Twitter specifically?
10        A    No.  No.  It hasn't happened a lot.  The two
11   that I remember is the two that's in this action that
12   I've had to rekindle my memories of -- of the time and
13   the circumstance and the place, et cetera.
14        Q    Would it surprise you that your Twitter
15   account and your Facebook account have blocked or banned
16   people that have only mentioned your name once in a --
17   and it was -- and it was a political critique on you, it
18   was political criticism; does -- does that surprise you
19   that -- you know, if somebody, for example, mentions you
20   on Twitter just one in criticism for something that
21   you've done as a state representative that they would be
22   blocked for that or banned for that?
23        A    No.
24             MR. WILLIAMS:  Objection to the form of the
25        question.  And, again, there's a difficulty here
```

Charles W. Clemons, Sr.   September 22, 2020

1          whether you're actually making a representation
2          that's actually occurred of if you're just asking
3          him in general if that would surprise him --
4     BY MR. LINDSTROM:
5          Q    Yeah.
6               MR. WILLIAMS:  -- if it were the case.
7     BY MR. LINDSTROM:
8          Q    There's -- there's a question.  Represen --
9     did you understand the question Representative Clemons?
10         A    I did not, but I'll be happy to try to attempt
11    to answer --
12         Q    Sure.
13         A    -- if you just make it a little more concise.
14         Q    I will represent to you that I looked through
15    the banned list and was able to find in -- in many cases
16    the comment that seemed to get them banned, and in --
17    and in quite a few cases it seemed like people had only
18    mentioned you once, they'd only had one interaction with
19    your account, it was based on political critiques and
20    then they were banned.
21              And so my -- my question is, does that
22    surprise you if -- if those are the circumstances, if
23    somebody would be banned under those circumstances?
24              MR. WILLIAMS:  Objection to the form of the
25         question again.  You may answer.

Charles W. Clemons, Sr.   September 22, 2020

```
 1          THE WITNESS:  I'll -- I'll do my best to
 2     answer.  I admit that I've banned people from my
 3     campaign platforms.  I also admit that other people
 4     have access to be able to ban people on our
 5     campaign platform.
 6          You have indicated that you pointed out people
 7     that have been banned for something that you think
 8     that perhaps got them banned, I can't speak to
 9     that.
10          What I can speak to is that there are people,
11     even on the campaign platform today, like Ms. Cook
12     who is on -- and has not been banned or banished or
13     whatever or taking off of the Facebook account at
14     all.
15          There are lots of people on my platforms that
16     perhaps don't see eye-to-eye with me.  But, yes, I
17     admit that there are however many -- I've done
18     probably many of those myself, and I've utilized
19     the tools that the -- the platform has allowed me
20     to use to manage any account.  That's my answer.
21     BY MR. LINDSTROM:
22     Q    Would you -- would you ever block somebody who
23     doesn't have anything offensive, doesn't post
24     excessively, who just mentions you, say, once in a
25     political critique, would you ever ban somebody like
```

Charles W. Clemons, Sr.   September 22, 2020

1  **that or blocked someone like that?**

2       A    I've blocked for people not even that, and we

3  just talked about them.  The campaign manager or

4  director for my political opponent, hasn't said, to my

5  knowledge, things that you've expressed.  The mayor is a

6  fine individual, but he's also a super supporter of

7  every opponent that I've had.

8            They're free to make whatever statements on

9  social media that they control or that they are friends

10 with, but I kept them from being on my campaign

11 platforms.

12      **Q    Showing you what was marked Exhibit 4 now.**

13 **This looks like an e-mail from you to Andrew Caplan on**

14 **the day -- well, shortly after you banned Mr. Attwood, I**

15 **think this is maybe just after we had filed the lawsuit;**

16 **do you recognize this e-mail?**

17      A    I -- I can't read that.  If you can make it --

18 it's not clear to me at all what it says.

19      **Q    Not at all clear to me either and that was**

20 **going to be my question for you; do you remember what --**

21 **it looks like you're e-mailing Caplan -- you know,**

22 **Andrew Caplan, right?**

23      A    Yes, I do.

24      **Q    He was a reporter for the Gainesville Sun?**

25      A    Yes.

Charles W. Clemons, Sr.   September 22, 2020

```
 1        Q     He was asking you questions about the lawsuit,
 2   right?
 3        A     Yes, he was.
 4        Q     He --
 5        A     To my knowledge.
 6        Q     He did -- he ran -- he ran several stories, I
 7   think, about the lawsuit against you, right?
 8        A     Yes.
 9        Q     And so this is in -- is it right that you
10   e-mailed Mr. Caplan several times?
11        A     Yes.  Absolutely.
12        Q     And do you remember th --
13        A     I can't -- I can't -- is there a clearer
14   version of that, because I cannot see any of those words
15   that are -- that are on the screen now.
16        Q     I -- I -- I can represent that I am more
17   frustrated about that maybe than you are.  This is
18   the -- this is how the image was produced to me through
19   discovery, and I wondered if you have a clearer version
20   of this, this -- or -- or if you can explain what this
21   image was initially?
22        A     Without seeing it clear -- more clearly --
23        Q     Yeah.
24        A     I can't -- I can't make out what the words
25   are.
```

Charles W. Clemons, Sr.   September 22, 2020

Page 87

```
 1        Q    Right.  I can't either.
 2        A    I -- what I -- what I will admit, yes, I've
 3   had communications with Mr. Caplan.  Mr. Caplan called
 4   me -- as a matter fact, if my recollection is correct,
 5   Mr. Caplan called me for comment on the lawsuit before I
 6   knew that there was a lawsuit.
 7             I had not been notified of the lawsuit.  And I
 8   said, you know, I'll -- I'll let you know or I'll call
 9   you back or whatever, but you're -- you're bringing this
10   news to me now.
11             My recollection is I've spoken to Mr. Caplan,
12   I don't know, on several occasion before he left the
13   Gainesville Sun, because he would ask my -- he'd ask
14   questions of me to get statements from my side of the --
15   of the action.  So that's -- that's my interaction --
16        Q    It looks like you may have been sending
17   Mr. Caplan information about Mr. Attwood, maybe
18   information that you got online; does that sound
19   possible?
20        A    Yeah.  No, it's not just possible, I -- I sent
21   Mr. Caplan information, this may very well be the Google
22   search or whatever that -- that I uncovered.  I can't
23   validate that today, because I can't see it, it's
24   blurry.
25             But -- but I will confirm that I've had
```

Charles W. Clemons, Sr.   September 22, 2020

1   interactions with Mr. Caplan to -- he wanted to know

2   maybe why.  And so I said, well, when I searched these

3   are some of the things that came up.

4       **Q    Okay.**

5       A    And I assume that's the same search that was

6   sent to Mr. Caplan.

7       **Q    Have you ever banned or blocked anybody from**

8   **your social media pages and then removed them from being**

9   **blocked or banned?**

10      A    Probably, but I don't recollect individuals --

11  maybe.  It's certainly possible.

12      **Q    You can't remember any specific instance of**

13  **that happening?**

14      A    I don't, not off the top of my head.  No, sir.

15      **Q    Is there any -- is there any procedure or a --**

16  **there's probably not a form somewhere that you can file**

17  **to request to be unblocked, is there?**

18      A    No, sir.

19      **Q    Is there any -- do you remember anybody ever**

20  **asking you to be unbanned or unblocked?**

21      A    No, sir.  I don't recall anyone ever

22  requesting that.

23      **Q    Do you -- do you have any intention of ever**

24  **unbanning and unblocking Mr. Attwood?**

25      A    No.  I have no intention of ever unbanning or

```
 1   unblocking Mr. Attwood.
 2        Q    If he -- if he promised to clean up his act
 3   to -- to meet your standards and lived up to that for a
 4   period of time, would you consider un -- unbanning him
 5   or unblocking him?
 6        A    Of course, I believe in redemption.  Maybe --
 7   maybe Mr. Attwood and I need to have a conversation or
 8   we -- we would maybe perhaps both benefit from having a
 9   conversation.  So, yeah, that's not off the table, not
10   at all.
11        Q    On Facebook -- let me show you this.  Have you
12   ever seen this page on Facebook (indicating)?
13        A    Yes.  I've seen it, because it was -- it's in
14   the -- it's in the exhibits.
15        Q    Just -- yeah.  Just for today, though.
16   That's -- is that the first time you'd seen it?
17        A    No.  No.  I've seen other -- what do you say,
18   page settings, I've seen other things, I don't
19   understand what all of those tools will do for you to
20   manage, because I'm no expert.
21             And I was surprised, once this -- this action
22   was taken, I started looking at the settings and the
23   things that you can do to manage your pages or your
24   platforms.
25        Q    This is the -- I'm -- I'm showing you Exhibit
```

Charles W. Clemons, Sr.   September 22, 2020

1   **7 for today.  We -- my law firm has a Facebook page.  I**

2   **just wanted to ask you if you know what any of the**

3   **settings are for your page, your campaign page; do you**

4   **use the profanity filter, do you think?**

5       A    No.  I'm not familiar with these settings and

6   I don't think I've ever exercised these settings for the

7   platform.

8       **Q    The -- they are settings in here to say**

9   **whether people can post on your -- whether people can**

10  **comment on your individual posts or not, and, obviously,**

11  **that setting has been checked, because people can post**

12  **on your -- people can comment on your posts, right?**

13          MR. WILLIAMS:  Object to the form of the

14      question.

15          THE WITNESS:  I'm not certain -- I'm not

16      certain about the page settings and how they are

17      calibrated on my campaign Facebook page.  I don't

18      know.

19  BY MR. LINDSTROM:

20      **Q    Have you ever limited access to your accounts**

21  **or your individual posts in any other way besides**

22  **blan -- banning or blocking people entirely?**

23      A    I don't recall.  I've banned and I've blocked,

24  using those terms interchangeably, I've used that

25  particular tool and I've used those on occasion.  But I

Charles W. Clemons, Sr.   September 22, 2020

1   don't know of any over limitations that -- in the

2   controls that I have exercised on those platforms.

3        Q    I think Facebook allows you to set the -- set

4   the users that can actually view a specific post; do you

5   know whether any of your posts have ever been restricted

6   so that they couldn't be seen by everyone?

7        A    I do not.

8        Q    One thing I skipped over earlier, the

9   statement that you posted on February 21st, the

10  statement regarding the recent gun control debate,

11  again, February 20th was the vote, February 21st was the

12  next day, and I think February 21st was the date that

13  you banned and blocked Attwood, is that -- is that --

14  does that seem fair, accurate?

15       A    I think that's accurate.

16       Q    And the statement that you posted that on

17  February 21st, do you recall the circumstances of

18  posting that statement?

19       A    What do you mean by "circumstances"?

20       Q    Well, did -- did you -- did you post that

21  statement or did it -- was it somebody else?

22       A    No.  I think David Allen posted it.

23       Q    The time stamp on it is 1:09, at least that's

24  the last time stamp, it may have been edited multiple

25  times, but I think the -- the exhibit I'm looking at

Charles W. Clemons, Sr.   September 22, 2020

```
 1   says 1:09.

 2            You had session, I think that day at 1:30, I

 3   guess a -- a couple of questions there; how long does it

 4   take to -- for you to get from your office in the

 5   capitol to the House chamber?

 6        A    Remind me again -- because we changed offices,

 7   this is in February of 2018; is that correct?

 8        Q    Yeah.

 9        A    I was in the tower.  So it depends -- it

10   depends on the elevator, because the tower is longer to

11   get to the chamber than my most recent office.  So it --

12   it just var -- it various from, I don't know, five

13   minutes to ten minutes.  I don't -- I'm not certain.  I

14   can't say with specificity how long it takes me to get

15   from my office to the chamber.

16        Q    Would -- would David Allen have been

17   physically with you that day?  Would he have like

18   followed you around in the capitol everywhere you went?

19        A    I don't recall.  That was two and a half years

20   ago.  I don't recall where David was at the specific

21   time 1:09 or whenever, I can't -- I don't have any

22   knowledge of that.

23        Q    Did he go into the chambers with you every

24   day?

25        A    No.  Interns aren't allowed in the chamber.
```

Charles W. Clemons, Sr.   September 22, 2020

1      Q     Oh, I thought they were allowed with -- with

2   the representative, but not -- not ever?

3      A     No, not ever.

4      Q     Your -- one of your district -- does your

5   legislative person sit in the chamber with you?  Does

6   anybody sit in the chamber with you?

7      A     No, sir.

8      Q     Just you?

9      A     Yes, sir.

10      Q     Okay.  When you're in the chamber, do you

11   bring a -- a laptop?

12      A     It can happen in two ways.  Most of the time I

13   bring my own laptop, if I don't bring my own laptop,

14   Ellen Boukari brings the laptop in absence of me

15   bringing it myself.

16      Q     Do you also use -- you -- you have a

17   smartphone, I assume?

18      A     I have an -- an iPhone.

19      Q     Yeah.  You had an iPhone in 2018, right?

20      A     Yes, sir.

21      Q     When you would manage your -- I say man --

22   when you would make posts or whatever on Twitter or

23   Facebook, would you use your phone or what device would

24   you use?

25      A     Probably my phone or my iPad would be the

Charles W. Clemons, Sr.   September 22, 2020

 1    choices.
 2         Q    I didn't ask about your iPad; did you -- did
 3    you bring your iPad with you to the chamber as well?
 4         A    I bring my iPad frequently to the chamber with
 5    me as well.
 6         Q    When you're in the capitol building, is there
 7    WiFi that's secured WiFi for state representatives?
 8         A    Let me see if I can answer that.  There's a
 9    secured network that the state representatives portable
10    laptop is included on the desk in the chamber, that is
11    on a secured network.
12         Q    Yeah.
13         A    There's a pu -- there's a public WiFi
14    available to guests and others.  And I have a plan on my
15    smart devices where I pay X number of dollars a month to
16    have a direct access to high speed Internet.
17         Q    That's a -- that's your personal plan?  You
18    pay --
19         A    That's correct.
20         Q    You pay for your -- you pay for your iPad and
21    your phone to be -- to have Internet connection?
22         A    Yes, sir.  The iPad doesn't have direct, it,
23    what do you call, links to my personal cell phone,
24    whatever that's called.  The little things like this
25    (indicating), it links.

Charles W. Clemons, Sr.   September 22, 2020

1    **Q**    **Right.**

2    A    So I plug into my -- to my smartphone from the

3  iPad when I have that with me and I need Internet access

4  that's high speed.

5    **Q**    **So you don't use -- do you ever use the -- the**

6  **WiFi -- the public WiFi in the capitol --**

7    A   I'm -- I'm certain that I've used the -- the

8  public WiFi, it's available to everyone.  I'm just

9  saying that I have consistent high speed Internet no

10  mater where I am, because of the plan that I buy from, I

11  think, it's BellSouth or whichever phone -- AT&T -- AT&T

12  I think it is.

13    **Q**    **We -- we talked about taking pictures in the**

14  **chambers earlier before, but did you ever post -- did**

15  **you ever post or edit your special media accounts while**

16  **you were in the chamber?**

17    A    Yeah.  Certainly.  Of course.  I've taken

18  pictures and I've -- I've posted on my -- on my accounts

19  various times.  Yes.

20    **Q**    **Do you think you've ever posted using the**

21  **secure network?**

22    A   I couldn't speak to that.  I would be

23  surprised if -- if you told me that I did.  It would

24  surprise me, because when I am there on the secure

25  network, I'm not on Facebook.  The secured network has

Charles W. Clemons, Sr.   September 22, 2020

```
 1    the -- the House's docked portable computer.  And my
 2    social media platforms are already installed on my smart
 3    devices.
 4           And then the official one uses the agenda, the
 5    bill reviews, the -- the things that I would need to
 6    discuss or debate or understand where we are in the
 7    day's agenda.
 8        Q    Do you know a R.A. Harrison, P.A.?
 9        A    The name is not directly familiar.  Can you
10    tell me more about who they are?
11        Q    Richard A. Harrison, he's -- he's an attorney
12    in -- in Tampa, I think?
13        A    Okay.
14        Q    You -- you don't know who he is?
15        A    The name is not familiar directly.
16        Q    I -- I think you've -- you've retweeted him a
17    few times.  I think he's connected to Republican
18    somehow, I'm -- I'm not sure.  You -- you don't know who
19    he is, though?
20        A    I don't think I've ever met him, but it's
21    possible that I could have retweeted something from him.
22    Yes.
23        Q    He -- he's one of the best examples, I
24    think -- I -- I tried to kind of review people that
25    you've retweeted and allowed to mention you, and he's
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1    one of the best examples.  I think I counted something

 2    like 120 instances of the F bomb in just like a two-year

 3    period or something.

 4         He -- he calls -- he calls people F bombs

 5    almost every week, but I saw that you retweeted him,

 6    and -- does that shock you that you would have retweeted

 7    somebody who has posted such offensive materials

 8    repeatedly and...

 9         A    Well, no, not at all.

10         MR. WILLIAMS:  I'm just going to object to the

11    form of the question and lack of foundation for the

12    question, but you may answer.

13         THE WITNESS:  Yeah.  The way that you've asked

14    the question is more shocking.  I don't know

15    Mr. Harrison.  I did retweet.  I absolutely did

16    retweet.  The facts show that I retreat [sic] it

17    and I guess found favorable what he had in the

18    initial tweet.

19         The fact that I've never met Mr. Harrison,

20    would have no even inkling to research

21    Mr. Harrison.

22         But, thank you, Counselor, for bringing that

23    forward, I will look at his accounts today and if

24    it's what you say, I will summarily ban

25    Mr. Harrison from my campaign account.
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1   BY MR. LINDSTROM:
 2       Q    Well, that -- yeah.  I don't want to get
 3   anybody in trouble, but that's what I wondered, you
 4   know, if -- if I shared with you, you know, the greatest
 5   hits of people that you've -- that you've retweeted --
 6   yeah, that's what I wondered, would you -- would you be
 7   interested in -- in blocking and banning these people,
 8   if you -- if you knew -- if you knew that they were
 9   posting offensive stuff?
10       A    Perhaps.  Perhaps I would.
11       Q    Yeah.
12       A    I'm working two jobs and I have a campaign --
13       Q    Yeah.
14       A    -- and I have very little time to look up the
15   thousands of people on the Facebook or the -- the
16   Twitter, and I probably only have maybe 1,700 or
17   something that I'm following.  But I'm always open to
18   adjusting the people who have access to my account, I
19   just don't have the time to devote to that.
20       Q    When you retweet people, do you ever look at
21   their accounts to see -- you know, like look at the last
22   three posts to make sure that they're not crazy, make
23   sure that they're not like a Russian troll or something?
24       A    Well, I can't speak to -- I can't speak to
25   their state of mind.  Most of the things that I have
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1    placed on my Twitter have been retweets of some
 2    particular kind.  I have colleagues that are on Twitter
 3    all the time and what I'm here to share with you and
 4    everyone, I'm not on Twitter all the time and I don't --
 5        Q    Yeah.
 6        A    -- devote a lot of time for that -- for that
 7    social media.  But thank you for bringing that
 8    Mr. Harrison to my attention.
 9        Q    I have a Twitter account too, I don't -- I
10    don't think I've posted in several years.  I -- I -- I
11    noticed that you do mostly retweets, which I appreciate
12    too, that means you're not spending copious amounts of
13    time co -- but I -- but I still wondered.
14             I mean, when you -- when you retweet, do you
15    do any -- do you do any checking to make sure that
16    you're -- you're retweeting something that's not
17    offensive?
18        A    No.  I don't spend a lot of time on Twitter at
19    all, but if there is a phrase or a position or a --
20    something that, you know, strikes me as -- that I want
21    to mash to retweet button, I summarily choose that
22    option and I retweet it.
23             And Mr. Harrison is a great example, whatever
24    he said that particular day -- and you might can show
25    me, but whatever he said I felt compelled that I
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1    retweeted it.
 2        Q    I wanted to go through your responses to the
 3    admissions, and for the things that you didn't admit, I
 4    wanted to ask you about each of those.
 5             MR. LINDSTROM:  If anybody wanted to take
 6        another break, though, this would be a good
 7        opportunity -- you want to take five minutes or so?
 8             THE WITNESS:  That -- that would be great.
 9             MR. WILLIAMS:  I've been having a lot of
10        coffee, so...
11             THE WITNESS:  Yes.  Thank you.  Five minutes,
12        I'll be right back.  Yes, sir.  Thank you.
13          (A brief break was taken at 11:27 a.m.)
14      (The Zoom deposition was resumed at 11:33 a.m.)
15             MR. LINDSTROM:  Back on the record then.
16             MR. WILLIAMS:  I'm ready.
17    BY MR. LINDSTROM:
18        Q    Representative Clemons, do you have the
19    defendant's responses and objections to plaintiff's
20    first set of request for admissions in front of you?
21        A    (Indicating.)  Yes, sir.
22        Q    Yeah.  Okay.  It's a mouth full.  It's Exhibit
23    2 for today.  I just wanted to go through and for the
24    things that weren't just admitted, I want to clarify why
25    they were denied.
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1            The first one, admit that you have the ability
 2    to control whether public comments and interaction is
 3    permitted on your accounts.  Not sure why -- do -- do
 4    you admit that or do you -- do you deny that for some
 5    reason and if so why --
 6        A    Well --
 7            MR. WILLIAMS:  Objection briefly, that the
 8        response speaks for itself, but you can ask him
 9        about it.
10    BY MR. LINDSTROM:
11        Q    Yeah.
12        A    I -- I stand by the response that we -- we've
13    submitted.  I think the term control or public could be
14    subject to interpretation.  So we -- we answered it as
15    truthfully and as directly as we could.
16        Q    Isn't it right that you have the ability to
17    control whether public comment is allowed on your social
18    media accounts, though?
19            MR. WILLIAMS:  Just object to the form of the
20        question.
21            THE WITNESS:  I think perhaps the confusion,
22        at least for me, with -- with these terms is, I'm
23        not an expert on the social media platforms or all
24        of the various ability that you have to customize
25        it.
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1            What I am certain of is that what I have done
 2       is ban or block people on these platforms, based
 3       upon the particular address or the handle or
 4       whatever account that they've used.
 5            There are other ways to be on someone's
 6       platform or see what someone posts on -- on there.
 7       So I stand by the response that we submitted.
 8  BY MR. LINDSTROM:
 9       Q    You're not aware that on -- on Facebook you
10  can -- you can have a Facebook page that doesn't allow
11  any public -- that doesn't allow any commenting?
12       A    No.  I wasn't aware of that.
13       Q    Are you aware of that now?
14       A    Well --
15            MR. WILLIAMS:  I'm just going to object to the
16       lack of foundation.
17            THE WITNESS:  You have shared with me things
18       with this that I was not aware of before today.
19       Correct.
20  BY MR. LINDSTROM:
21       Q    So you are aware, as of today, that you don't
22  have to allow comments on your posting?
23            MR. WILLIAMS:  Just object to the lack of
24       foundation, again, I -- it's not correct.
25            MR. LINDSTROM:  Well, it's a question, that's
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1        why I'm asking a question.
 2             MR. WILLIAMS:  Well, you're phrasing it as
 3        awareness, which makes it sound like you're
 4        representing that it's correct, and I'm objecting
 5        to that.
 6             MR. LINDSTROM:  It's a speaking objection.
 7        I -- you can just -- if you have an objection,
 8        state it, you don't need to interrupt with -- with
 9        all of the -- with all of the speaking.
10             Are you -- I mean, are you telling the witness
11        not to answer the question?
12             MR. WILLIAMS:  He's welcome to answer the
13        question, I'm making the nature of my objection
14        clear to you, because you seemed to think it was
15        not a proper objection.  And he's welcome to --
16             MR. LINDSTROM:  All right.
17             MR. WILLIAMS:  -- an -- answer the questions.
18        So that's -- I'm done, and he's welcome to answer.
19   BY MR. LINDSTROM:
20        Q    Okay.  Did you -- did you understand the
21   question, Representative Clemons?
22        A    No.  I didn't understand it at all.
23        Q    Are you aware as of today, now, that you could
24   choose not to allow comments on your Facebook page?
25             MR. WILLIAMS:  Objection to the form.
```

```
 1              THE WITNESS:  I'm -- allegedly.  I -- I'm not
 2         certain of that fact.  You're -- you're posing a
 3         situation that I am not aware of and I don't know
 4         it to be true and correct.
 5    BY MR. LINDSTROM:
 6         Q    No. 7, admit that a user who is blocked from
 7    your Facebook page cannot comment on your page or
 8    individual posts; why did you deny that?
 9         A    Well, the way that I understand it, it's
10    plain.  You said in your question, "a user," a user is
11    defined as what?  There are people who have accounts,
12    accounts are blocked, handles are blocked --
13         Q    Okay.
14         A    -- users -- users are not blocked.
15         Q    Okay.
16         A    A user could have multiple accounts.  So we
17    denied that, because it's not factually correct, because
18    we're not blocking users, we're blocking accounts.
19         Q    I got it.  So with Mr. Attwood -- Mr. Attwood
20    has his personal page, I'm not -- I'm not even sure what
21    his handle is on Facebook, but he has a personal user
22    page on Facebook, and you've blocked his -- you've
23    blocked that account; but what you're saying is
24    Mr. Attwood could create another account and access
25    your -- your Facebook page?
```

```
 1        A    That's what I'm saying.
 2             MR. WILLIAMS:  Object to the form of the
 3        question.
 4             THE WITNESS:  That's what I'm saying.
 5        Correct.
 6   BY MR. LINDSTROM:
 7        Q    But you -- you admit that you have blocked
 8   Mr. Attwood's account, or one of his accounts, and that
 9   as a result of that he cannot comment on your page or
10   individual posts?
11             MR. WILLIAMS:  Object to the form of the
12        question.
13             THE WITNESS:  I admit I blocked Mr. Attwood's
14        account and all of the ramifications that that --
15        that allows.
16   BY MR. LINDSTROM:
17        Q    And is it the same issue then with No. 11,
18   admit that a -- admit that a user who is blocked from
19   your Twitter account cannot view your timeline; if -- if
20   we had said admit that an account that is blocked can't
21   view your timeline, that would be -- you would have
22   admitted to that?
23        A    That would be more clear.  The -- the term
24   user to me is ambiguous.  A user can have a dozen
25   accounts, can have a hundred accounts.
```

```
 1        Q      Right.
 2        A      But -- but that you're not defining it as
 3   user, you're defining it as the accounts that we have
 4   blocked, specific accounts.
 5        Q      And, again, the idea is that person isn't
 6   blocked, because they could just create another account?
 7        A      That's the way I understand it.
 8        Q      But if a person didn't want to create another
 9   account, and if they -- and if they only had one
10   account, then that person would be blocked from your --
11   from your timeline, correct?
12        A      That's correct.
13               MR. WILLIAMS:  Object to form.
14   BY MR. LINDSTROM:
15        Q      And the same on Facebook, if a person didn't
16   want to create another account and they only had one
17   account on Facebook and you banned that account, that
18   person would be banned from your -- from your Facebook
19   page?
20        A      That's correct.
21               MR. WILLIAMS:  Object to form.
22   BY MR. LINDSTROM:
23        Q      Thirteen, admit that you haven't published or
24   otherwise communicated to your followers any rules or
25   policies governing public comment and interaction with
```

Charles W. Clemons, Sr.   September 22, 2020

1   **your social media accounts; why did you deny that?**

2       A    Well, I don't know that I have not, but I

3   don't think that I have.  So I'm not the only person

4   that has access to this account.  There's David Allen,

5   there's Brian Graham, my wife, now Courtney Anderson,

6   Cale McCall, to my knowledge, we haven't, but it wasn't

7   something that I could answer definitively and -- and

8   put this into the record.

9       **Q    Understood.  So to your knowledge, there**

10  **haven't been any rules or policies governing public**

11  **comment and interaction announced?**

12      A    I would -- I would say that, yes, that

13  would -- I can affirm, to my knowledge, yes.

14      **Q    No. 15, admit that you do not have a practice**

15  **of reviewing the social media postings of every user who**

16  **comments or interacts with your page.**

17          **You said you didn't know what practice means,**

18  **I -- I guess I would ask you just to use your common**

19  **understanding or however you want to define practice --**

20  **I mean, do you do that or don't you do that?**

21      A    What I can ans --

22          MR. WILLIAMS:  Object to the form.

23          THE WITNESS:  What I can answer is, I -- when

24      I choose to research users who have handles or

25      names that post things on my account, I maintain

Charles W. Clemons, Sr.   September 22, 2020

```
 1        the prerogative that I can look them up if I
 2        choose.  I do not make it -- it's not usual or
 3        reasonable or customary, because I don't have time
 4        to spend on the social platforms.
 5              But should something peek my interest or
 6        something give me pause, I would certainly
 7        undertake that choice to -- to do that.  So I'll
 8        stand with the answer that it's -- it's not my
 9        practice.
10   BY MR. LINDSTROM:
11        Q     Admit that -- No. 19 now.
12        A     Okay.
13        Q     Admit that plaintiff's comments on Twitter on
14   February 20th, dot, dot, dot, was not aggressive.  You
15   said you don't know what the word aggressive means,
16   but -- I mean, again, could you just use the ordinary
17   meaning of that term and respond?
18        A     Well, I think I responded earlier to a
19   question in taking out of context, it -- it seems to be
20   benign, those other factors that I brought into the
21   answer earlier, that beginning the post with, I am your
22   constituent, causes a yellow flag to go up for me,
23   because it is a campaign account not an official way to
24   transact any sort of answers.
25              But the second thing was Ms. Gonzalez and --
```

Charles W. Clemons, Sr.   September 22, 2020

1   because of the level of her involvement in the highly

2   charged environment that -- that was occurring during

3   that time, it was a very pensive time, when you have

4   colleagues who've had employees physically attacked or

5   you've had other colleagues whose children were

6   threatened during this time, it was very pensive.

7            So taking that in totality, after I looked at

8   the aggressive way that this individual interacts on

9   social media, yeah, I -- I stand by my previous answers.

10      **Q    You think Ms. -- did you think that the**

11  **content that Mr. Attwood was retweeting from -- from**

12  **Ms. Gonzalez, did you think that her post was -- was**

13  **aggressive?**

14      A    No.  As I previously stated, taking

15  singularly, the answer would be no, taking in context of

16  the totality of all of those factors and the quite hot

17  issue that was occurring, not only at the capitol, but

18  in every mainstream media across the state and sometimes

19  nation, yes, it was a very volatile time.

20      **Q    Okay.  Twenty-one, admit the plaintiff's**

21  **comment on the Twitter on February 20th, 2018, dot, dot,**

22  **dot, related to the performance of your official duties**

23  **as a state representative.  I don't -- I don't even**

24  **understand your response; can -- can you explain whether**

25  **you admit or deny that?**

Charles W. Clemons, Sr.   September 22, 2020

1      A    I don't -- I stand by my response, the written

2    response.  Unable to admit or deny the request, because

3    of I do not know what the plaintiff intended by the

4    comment.  The comment does not unambiguously reference

5    my actions.

6          **Q    It says, please explain your vote, isn't that**

7    **obviously related to --**

8                MR. WILLIAMS:  Object to form, misstates the

9          tweet.

10   BY MR. LINDSTROM:

11         **Q    Well, within the tweet he says, please explain**

12   **this vote; was it -- did you not understand that that**

13   **referred to your vote on the House floor?**

14         A    Well, what I understand is the situation that

15   was occurring during that time, because this is

16   something that is not entertained on a regular basis,

17   not saying it's never been any sort of inquiry, but it

18   was not usual or reasonable or customary to entertain

19   these types of questions on the campaign social media

20   platforms.

21         **Q    I'm not asking you to identify what**

22   **Mr. Attwood was intending, but I would like to know what**

23   **you thought you were being asked when -- when the tweet**

24   **says, please explain this vote; what did you think --**

25   **what did you think that "this vote" referred to?**

Charles W. Clemons, Sr.   September 22, 2020

1      A    Well, that -- that would be just speculating
2  at this time, two and a half years after that occurred.
3      Q    **You had --**
4      A    It's facts that I banned the gentleman, and
5  I've repeatedly explained multiple reasons why that has
6  occurred.
7      **Q    You have no idea what "this vote" means in the**
8  **context of the timing and with Emma Gonzalez' tweet and**
9  **your understanding that you said earlier that Emma**
10 **Gonzalez may have been in the gallery during a vote, and**
11 **we were talking about a vote earlier.**
12     A    I said all of those --
13          MR. WILLIAMS:  Objection to the form of the
14     question.
15          THE WITNESS:  Yeah.  I said all of those
16     things.  I guess what I -- I'm trying to convey
17     in -- in many different ways is that I am not going
18     to entertain this type of interaction on a platform
19     that it wasn't designed for.
20 BY MR. LINDSTROM:
21     **Q    I'm not asking anything about that.  I'm not**
22 **asking about whether you have to entertain it or -- or**
23 **anything about that, all I'm asking is, what did you**
24 **understand "this vote" to mean when Mr. Attwood**
25 **included, quote, "this vote," unquote, in his tweet;**

Charles W. Clemons, Sr.   September 22, 2020

1    **what did you understand that to mean?**

2         A    I'm -- again, I'm sorry, you must think I'm

3    not understanding, and that's the truth, I'm not

4    understanding what you're asking me.

5         **Q    Were you -- were you doing any other voting at**

6    **that time that would have been public knowledge, other**

7    **than voting in your capacity as a state representative?**

8         A    I'm not certain what was going on at that

9    particular time.  If you're asking me, do I have any

10   doubt of the -- perhaps the topic that was being

11   inquired about, no, I -- I didn't have -- I don't have

12   any doubt as to perhaps what was being inquired about.

13   If that was your question, the answer is, no, I had no

14   doubt, probably, what this inquiry was concerning.

15        **Q    And what was your understanding of what --**

16   **what the tweet was concerning?**

17        A    Well, my belief is this tweet would be

18   concerning about the circus-like spectacle that happened

19   either the day before or sometime near there, where an

20   unscheduled political stunt was pulled, it was pulled

21   off successfully, it was extremely media worthy with the

22   10 or 20 buses of young people that filled the capitol,

23   and then the minority leader at the end of the session

24   stands up to be recognized.

25              And this particular suspension of the rules

1   was proffered and it was not even well known among the

2   Democratic Caucus with the -- I think I mentioned

3   previously, Representative Jared Moskowitz who

4   represents the Marjory Stoneman Douglas High School was

5   not even on the floor.

6           And I think he took -- I think he took to the

7   public to chastise his colleagues and called it, in

8   fact, a political stunt.

9           So I believe what your question is, and -- and

10  I'll try to be specific in answering it, the question

11  was, why did I perhaps vote against suspending the

12  rules.

13      **Q    And all of that had to do with your official**

14  **duties as a state representative, right?**

15      A    Well, the -- the -- you don't get to vote on

16  the floor of the House unless you're a state

17  representative.

18      **Q    Right.  So Mr. Attwood was asking you about**

19  **your duties as a state representative, right?**

20      A    I -- yes.  Certainly.  You know, because

21  that's how you get to vote.  And -- and I've repeatedly

22  said that that wasn't the place to carry on that

23  conversation, and I stand firm in that belief.

24      **Q    Thank you.**

25          **Twenty-four, I think is a variation maybe of**

1   something we've already talked about.  I think maybe we

2   talked about Facebook earlier, and now we're asking

3   about Twitter.

4           Admit that plaintiff has never posted any

5   content linked to your Twitter account that violates any

6   rules or policies governing public comment or

7   interaction with your social media accounts.  If -- If I

8   change that to admit that you're not aware of plaintiff

9   posting any content, dot, dot, dot; does that -- does

10  that fix it?  Are you able to admit that?

11      A    Let -- let me have a moment to read completory

12  Request 24.  (Peruses documents.)

13          And -- and how -- how did you want to alter

14  the question?

15      Q    I guess, I would insert admit that you're not

16  aware of plaintiff having posted content linked to your

17  Twitter account that violates, dot, dot, dot?

18      A    Yeah.  Yeah.  That -- that would come closer

19  to something that I would feel comfortable answering,

20  because I'm not aware.

21      Q    Comes closer, but you're not aware of that,

22  period, right?

23      A    I'm not aware.  But I'm also not an expert on

24  the applicable rules or policies and I don't have, as I

25  mentioned before, the time to study those rules or

Charles W. Clemons, Sr.   September 22, 2020

1    policies nor the time to police everyone who posts on my
2    platforms.
3         Q    Same question then in -- in 27, admit the
4    plaintiff has never posted any content on Facebook -- on
5    your Facebook page in violation of policies, if I change
6    that to admit that you're not aware of plaintiff having
7    ever posted any content on your Facebook page in
8    violations of policies; would that be -- would that be
9    fair to admit that?
10        A    I don't know that it's fair, I think it would
11   be correct.  I'm not aware of the plaintiff posting
12   anything on my platforms other than the Twitter.
13        Q    That's what I was going to ask, we're not
14   aware of the plaintiff ever posting anything, much less
15   anything that was offensive, but -- but anything on your
16   Facebook page ever, right?
17        A    Not to my knowledge.  I don't think I've ever
18   seen a post with his name on it, on that account.
19        Q    Thirty-seven, admit that your social media
20   account names include the number 21 because that is the
21   House district that you represent.  You're -- you're not
22   disputing that 21 is your House district, but it -- are
23   you saying that the 21 means that's the House district
24   that you were going to represent and that you are
25   campaigning to represent; is that -- is that your -- is

Charles W. Clemons, Sr.   September 22, 2020

1    **that the issue with not admitting that -- that one?**

2         A     Yes.  Because in -- in the request it says,

3    because that's the House district.  So looking at your

4    words and taking them on their face, that wasn't the

5    reason that they were named, they were named because

6    that's what we were running for, because these accounts

7    were set up ten months before the election occurred.

8         **Q     Yeah.**

9         A     So they weren't set up because that's the

10   House district.

11        **Q     But you've now been elected for a while and**

12   **you continue to use the 21, right?**

13        A     I do.  It's continued to serve me as a

14   campaign platform, including lots of paid advertisements

15   and campaign videos and other personal endorsements and

16   those types of things on that platform.

17        **Q     What's the -- what are you -- you get four**

18   **terms as a representative; is that what the term limits**

19   **are?**

20        A     You get four terms in -- in Florida, eight

21   years is the maximum that you can serve in an office.

22        **Q     If you are, you know, privileged enough to get**

23   **reelected into your fourth term, do you think you'll**

24   **continue the -- the chuckclemons21 accounts?**

25        A     Well --

Charles W. Clemons, Sr.   September 22, 2020

```
 1              MR. WILLIAMS:  Objection to form.
 2              THE WITNESS:  -- I'm currently running --
 3         running for my third term.
 4    BY MR. LINDSTROM:
 5         Q     Yeah.
 6         A     We have no plans to abandon the social media
 7    platforms that we've constructed until such time that
 8    either I -- I don't get elected or my terms are
 9    completed.
10         Q     Forty-one and 42, I -- I think we already
11    talked about, I was a little confused about why you
12    couldn't answer those, though.  You -- you've admitted,
13    I think, today already that you've -- you've -- for 41,
14    you admit that you've posted to your social media
15    accounts from inside the House chamber, right?
16         A     I posted --
17         Q     While the House -- while the House was in
18    session?
19         A     I have posted various maybe tweets or retweets
20    or Facebook posts on the -- on the accounts that I
21    control --
22         Q     And --
23         A     -- from just -- from just about everywhere.
24         Q     And from 4 -- for 42, admit that you have
25    posted to the social media accounts from your office in
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1    the capitol while the House was in session; you admit
 2    that too, right?
 3         A    Well, from my office while the House is in
 4    session, do you mean --
 5         Q    Oh.
 6         A    -- literally while it's in session or do you
 7    mean while the session is underway?  Because the House
 8    is in session for six weeks.
 9         Q    Yeah.  That's --
10         A    I'm sorry.
11         Q    That's always confused me, the word session.
12    The -- is session used in two different ways?  Does it
13    refer to the -- both the -- the time -- the date range,
14    is that one way or saying session, but it also can refer
15    to the actual hours that the -- that you -- you are
16    gaveled in for -- for --
17         A    Yes, sir.  I -- I think that you're -- you're
18    right, there -- there's confusion.  Session is announced
19    and by the, I think, contusion it's 60 days a year, but
20    just because we're in session doesn't mean that the
21    session is underway.
22         Q    Right.  Right.
23         A    The -- the session has the days declared and
24    then we get a -- we get an agenda of when -- it's called
25    floor time, floor time --
```

Charles W. Clemons, Sr.   September 22, 2020

1    **Q     Yeah.**

2    A     -- and then that's when the -- the speaking or

3    the president of the senate gavels you in or gavels the

4    adjourned for that day.

5    **Q     I wasn't accusing you of missing a vote or**

6    **anything, but you -- you admit that you've posted to**

7    **social media from your office in the capitol while the**

8    **House was in session just during these 60 days, not**

9    **necessarily during a floor time?**

10   A     Yes.

11   **Q     Forty-five, I think you answered and then**

12   **amended -- I got your amendment, I just wondered why --**

13   **why you -- you know, so there was a time when, prior to**

14   **this lawsuit, your Facebook page at least was titled**

15   **State Representative Chuck Clemons District 21; is**

16   **that -- is that correct?**

17   A     That's what I understood.

18   **Q     And I think shortly after this lawsuit was**

19   **filed that title was changed, I'm not sure what it is**

20   **today, is it just -- is it just Chuck Clemons or -- it**

21   **was changed somehow?**

22   A     I think when you say title, that's -- that's

23   where -- that's where the -- the words matter.

24   You're -- you're talking about the banner area or you're

25   talking about what's called -- I'm no expert, it's

Charles W. Clemons, Sr.   September 22, 2020

Page 120

1  called the -- there's a -- there's a name for it and

2  it's not title.

3       Q    Yeah.

4       A    That -- that is interchangeable.  That has

5  changed a variety of times in the four and a half years

6  that we have had this account.  And all of those are

7  documented on the administration page.

8       Q    Why was -- why was it changed from State

9  Represent Chuck Clemons District 21 to something else?

10      A    I don't know.

11      Q    Did it have anything to do with this lawsuit?

12      A    Yeah, possibly.  I don't know.  I personally

13 have never exercised any posting or removing of the face

14 page -- it's not the face page.  I wish I could remember

15 the name of it.  But I've never altered the content of

16 that first page of the campaign site.

17      Q    Have you ever talked with anybody about that?

18      A    I don't recall.  It very well could.

19      Q    You don't remember any specific instances,

20 though, of talking about --

21      A    I -- I don't recall.  It -- it may be called

22 the landing page.  I'm not certain of the -- of the --

23 but that has changed frequently.  Yes.

24      Q    This is -- this is, I think, how it used to

25 look, it said, State Representative Chuck Clemons

Charles W. Clemons, Sr.   September 22, 2020

1   District 21 on the left side underneath your picture

2   (indicating).

3        A    Okay.

4        Q    And I think -- as I'm looking at it today on

5   the Internet, I think it just says Chuck Clemons now.

6        A    Well, if you look in the middle, if you'd take

7   your cursor to the middle of the banner -- it's called

8   the banner page, it says for --

9        Q    Yeah.

10       A    -- state representative.  But -- but that has

11   changed -- that has changed a dozen different times or

12   more over the course of the life of this platform.

13   We've had pictures of the springs.  We've had pictures

14   of agricultural fields.  We've had a lot of different

15   things that have been presented on the banner page.

16            And, again, I've never -- I've never altered

17   or change anything that has appeared on the -- on the

18   banner page.

19       Q    The -- the -- back when it still said, State

20   Representative Chuck Clemons District 21, it looks like

21   there's an image of you in the House chamber during

22   floor time, it looks like; is that -- is that right?

23       A    That's correct.

24       Q    Who -- who would have taken -- would it -- is

25   that another representative that would have taken a

Charles W. Clemons, Sr.   September 22, 2020

```
 1   picture of you?
 2        A    I don't think so.  I think that was taken and
 3   placed as a public image on the myfloridahouse.gov
 4   website.
 5        Q    Who would have taken the picture?
 6        A    Whomever takes pictures on the floor of the
 7   House of Representatives.
 8        Q    Okay.
 9        A    I'm sorry?
10        Q    There's like an official, like, House
11   photographer?
12        A    There's probably several House photographers.
13   That was -- that was placed on the -- the state's
14   website for the public to observe.  And there's a whole
15   gallery of photographs that have been taken with me in
16   some -- in some situation on the floor of the House.
17             MR. WILLIAMS:  Just for the record, could you
18        identify -- I think that was -- the image you were
19        looking at was marked as an exhibit.
20             MR. LINDSTROM:  I -- you know, I couldn't
21        actually -- that was just an image on my computer.
22        I think we filed that in connection with the motion
23        for preliminary injection.  I could -- does it
24        matter?  I don't -- I wasn't intending to use it as
25        an exhibit, just -- just for purpose of that
```

Charles W. Clemons, Sr.   September 22, 2020

1      conversation, I thought it was helpful to show.

2           But do you really want that to be recorded for

3      posterity?

4           MR. WILLIAMS:  I just -- I don't need you to

5      mark it as an exhibit, I'll just tell you, if you

6      don't mind, I believe that it was marked as Exhibit

7      3 to your preliminary injection motion previously.

8           I just wanted to be clear what I was looking

9      at, that's all.

10          MR. LINDSTROM:  Yeah.  You're right, Exhibit 3

11     to preliminary injection.

12          MR. WILLIAMS:  Thank you.

13 BY MR. LINDSTROM:

14     **Q    Okay.  No. 50 now, admit that you've used the**

15 **social medial accounts to issue public statements in**

16 **your capacity as a state representative.  The statement**

17 **that you published on February 21st, regarding gun**

18 **control, why -- why do you think that wasn't a statement**

19 **in your capacity as a state representative?**

20     A    Well, I think that it was not a statement in

21 my capacity as a state representative, because I didn't

22 issue it as a press release.  Nowhere on this

23 information did it have the state seal, did it come from

24 my offices in the capitol or in -- in the district.

25          It was placed by -- by me or by David at my

1    request on the social media platforms, because I had

2    supporters, I had campaign team members, I had neighbors

3    that were calling me saying, what is going on in

4    Tallahassee?  You know, it seems like it's in -- in an

5    uproar.  What exactly happened?  So I tried to be as

6    concise as I could, and I didn't send out a press

7    release on that.

8         **Q    Did you post the statements anywhere else**

9    **besides Twitter and Facebook?**

10        A    I don't recall posting them anywhere, other

11   than on those two accounts.

12        **Q    There -- most of the rest of the admissions,**

13   **then, start asking about kind of isn't it true that**

14   **you've posted this kind of stuff, specific content on**

15   **your pages, and I think you -- you admitted to basically**

16   **everything that we asked, that, yeah, you've posted**

17   **that.**

18             **So, for example, you admit that you've used**

19   **social media to post executive orders issued by the**

20   **governor?**

21        A    What number is that, sir?

22        **Q    Fif -- fifty-one, just, for example, now.**

23        A    Yes.  I have reposted many things that have

24   come from a variety of sources.  And I do recall

25   executive orders that -- that have hit the Internet

Charles W. Clemons, Sr.   September 22, 2020

Page 125

```
 1   waves, I've captured.
 2            If it came in on one of my platforms, I've
 3   reposted it.  If it came in on another source, I perhaps
 4   took a screen shot and edited it and then put it on
 5   my -- my -- my platforms.  So, yes, absolutely.
 6        Q    For 5 -- for 51, but then all of this kind of
 7   stuff -- do you have a way of communicating this stuff
 8   directly to constituents in your capacity as a state
 9   representative?
10        A    Well, if I chose, I could do a newsletter,
11   which I don't choose to do.  If I chose, I could, like
12   some of my colleagues, do a press release on anything
13   that -- that they wanted to do that, I have chosen in
14   my -- in my two terms not to do that.
15        Q    So, you know, starting at -- you know, for
16   example 51, you didn't share that executive order with
17   your -- in any other way besides your Facebook page and
18   the Twitter account, right?
19        A    I don't -- I don't think so.
20        Q    And for, you know, 52, the information from
21   the Florida Department of Economic Opportunity, you
22   didn't share that with the constituents other than
23   through Facebook and Twitter, right?
24        A    To my recoll --
25            MR. WILLIAMS:  Object to form.
```

```
 1              THE WITNESS:  To my recollection, I don't
 2        think I did.
 3   BY MR. LINDSTROM:
 4        Q    And 53, information from the Florida
 5   Reemployment Assistance Program, same question, just --
 6   just through Facebook and Twitter, right?
 7              MR. WILLIAMS:  Object to form.
 8              THE WITNESS:  I -- I think that we changed 53,
 9        because you put in the question, official guidance,
10        what we were doing was reposting things from
11        agencies, it was not coming from me in an official
12        way.
13              I was reposting things that were factual based
14        upon whatever the situation that that particular
15        author or -- or expert -- not expert, say, the
16        source of that information, I was reposting that.
17   BY MR. LINDSTROM:
18        Q    Understood.
19        A    Okay.
20        Q    My question, though, is, you didn't -- you
21   didn't share that with constituents outside of Facebook
22   or Twitter, right?
23        A    I --
24        Q    And --
25        A    I don't recall.  No.  I -- I don't recall.  I
```

1    don't issue -- I don't issue press releases.  The only

2    ones that I've issued, I think, has been for the public

3    meetings.

4         **Q    Fif -- fifty-four, the Coronavirus Food**

5    **Assistant Program, did you share that with constituents**

6    **other than through Facebook page or Twitter account?**

7         A    I believe I only shared it on my reelection

8    platforms.

9         **Q    Fifty-five then, admit that you have used the**

10   **social media accounts to host events in which you**

11   **participate in your capacity as a state representative.**

12   **You have used the Facebook page and, I think, you linked**

13   **from the Twitter account too, in between March and June**

14   **maybe, didn't you host several visual town halls?**

15        A    Yes.  Yes, I did.

16        **Q    And on the announcements for that, isn't --**

17   **isn't it right that you referred to yourself or you were**

18   **referred to as, quote, representative or State**

19   **Representative Chuck Clemons?**

20        A    Yes.  That's correct.  When -- when I got

21   elected in November of 2016, as a result of that, there

22   comes a title --

23        **Q    Yeah.**

24        A    -- and until -- until I'm not elected, people

25   refer me -- refer to me as that.  The campaign held

1    three public -- what do you call it, whatever the word,

2    anyone could -- anyone could sign up, but it was paid

3    for and sponsored by the Chuck Clemons for State

4    Representative Campaign.

5         **Q    One of the town halls you spoke with other**

6    **elected leaders, right?**

7         A    I believe -- yes, on several of them.  I think

8    I had Dr. Ralph Massullo a state representative from

9    Central Florida.  One of the only two, I believe,

10   medical doctors in the House, and he spoke to his

11   knowledge.

12              I've had perhaps sheriff of Gilchrist County

13   spoke to the criminal justice part.  I've had several

14   guests.  And we had three -- I don't know the number,

15   but we've had an economist.  We've had a variety of

16   guests on those -- on those town hall meetings.

17        **Q    You did a town hall with -- with local city**

18   **county leaders, right, with mayors, sheriffs, something**

19   **like that?**

20        A    We had a variety of -- of local people on one

21   of them and then we've had some people that had

22   statewide -- statewide information on -- on some of them

23   as well.

24        **Q    Those events were providing important**

25   **information to people in House District 21, right?**

Charles W. Clemons, Sr.   September 22, 2020

1      A    Those events were open to the public and

2   anyone could participate.  And we had people participate

3   inside District 21 and we had participants outside

4   District 21.  I did it to -- I did it to get information

5   to -- to people that I would want to support me.

6      Q    **And you used the Facebook page Cluck Clemons**

7   **21 Facebook page to actually host Facebook events for**

8   **those visual town halls, right?**

9      A    That's correct.

10     Q    **I guess kind of skipping ahead, 58, same**

11  **questions as before, you posted information from the**

12  **Florida Department of Education about COVID-19 and you**

13  **only posted that on Fa -- on your Facebook page and**

14  **Twitter account, not -- you didn't share that with**

15  **constituents any other way, right?**

16     A    I've -- I've -- I've repeatedly said that I

17  haven't sent out any information on official letterhead

18  to make announcements.

19     Q    **Same question for 59, you posted information**

20  **from the CDC about COVID-19 on Facebook and Twitter, but**

21  **you haven't sent that out to constituents in any other**

22  **way, right?**

23     A    That's correct.

24     Q    **Same question on 60, you posted information**

25  **for the Department of Revenue about sales tax holiday,**

Charles W. Clemons, Sr.   September 22, 2020

1   **Facebook and Twitter, you didn't share that with**

2   **constituents in any other way, right?**

3        A    That's correct.  Well, I'm sorry, let me back

4   up, some of these have been reposted on my personal

5   Facebook account.

6        **Q    Okay.**

7        A    So I'll amend -- I'll amend my question [sic],

8   there's been no official state representative letterhead

9   or public official announcement from the state

10  representative's office, I have -- on several of these

11  that you have mentioned, they've also been posted on my

12  personal Facebook page.

13       **Q    Is Mr. Attwood banned from your personal page?**

14       A    Yes, he is.  Maybe when we sit down and -- and

15  discuss some things those -- those -- those restrictions

16  may be lifted.

17       **Q    No. 61, is it right that you've shared**

18  **information about unsafe weather conditions in House**

19  **District 21 on Facebook and on your Twitter page and you**

20  **haven't communicated that in any other way to**

21  **constituents?**

22       A    Again, the answer is, yes, I have reposted

23  national weather service, hurricane information, river

24  flooding, bridge closings, anything that I would deem

25  timely, I have placed on -- on these platforms.  And --

Charles W. Clemons, Sr.   September 22, 2020

```
 1   and others could have posted as well.  Many of these I
 2   recognize that I have done the reposting of them.
 3            To give you -- give you an example of my
 4   answer, on No. 59, and I'll turn it so that you can see
 5   it (indicating).
 6       Q    Yeah.  Oh, you printed out in color, that's
 7   fancier than I did.
 8       A    Well, I just -- this was your exhibits --
 9       Q    Yeah.  Yeah.
10       A    -- but I wanted to make known for you and
11   others that that Disaster Preparedness Tax Holiday was
12   composed by Cale McCall, my social media director, he
13   actually composed that himself, that was not a reprint.
14       Q    Okay.
15       A    Anything -- anything that's exhibited that
16   would be in a gold or a -- a blue and gold, that is
17   branding to disseminate information using the campaign
18   colors, fonts and other types of things.
19       Q    I see.
20            Sixty-three then, this is kind of interesting
21   you -- you've posted on your Facebook page, Chuck
22   Clemons 21, a link to a -- what's called District 21
23   COVID-19 Survey; is that right?
24       A    That's correct.
25       Q    And then if you take the survey --
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1        A    I -- I did not take the survey.
 2        Q    Oh, I've taken it a couple of times.
 3        A    Okay.  I haven't taken it.
 4        Q    I -- I hope that is okay, I hope -- I hope I'm
 5   not skewing -- or something.  I am -- well, I guess --
 6             MR. WILLIAMS:  Is that improper communication
 7        with a represented party, I don't know.
 8             MR. LINDSTROM:  Yeah.  I wonder.  Sorry.
 9             MR. WILLIAMS:  I'm kidding.  I'm kidding.
10             THE WITNESS:  No.
11   BY MR. LINDSTROM:
12        Q    The -- the sur -- it's a -- it's a nice
13   survey.  I mean, it's the kind of survey I would -- I
14   would hope my -- I -- I'm not in 21, I live in the Duck
15   Pond, it's the kind of survey that I wish my state
16   representative was asking me.  It's -- it's asking --
17   it's asking about concerns that your constituents might
18   have, really concerns during a -- during a time of
19   crisis, right?
20        A    I haven't taken the survey.  I haven't even
21   looked at the survey.  This was created by my campaign
22   team, and they're a very good team, and they wanted to
23   basically take -- take inventory of the things that, you
24   know, people in the community were thinking about,
25   worrying about, fretting about.  And -- and I applaud
```

1  them for that.  And thank you for taking the survey.  I
2  think when I get finished today I'm probably going to
3  get on there, if it's still up and see what -- see what
4  it asks.

5       Q    Yeah, it is.  I -- I just looked at it again
6  yesterday.  It -- it asks about whether people need any
7  particular assistance, you -- and you can check --
8  there's check boxes.  Check boxes for unemployment, food
9  benefits, housing, rent, mental, health services, public
10 safety, veterans administration, small business,
11 education resources for distant learnings.  Those are
12 services that I'm sure your constituents need right now
13 and have a lot of questions about.

14           What I wondered is, when somebody fills out
15 that survey, do they get -- does your campaign route
16 those people back to your legislative side to get them
17 service?

18      A    I don't think so.  I don't think there's a
19 connection there.  And I don't know the answer
20 specifically to your question.  I don't think I've seen
21 a compilation of the District 21 COVID-19 survey.  I'll
22 find out about that.

23           But, no, I haven't taken the survey.  This was
24 placed on here.  I wasn't -- I wasn't responsible for it
25 being placed, I'm happy it was placed there.  And I'll

Charles W. Clemons, Sr.   September 22, 2020

Page 134

1    find out what we did with the information.

2         **Q     There's an e-mail referenced on the survey too**

3    **that I hadn't seen before, it's rep.clemons21@gmail; is**

4    **that a campaign e-mail?**

5         A     I think so.

6         **Q     Do you ever use that e-mail yourself?**

7         A     I do not.

8         **Q     And same question then, you posted information**

9    **on your Facebook page about the 2020 census, you haven't**

10   **communicated that to constituents in any way other than**

11   **your social media accounts, right?**

12        A     Uh-uh.  Uh-uh.  No.  That's correct.

13        **Q     The -- do people -- on Facebook and Twitter,**

14   **people can send you direct messages; is -- is that**

15   **correct?**

16        A     I believe that is a -- a function.  I'm not

17   recalling direct messages -- are you talking about like

18   when they DM you, direct message on messaging?  Because

19   I know on the personal account, people can have a -- a

20   text or like an e-mail exchange on the personal account,

21   I'm not certain about the campaign account.  And I'm

22   certain that I've never entertained anything on the

23   Twitter.  I don't know there's a way -- is there a

24   way that -- I'm unaware.

25        **Q     Yeah.  I'm also not -- now that you say**

Charles W. Clemons, Sr.   September 22, 2020

```
 1    that -- I mean, I know you can direct message Facebook
 2    accounts, but I guess I didn't -- I guess I don't know
 3    whether you can message a page, I assume that you can;
 4    but you don't have any knowledge about that?
 5         A    Well, I -- I don't know of it's direct
 6    messaging, I think people post on that page, they ask
 7    questions on that page.  And I -- and you've spanned my
 8    memory, there have been times when people post or they
 9    ask questions on the page, and campaign team has
10    responded to maybe -- whatever the question or referred
11    them to perhaps where they could get the answer.
12         Q    Twitter I know you can direct message people,
13    but you don't -- you don't have any knowledge of
14    messaging people on Twitter like that?
15         A    No, sir.  I wouldn't know how to do that.  And
16    I'm not interested in that.
17         Q    Okay.  Last thing then, the -- well, let me --
18    let me go back through my exhibits to make sure too.
19    One is your affidavit, two are the admissions, three are
20    the interrogatories, we didn't talk about those, I'll
21    just skip those.
22              Four was the e-mail with the Gainesville Sun,
23    five and six are the blocked accounts, seven was my own
24    Facebook page setting.
25              Oh, I forgot, I didn't show you earlier, but
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1    that guy Harrison -- I -- I did include some snippets
 2    from him if you want to -- I -- I included -- you've
 3    retweeted him, and then I think I -- I gave you the two
 4    F bombs that were, like, within a day or several days of
 5    your retweet for you to see there, that's Exhibit 8, 9
 6    and 10.
 7              And then what I wanted to show you last is --
 8    I -- I guess we can mark this as -- as Exhibit 11, I can
 9    send -- Lisa, I can send you a copy of this.
10              This -- Representative Clemons, I received
11    this yesterday it's Bates Stamped 67, 68, 69 and 70,
12    and, Representative Clemons, I wanted to ask about
13    this -- maybe we just talked about it, though, these
14    look like -- well, do you know what -- have -- have you
15    ever seen this, Representative Clemons, do you know
16    anything about these communications?
17         A    I have seen these.  Yes.
18         Q    I -- I thought that these were direct
19    communications with you, but were these -- were these
20    posts?
21         A    These were on the -- from what I understand,
22    they're on the -- the campaign Facebook page.
23         Q    I see.
24         A    The way I understand it is, when people pause
25    a question that gets into the official category, then
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1  perhaps those people have been directed to the telephone
 2  number or the -- even the e-mail address or address
 3  where that answers could be received.
 4       Q    I see.  So -- so this would appear -- these
 5  are still publicly available, I guess, then as -- if you
 6  read through all the comments on the page, these --
 7  these would show up on the page so anybody could see
 8  them?
 9       A    I would -- I assume, yes.  I don't think
10  they've been taken down.  And I think they would be in
11  the thread from where -- from where they originated.
12       Q    Well, that shows you, I thought I did a lot of
13  research, but I haven't read every single comment for
14  four years or so.
15       A    Yeah.  Nei -- neither have I, because we have
16  people that -- that manage that on a day-to-day basis.
17       Q    These --
18            MR. WILLIAMS:  I'd be happy to provide you
19       more information about these -- these documents as
20       well outside of the deposition, but you're welcome
21       to ask him.
22            MR. LINDSTROM:  Well, I think that -- that
23       clarified it for me.  I thought that these were
24       like direct communications that I was going to --
25       you know, that's why, Jonathan, I asked you for the
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1        other direct communications, but if -- if these are
 2        all publicly accessible, I don't think I have
 3        any -- any more --
 4   BY MR. LINDSTROM:
 5        Q    I guess -- I -- Representative Clemons, do you
 6   know whether you have ever posted anything like these
 7   yourself?
 8        A    I know that I have not posted anything like
 9   those myself.
10        Q    These postings -- I guess, there's like, what,
11   four of them, right, these are instances where a
12   constituent or somebody has posted a question, and your
13   account has responded by saying, you should contact
14   our -- our legislative team, here's the phone number;
15   is -- is that basically what each of those are -- are
16   saying?
17        A    I believe that's exactly what they say.
18        Q    And you're saying none of these were posted by
19   you?
20        A    That -- I'm saying that none of these were
21   posted by me.
22        Q    And you've never posted anything like this
23   yourself?
24        A    Not to my knowledge.
25        Q    Have you had any conversations with your team
```

1   about whether to post something like this or how to post

2   something like this?

3        A    Certainly, at different times when we talk

4   about the website, my team understands that they're not

5   legislative in nature and that -- that we don't handle

6   legislative affairs.  If the people have things that

7   need to be handled by either Ellen Boukari, because it's

8   a legislative, or either in the district office, then

9   that's where that referral would need to go.

10       Q    What I was wondering, based on the timing, it

11  seems like this is a more recent thing, have -- have you

12  had -- have you had conversations with your campaign

13  team, you know, this summer, recently, this year, to try

14  to maintain the distinction between the campaign and the

15  legislative team?

16       A    Certainly there's been interaction about

17  maintaining that divide.  I don't recall when that

18  conversation or perhaps if it was several conversations

19  have occurred.  I've got a really good campaign team and

20  they're -- they need very little direction.

21       Q    Other than David Allen, did -- have the other

22  two full-time -- your district person and your

23  legislative person, your state employees, did they have

24  anything to do with your social media?

25       A    No, sir.

Charles W. Clemons, Sr.   September 22, 2020

```
 1              MR. WILLIAMS:  Object to form.
 2   BY MR. LINDSTROM:
 3       Q    Have they ever helped you craft a post or
 4   suggested a post or anything?
 5       A    I don't think they ever have helped me to post
 6   anything on the platforms.  They don't have access to
 7   either of the platforms.
 8       Q    Do they have access to your personal e-mail?
 9       A    My -- no.  No.  They do not have access to my
10   personal e-mail.
11       Q    And they don't have access to either the --
12   either the Twitter page or the Facebook page?
13       A    That's correct.
14       Q    I mean, I guess I -- why don't you have a --
15   why don't you have a newsletter?  Why -- why don't you
16   have a way of communicating with your constituents
17   using -- using the Internet?
18       A    Several colleagues have those types of things,
19   we've chosen from the beginning not to have that type of
20   activity.  There's a protocol in the House, and it's a
21   time horizon, where you must submit in advance and you
22   go through these iterations and -- and get approval at
23   different stages, and it's just -- it seems cumbersome
24   to us.
25              And so since 2016, when I got elected and
```

Charles W. Clemons, Sr.   September 22, 2020

```
 1   assembled my team, we decided not to go that route, we
 2   consciously chose not to go that route.
 3       Q    Say that again, newsletters have to be
 4   approved through some process?
 5       A    Yes.
 6       Q    What's the -- and what's the -- what is the
 7   process, just generally, who has to approve what?
 8       A    The speaker's office approves all content.
 9       Q    Anything that you send out by e-mail or on
10   paper, any sort of a constituent announcement has to be
11   approved by the speaker's office?
12       A    I can't speak to what you've asked, what I can
13   say is, newsletters have to be preapproved to content
14   before they could be distributed to the public.  To
15   further clarify, e-mails, corresponding with your
16   constituents, are not a part of that approval process.
17       Q    Yeah.  I guess what I was saying is like a
18   mass e-mail, though?
19       A    I've never inquired about a mass e-mail.
20       Q    What --
21       A    I would assume -- I would assume -- well, I
22   can't assume anything.
23       Q    And is that requirement like -- is that a
24   party thing?  Is that just the republicans have to get
25   it approved by the speaker or is that -- is that
```

Charles W. Clemons, Sr.   September 22, 2020

1  everybody?

2       A    I'm -- I'm not certain as to what the

3  validation is.  I've just been noticed, since I was

4  elected, that any newsletters themselves all of the

5  contents must be vetted by the speaker's office.  And I

6  don't know if that's 120 members or if that's the -- the

7  Republican majority or what.

8            They did say the speaker's office, they didn't

9  say send it to the majority office, they said, send the

10 content to the speaker's office.

11      Q    Are you aware that some of your colleagues

12 operate social media accounts in their official

13 capacity?

14      A    I can't speak to how --

15           MR. WILLIAMS:  Object to form.

16           THE WITNESS:  -- others operate theirs.

17 BY MR. LINDSTROM:

18      Q    Have you had any -- you haven't had any

19 conversations with anybody about operating a social

20 media account in their official capacity with your

21 colleagues?

22      A    I -- you ask me about the way others operate

23 theirs, I can't speak -- I can't speak without

24 speculating, and I won't speculate how others operate

25 their social media accounts.

1      Q    I -- I asked about your conversations.  Have
2   you talked with other people about -- about operating
3   their accounts in their official capacity?
4      A    I don't recall.
5      Q    Is -- I mean, you're aware that other
6   representatives do like you used to do, they title their
7   accounts, you know, State Representative John Doe,
8   right?  You -- are you aware that other state
9   representatives title their accounts like that?
10      A    I --
11           MR. WILLIAMS:  Object to form.
12           THE WITNESS:  I -- I'm not aware.
13   BY MR. LINDSTROM:
14      Q    Do you know whether -- have you had any other
15   conversations with your colleagues about whether --
16   whether other representatives ban and block people?
17      A    I don't have any recollection of any
18   conversation.  Perhaps I have, but none -- none comes to
19   my memory.
20      Q    One -- one thing I didn't -- I don't think I
21   asked earlier, but in -- in addition to banning and
22   blocking, have you ever deleted comments from your
23   Facebook page?
24      A    You mean like mute comments, delete comments.
25   I'm -- I'm not understanding, because there's different

Charles W. Clemons, Sr.   September 22, 2020

1    terms for managing --

2        **Q      Are there -- yeah, there are, aren't there?**

3    **Have you ever done anything like that, have you ever**

4    **muted a comment or outright deleted it?**

5        A      Yeah, I probably muted a comment.  Yeah.  I

6    don't -- I don't think -- you can't delete -- you can't

7    delete comments -- it's my understanding, you can't

8    delete comments off of a campaign Facebook page, that

9    platform, comments cannot be deleted, they can only be

10   muted.

11       **Q      That prevents other users from seeing the**

12   **comments?**

13       A      That prevents other users from seeing them on

14   your platform, they are still seen and recognizable and

15   ability to communicate on any other platform.

16           MR. LINDSTROM:  Okay.  I don't think I have

17       any more questions.  I appreciate your time.

18           MR. WILLIAMS:  I may have a few, let me just

19       take a quick break and look at my -- my notes.

20           THE WITNESS:  Do you --

21           MR. WILLIAMS:  Can we take five minutes?

22           THE WITNESS:  Okay.  Five minutes is good.

23           MR. LINDSTROM:  Yeah.

24           THE WITNESS:  Thank you.

25           (A brief break was taken at 12:43 p.m.)

Charles W. Clemons, Sr.   September 22, 2020

```
 1        (The Zoom deposition was resumed at 12:48 p.m.)
 2             MR. WILLIAMS:  I'm ready to go back on, if
 3        everybody else is?
 4             MR. LINDSTROM:  Yeah.
 5             MR. WILLIAMS:  Ms. Trombly, you ready to go?
 6             THE COURT REPORTER:  Yes, I am.
 7             MR. WILLIAMS:  Okay.
 8                       CROSS-EXAMINATION
 9   BY MR. WILLIAMS:
10        Q    Representative Clemons, just a few questions
11   for you.
12             You've been asked today a variety of questions
13   about the specifics of how Facebook and Twitter work and
14   specific questions, for example, about, you know, what a
15   user can or cannot do on Facebook; do you remember being
16   asked questions on that general topic?
17        A    Yes.
18        Q    Do you consider yourself a -- an expert in how
19   Twitter and Facebook work?
20        A    No, sir.
21        Q    Do you employ somebody on your campaign team
22   to have that expertise?
23        A    Yes, sir.  I do rely on Cale McCall and
24   previously David Allen and before that Brian Graham to
25   guide and direct me, because I'm -- not only am I not an
```

Charles W. Clemons, Sr.   September 22, 2020

1   expert, I'm not really hardly a novice.  And I learned

2   some things today through this dep -- deposition that I

3   need to go back and take a look at.

4        **Q    So if you had a question just day-to-day about**

5   **how social media worked now, would you ask Cale McCall**

6   **about that --**

7        A    Yes.  Yes, sir.  That -- that would be the

8   first -- that would be the first call I -- I would go.

9   And then secondly, I'd go to my 11-year-old grandson,

10  because he probably knows more about the social media

11  functions than -- than his grandfather does.

12       **Q    And if -- if you were to read Facebook or**

13  **Twitter materials or terms of service that contradicted**

14  **anything you said in your deposition today, you -- you**

15  **would defer to what the official Twitter and Facebook**

16  **materials say about how those plat -- platforms work,**

17  **right?**

18       A    Yes, sir.  I would rely on the controls or the

19  settings, if -- it that's what you call them, that the

20  platforms have to manage -- manage the account.  I -- I

21  don't know how all the settings work, don't even know

22  that -- you know, that we have employed some of the

23  settings.

24            But I would rely on the people that I trust

25  in -- that's on the campaign team to guide and direct us

Charles W. Clemons, Sr.   September 22, 2020

```
 1   in -- in any matter that might come up regarding the
 2   platforms.
 3           MR. WILLIAMS:  I don't have any further
 4      questions.
 5           MR. LINDSTROM:  Call it a day?
 6           MR. WILLIAMS:  Yeah.  We'd like to read and
 7      sign.
 8           THE COURT REPORTER:  Okay.
 9           MR. LINDSTROM:  Thanks everybody.
10           MR. WILLIAMS:  Thank you.  Have a good
11      afternoon.
12        (Plaintiff's Exhibit No. 11 was marked for
13                    identification.)
14              (Signature was RESERVED.)
15      (The Zoom deposition was concluded at 12:53 p.m.)
16
17
18
19
20
21
22
23
24
25
```

```
 1                      CERTIFICATE OF OATH

 2

 3    STATE OF FLORIDA )

 4    COUNTY OF VOLUSIA  )

 5

 6

 7           I, Lisa M. Trombly, Professional Court

 8    Reporter, Notary Public, State of Florida, certify that

 9    CHARLES W. CLEMONS, SR., personally appeared before me

10    via Zoom on this 22nd day of September, 2020, and was

11    duly sworn via Zoom by stipulation of all counsel.

12

13           Signed this 5th day of October, 2020.

14

15

16

17    _____
      Lisa M. Trombly
      Professional Court Reporter

18
      Notary Public - State of Florida
19    Commission No.:  GG 102916
      Expires:  June 5, 2021

20

21

22

23

24

25
```

Charles W. Clemons, Sr.   September 22, 2020

1                    CERTIFICATE OF REPORTER

2

   STATE OF FLORIDA )
3
   COUNTY OF VOLUSIA  )
4

5           I, Lisa M. Trombly, Professional Court

6   Reporter, do hereby certify that I was authorized to and

7   did stenographically report the Zoom deposition of

8   CHARLES W. CLEMONS, SR.; that a review of the transcript

9   was requested; and that the foregoing transcript, pages

10  5 through 147, is a true record of my stenographic notes

11  to the best of my ability.

12

13          I FURTHER CERTIFY that I am not a relative,

14  employee, or attorney, or counsel of any of the parties,

15  nor am I a relative or employee of any of the parties'

16  attorney or counsel connected with the action, nor am I

17  financially interested in the action.

18

19          DATED this 5th day of October, 2020.

20

21

22  Lisa M. Trombly
    Professional Court Reporter
23

24

25

Charles W. Clemons, Sr.   September 22, 2020

```
 1                  LGT Reporting Company
                     Post Office Box 1154
 2              New Smyrna Beach, Florida 32170
                        (407) 442-0223
 3
     October 5, 2020
 4
     Jonathan L. Williams, Esquire
 5   Lash & Goldberg, LLP
     100 Southeast Second Street, Suite 1200
 6   Miami, Florida 33131
 7   RE:  Peter Morgan Attwood v. Charles W. Clemons, Sr.
 8   Dear Mr. Williams:
 9        This letter is to advise you that Charles W.
     Clemons, Sr.'s Zoom deposition taken in the above-styled
10   cause on September 22, 2020, has been transcribed.
     Along with your copy of the transcript, we are
11   forwarding to you the original Errata Page for
     execution.
12
          Once reading and signing has been completed, please
13   make a copy of the Errata for your records and return
     the originals to us at the address listed above.
14
          It is suggested that the review of this transcript
15   be completed within 30 days of your receipt of this
     letter, as considered reasonable under Federal Rules*;
16   however, there is no Florida Statute to this regard.
17   Sincerely,
18   Lisa Trombly,
     Professional Court Reporter
19
     cc:  Eric Lindstrom, Esquire
20
     Waiver:
21
     I, _____, hereby waive the reading and
22   signing of my Zoom deposition transcript.
23   _____    _____
     Deponent Signature               Date
24
     *Federal Civil Procedure Rule 30(e)/Florida Civil
25   Procedure Rule 1.310(e)
```

1              E R R A T A   S H E E T

2    DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES ON THIS SHEET

3    IN RE:   PETER MORGAN ATTWOOD V. CHARLES W. CLEMONS, SR.

4    Zoom Deposition of:  CHARLES W. CLEMONS, SR.

5    Taken on:   September 22, 2020

6    _____

7    PAGE NO.  LINE NO.        CHANGE              REASON

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   Under penalties of perjury, I declare that I have read
     the foregoing document and that the facts stated in it
21   are true and correct, subject to any changes in form or
     substance entered here.

22

23   _____        _____

24     DATE                 CHARLES W. CLEMONS, SR.

25

*Attwood v. Clemons*, Case No. 1:18-cv-00038-MW-GRJ (N.D. Fla.)

**ERRATA SHEET TO DEPOSITION TRANSCRIPT OF
DEFENDANT CHARLES W. CLEMONS, SR.**

| Page/Line | Original text | Corrected text | Reason |
|---|---|---|---|
| 23:11 | council | counsel | transcription error |
| 35:25 | disperse | disburse | transcription error |
| 47:6 | floors | floor | transcription error |
| 52:12 | legislator | Legislature | transcription error |
| 56:6 | surveying | surviving | transcription error |
| 76:24 | keyword warrior | keyboard warrior | transcription error |
| 84:13 | taking off | taken off | transcription error |
| 92:12 | various | varies | transcription error |
| 114:11 | completory | completely | transcription error |
| 127:12 | perhaps sheriff | perhaps the sheriff | missing word |
| 128:13 | spo e to | speak to | transcription error |
| 141:6 | The speaker's office approves all content. | The Office of the Majority Leader approves newsletters from members of the majority party and the Office of the Minority Leader approves newsletters from members of the minority party. | substantive correction |
| 142:2-10 | I'm -- I'm not certain as to what the validation is. . . . They did say the speaker's office, they didn't say send it to the majority office, they said, send it to the speaker's office. | The Office of the Majority Leader approves newsletters from members of the majority party and the Office of the Minority Leader approves newsletters from members of the minority party. | substantive correction |

Dated: November 4, 2020

By:

*Charles W. Clemons Sr.*

Charles W. Clemons, Sr.