# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### GAINESVILLE DIVISION

**PETER MORGAN ATTWOOD,**

     *Plaintiff*,

v.                                     **Case No.: 1:18cv38-MW/MJF**

**CHARLES W. "CHUCK" CLEMONS, SR.,**
**in his official capacity as Florida State**
**Representative and in his individual capacity,**

     *Defendant*.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

This is a freedom of speech case. Plaintiff Peter Morgan Attwood alleges that

Defendant Representative Charles "Chuck" Clemons violated Plaintiff's right to

freely speak by blocking Plaintiff on Defendant's social media accounts. ECF No.

4. Specifically, Plaintiff argues that blocking him amounted to unconstitutional

viewpoint discrimination in a public forum, violating both the federal and Florida

Constitutions. ECF Nos. 4 & 67. Defendant asserts that (1) his social media is private

and does not constitute state action, (2) his social media pages are not public forums,

and (3) blocking Plaintiff was not unconstitutional viewpoint discrimination. ECF

No. 69. Both parties have moved for summary judgment. ECF Nos. 67 & 69. This

Court considered the parties' cross-motions for summary judgment at a hearing on

February 18, 2021. ECF No. 77. For the reasons below, Defendant's motion for summary judgment is **GRANTED in part** and **DENIED in part**, and Plaintiff's motion for summary judgment is **DENIED**.

## I.  Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This Court accepts the facts in the light most favorable to the non-movant. *See Galvez v. Bruce*, 552 F.3d 1238, 1239 (11th Cir. 2008). All reasonable doubts about the facts are resolved in favor of the non-movant. *Id.* at 1241. The standards governing cross-motions for summary judgment are the same, although this Court must construe the motions independently, viewing the evidence presented by each moving party in the light most favorable to the non-movant. *Lozman v. City of Riviera Beach*, 39 F. Supp. 3d 1392, 1404 (S.D. Fla. 2014) (citations omitted).

## II. Background

The following facts are undisputed. This case arises from Defendant's activity on the social media platforms Facebook and Twitter. ECF No. 4 ¶ 22. In 2016, Defendant's campaign manager created these accounts for Defendant's initial election campaign for District 21 in the Florida House of Representatives. ECF Nos.

66–1 at 27 & 68–2.[1] Defendant won the election for this office in 2016, 2018, and 2020. ECF No. 68–1 ¶ 1. He plans to run again in 2022. *Id*. Defendant has consistently used both accounts since their creation and intends to use them until his final term ends. ECF No. 66–1 at 117.

Defendant's social media accounts feature posts about campaign announcements, campaign endorsements, and position statements. ECF No 15–1 ¶ 4; *see, e.g.*, ECF No. 68–6 at 6 (posting about Defendant's positions on environmental issues and linking to his campaign website, which provides a more comprehensive position statement). Additionally, Defendant's accounts feature updates about his work as a legislator and issues affecting his district. *See, e.g.*, ECF No. 66–7 at 185 (updating the public on new legislation for economic development); *id.* at 166 (alerting the public of an upcoming tropical storm and providing a link to places where constituents can get more information about resources and weather updates). Defendant's accounts also feature posts about information regarding application for government benefits. *See, e.g., id.* at 202–03 (providing constituents information about the application process for economic assistance for farmers).

---

[1] Although Plaintiff disputes this fact in his motion, ECF No. 68 at 4, Plaintiff points to nothing in the record that would indicate Defendant created his social media accounts. *See* ECF No. 68 at 4 (citing ECF No. 66–1 at 26–28); ECF No. 66–1 at 29–30 (Defendant's deposition testimony clearly states that Defendant's campaign consultant created the accounts). Instead, the record makes it clear that Defendant's campaign manager created the accounts. ECF 66–1 at 29–30. Arguments made in the motions, without any support in the record, do not create a disputed issue of fact. *See Scott v. Harris*, 550 U.S. 373, 380 (2007).

Lastly, during the COVID-19 Pandemic, Defendant's accounts featured a virtual townhall meeting and a survey in which constituents were invited to express their needs during the pandemic. *Id.* at 209–13 (advertising a virtual town hall with "Rep. Clemons"); *id.* at 219 (posting a link to a survey meant to help understand his constituents' needs during the pandemic).

Plaintiff maintains personal Twitter and Facebook accounts. ECF No. 68–11. In February 2018, Plaintiff tagged Defendant in a Twitter post asking Defendant to explain his vote against House Bill 219, an assault weapons ban created in the wake of the shooting at Marjory Stoneman Douglas High School. ECF Nos. 68–16 & 68–17. Defendant found the post unnecessarily aggressive. ECF No. 66–1 at 108–09. Defendant then searched Plaintiff's posting history and noticed that Plaintiff had made profane tweets directed at other politicians. *Id*. at 62–63. Thereafter, Defendant blocked Plaintiff on Twitter. *Id*. Defendant's stated reason for blocking Plaintiff is Plaintiff's propensity for using profanity. *Id*. Subsequently, Plaintiff posted a comment on Defendant's Facebook page, criticizing Defendant for blocking Plaintiff on Twitter. ECF No. 6–1 at 10. Defendant then blocked Plaintiff on Facebook. ECF No. 55 ¶ 35. Plaintiff remains blocked from both accounts, and Defendant does not plan to unblock him. ECF Nos. 66–4 ¶ 3 & 66–1 at 88–89.

Plaintiff brings a § 1983 claim against Defendant in his individual and official capacities, alleging that Defendant's actions violated Plaintiff's First and Fourteenth

Amendment right to freedom of speech. ECF No. 4 ¶¶ 38–42. Additionally, Plaintiff brings two state constitutional claims, alleging violations of analogous state constitutional rights to freedom of speech and freedom of petition. *Id*. ¶¶ 43–49. Plaintiff requests (1) a declaratory judgment, (2) an injunction requiring Defendant to unblock Plaintiff on both social media accounts, and (3) reasonable attorneys' fees and costs. *Id*. at 11.

## III.   Discussion

In deciding the parties' cross-motions for summary judgment, this Court addresses four main questions. First, does Plaintiff state a cognizable official capacity § 1983 claim against Defendant? Second, does either party show that they are entitled to summary judgment regarding Plaintiff's individual capacity § 1983 claim? Third, are Plaintiff's state claims viable? Finally, is Plaintiff entitled to attorneys' fees and costs?

### A. Section 1983 — Official Capacity Claim

Earlier in the litigation, this Court denied Defendant's motion to dismiss on the ground that Defendant was not entitled to sovereign immunity under either the Eleventh Amendment or the legislative immunity doctrine. ECF No. 30. Upon interlocutory appeal, the Eleventh Circuit affirmed this Court's decision. *See Attwood v. Clemons*, 818 F. App'x 863, 870 (11th Cir. 2020). The concurrence opined that Defendant was not entitled to Eleventh Amendment immunity because

Plaintiff failed to state an official capacity claim. *Id*. (Grant, J., concurring). The majority took no position on the concurrence's view because Defendant had not argued before this Court that Plaintiff failed to state an official capacity claim. *Id*. at 869.

Defendant now argues that Plaintiff does not state a cognizable official capacity claim. As such, this Court must determine whether Plaintiff's official capacity claim is viable. ECF No. 69 at 33. This Court finds the concurring opinion from the interlocutory appeal persuasive in resolving this issue. As discussed below, Plaintiff has failed to state a viable official capacity claim under § 1983.

An official capacity claim may proceed only if "[t]he real party in interest is the government entity, not the named official." *Lewis v. Clark*, --- U.S. ---, 137 S. Ct. 1285, 1291, 197 L. Ed. 2d 631 (2017) (citing *Edelman v. Jordan*, 415 U.S. 651, 663–65 (1974)). In an official capacity claim, "the relief sought is only nominally against the official and in fact is against the official's office." *Id.* (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)). As Judge Grant thoughtfully explained, a successful official capacity suit will result in a remedy that attaches to the official's seat rather than to the individual, making the judgment effective even when the original official leaves office. *Clemons*, 818 F. App'x at 871 (Grant, J., concurring) ("[I]f [an official capacity suit is] successful . . . both the current

officeholder and any future officeholder will be barred from carrying out whatever policy is at issue."); *see also Lewis*, 137 S. Ct. at 1291.

Conversely, an individual capacity claim is one where "the real party in interest is the individual, not the sovereign." *Lewis*, 137 S. Ct. at 1291. Individual capacity suits seek to impose only personal liability upon a government official, meaning the remedy in a successful individual capacity claim does not extend to the official's office. *See Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985). This "means an individual capacity suit targets the individual behavior of an official . . . as he carries out his state duties." *Clemons*, 818 F. App'x at 872 (Grant, J., concurring).

"[T]he complaint itself . . . controls the identification of the parties and the capacity in which they are sued." *Welch v. Laney*, 57 F.3d 1004, 1010 (11th Cir. 1995). But this Court "may not simply rely on the characterization of the parties in the complaint, but rather must determine . . . whether the remedy sought is truly against the sovereign." *Lewis*, 137 S. Ct. at 1290 (citing *Ex parte N.Y.*, 256 U.S. 490, 500–502 (1921)). In the amended complaint, Plaintiff characterizes his § 1983 claim as being against Defendant in his official and individual capacities. However, Plaintiff's amended complaint seeks a remedy that does not lend itself to an official capacity claim. Plaintiff seeks an injunction requiring Defendant to unblock him from Defendant's social media accounts. This relief only attaches to Defendant, not

Defendant's office or the state. The relief would not bind any future legislator for District 21. Put another way, the relief Plaintiff seeks is not against a sovereign state but against an individual in his individual capacity. Given the facts of this case and the remedy at issue, this Court concludes that Plaintiff fails to state a cognizable official capacity claim. Instead, Plaintiff's claim is against Defendant in his individual capacity acting under color of state law. *See Clemons*, 818 F. App'x at 871 (Grant, J., concurring) (discussing the difference between an official capacity claim and an individual claim under the color of state law).

Accordingly, this Court **GRANTS** Defendant's motion as it relates to Plaintiff's official capacity § 1983 claim. To the extent Plaintiff moves for summary judgment as it relates to his official capacity § 1983 claim, the motion is **DENIED**.

### B. Section 1983 — Individual Capacity Claim

"To state a claim under § 1983, a plaintiff must allege the deprivation of a constitutional or federal statutory right by someone under [color] of state law." *N.R. v. Sch. Bd. of Okaloosa Cnty., Fla.*, 418 F. Supp. 3d 957, 977 (N.D. Fla. 2019) (citing *Doe v. Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d 1248, 1265 (11th Cir. 2010)). The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. Amend. I. The First Amendment has been incorporated against the States through the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652, 667–68 (1925). Plaintiff alleges that Defendant's actions in

blocking Plaintiff constituted unconstitutional viewpoint discrimination in a public forum.

In evaluating the cross-motions for summary judgment, this Court must decide, viewing the facts in the light most favorable to the non-moving party, 1) whether Defendant acted under color of state law, 2) which class of forum Defendant's social media accounts constitute, and 3) whether Defendant's restriction of Plaintiff's speech is consistent with the class of forum identified. *See, e.g.*, *Davison v. Randall*, 912 F.3d 666, 682 (4th Cir. 2019).

### 1. Under Color of State Law

To succeed on his § 1983 claim and show a deprivation of First Amendment rights, Plaintiff must establish that Defendant acted under color of state law. 42 U.S.C. § 1983. Plaintiff must also show that Defendant's actions constitutes state action. *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (stating that only state action is subject to Fourteenth Amendment scrutiny while private action is not). Both requirements are treated as the functional equivalent of one another and can be analyzed under the same framework. *United States v. Price*, 383 U.S. 787, 794 n.7 (1966) (citing *Smith v. Allwright*, 321 U.S. 649 (1944)) ("In cases under § 1983, 'under color of law' has consistently been treated as the same thing as 'state action' required under the Fourteenth Amendment."); *see also Charudattan v. Darnell*, 834 F. App'x 477, 479–82 (11th

9

Cir. 2020) (quoting *Brentwood Acad.*, 531 U.S. at 295) (analyzing color of state law and state action requirements under the same standard). Thus, both requirements are met when a plaintiff can show that there is a "close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State." *Brentwood Acad.*, 531 U.S. at 295 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974)) (internal quotations omitted).

This Court first analyzes threshold legal arguments that Defendant makes in his motions. Next, this Court determines whether Defendant's actions on his social media accounts constitute state action. In doing so, this Court evaluates the cross-motions independent of each other and views the facts in the light most favorable to the non-moving party.

(i) Threshold Arguments Regarding State Action

Before getting to the meat of this case—determining whether Defendant's actions were under color of state law and violative of the Constitution—this Court must address threshold legal arguments advanced by Defendant. Defendant makes two interdependent arguments. First, Defendant argues his speech is inherently private speech because he is a state legislator and thus his speech can never be considered state action. Second, Defendant argues blocking Plaintiff is an expression of Defendant's speech. Taken together, Defendant argues that blocking Plaintiff is a form of speech, and this speech is private speech that can never be considered state

action. As explained below, Defendant's arguments are unpersuasive because Defendant stretches the reasoning of the case law to an illogical conclusion and relies on inapplicable case law.

Defendant asserts that a legislator's speech is inherently private, meaning legislators' speech can never be deemed state action as a matter of law. ECF No. 69 at 15–19 (citing *Wood v. Georgia*, 370 U.S. 375 (1962); *Bond v. Floyd*, 385 U.S. 116 (1966); *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117 (2011); *Morgan v. Bevin*, 298 F. Supp. 3d 1003, 1012 (E.D. Ky. 2018)). Specifically, Defendant argues that these cases stand for the principle that "[w]hen elected officials, including state legislators, speak, the First Amendment treats their speech as personal, not government, actions," even when they speak in their official capacities. ECF No. 69 at 15. Defendant's rationale is that elected officials should be able to freely express themselves without government interference. *See id.* at 18.

To an extent, Defendant is correct. The Supreme Court cases he cites support the notion that a government official's speech is not automatically subject to heightened restrictions based on the nature of their position. For example, in *Wood*, the Supreme Court found that the state court violated a sheriff's First Amendment rights when it found him in contempt for criticizing one of its rulings. 370 U.S. at 394–95. The Court reasoned that the sheriff did not have heightened restrictions on his speech due to his position. *Id.* at 394. Similarly, the Supreme Court in *Bond* held

11

that the Georgia Legislature violated the First Amendment when it refused to seat a state legislator because of his comments on the Vietnam War. 385 U.S. at 136–37. As in *Wood*, the Court in *Bond* reasoned that the state legislator's expressive activity could not be censored simply because of the nature of his position. *Id.* at 136.

However, neither case involved an official speaking in his official capacity. Indeed, in *Wood*, the Court expressly noted that the sheriff's statements were made "as a private citizen." *Wood*, 370 U.S. at 393. And in *Bond*, Representative Bond made anti-war statements in his personal capacity as a Communications Director of a civil rights organization and then to a reporter. *Bond*, 385 U.S. at 118–22. Most importantly, neither decision held that a state representative could *never* act under color of state law. The facts, reasoning, and holding of these cases do not support Defendant's argument. Instead, these decisions stand for the narrow rule that a government official's First Amendment rights are not automatically restricted more than a private speaker's rights based on the nature of their position. *Bond* and *Wood* do not give state legislators greater rights than other citizens. And just as private actions can amount to state actions if there is sufficient nexus between the private actor and the government, *see, e.g.*, *Brentwood Acad.*, 531 U.S. at 305, a state legislator can act under color of state law too.[2]

---

[2] Defendant's reliance on *Carrigan* is also misplaced. The issue in *Carrigan* was "whether legislators have a personal, First Amendment right to vote on any given matter." 564 U.S. at 119. Just because the Court relied on cases addressing private speech does not mean the Court held that

Defendant's reliance on *Morgan* is also misplaced. *Morgan* is neither binding on this Court nor is its reasoning persuasive. The district court in *Morgan* analyzed a governor's social media activity under the government speech doctrine. 298 F. Supp. 3d at 1012 (analyzing *Walker v. Tex. Div.*, *Sons of Confederate Veterans*, *Inc.*, 576 U.S. 200, 135 S. Ct. 2239, 2250, 192 L. Ed. 2d 274 (2015); *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 479–80 (2009)). Here, Defendant does not argue that his speech (i.e., the act of blocking) is government speech. In fact, Defendant argues that his speech cannot be government speech. ECF No. 69 at 15.[3]

Turning to Defendant's second argument, which is dependent on his first argument, Defendant asserts that his decision to exclude Plaintiff from his social media accounts "is not just private action, it is private speech protected by the First Amendment." ECF No. 69 at 13. Specifically, Defendant cites Supreme Court precedent recognizing both "the power to exercise editorial discretion over the speech and speakers in a forum" and the right to freely associate. *Id*. at 13–14 (citing

---

a legislator's speech is always private speech. To the contrary, the Court unambiguously held private speech analysis did not apply to the issue before it. *Id.* at 126–28.

[3] The *Morgan* court arguably should not have applied the government speech exception in the context of blocking private accounts from a public official's pages. *See Faison v. Jones*, 440 F. Supp. 3d 1123, 1137 (E.D. Cal. 2020) (criticizing the holding in *Morgan v. Bevin* for confusing the government speech analysis with the government-controlled element of forum analysis); *See, e.g.*, *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 239 (2d. Cir. 2019) (holding that a public official's social media posts themselves are government speech but blocking private accounts' speech does not constitute government speech). However, this Court need not decide this issue because Defendant does not argue that his speech is government speech.

*Manhattan Cmty. Access Corp. v. Halleck*, --- U.S. --- 139 S. Ct. 1921, 1930, 204 L. Ed. 2d 405 (2019); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 570, 573 (1995); *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000)). Defendant argues that Plaintiff's suit hinders his ability to freely speak and associate. *Id*. at 14.

Defendant's cited authority recognizes First Amendment protection for *private actors*. *Manhattan Cmty.*, 139 S. Ct. at 1933 (ruling that an operator of a public access channel has the right of editorial discretion in choosing programs because the operator is a private actor not subject to the constraints of the First Amendment); *Hurley*, 515 U.S. at 566 (noting that private parade organizers have the right to exclude in order to editorialize their message); *Dale*, 530 U.S. at 648–49 (explaining that private groups' right to freedom of association is protected under the First Amendment). These cases would be applicable if Defendant's actions were those of a private actor or if Defendant's first argument—that state legislators' speech is always private speech and, thus, their actions are those of private actors— was successful. However, as explained above, state legislators, just like any other private actors, may act under color of state law.

In sum, this Court rejects Defendant's argument that a state legislator's actions can never amount to state actions because a legislator's speech is inherently private. Contrary to Defendant's assertion, Defendant's status as a state legislator is

not a magic pill that immunizes him from state action analysis. This Court must, therefore, analyze the cross-motions independently and determine whether Defendant's actions on his social media account are purely private or constitute state action when viewed the facts in the light most favorable to the non-movant.

(ii)State Action Analysis

Courts across the country, including the Eleventh Circuit in an unpublished opinion, have addressed the precise question of whether and when government officials' social media activity constitutes state action. *Charudattan*, 834 F. App'x at 479–81; *See*, *e.g.*, *Knight First Amendment Inst.*, 928 F.3d at 235–36. This Court finds these cases persuasive because they properly focus on factors that convey state action within the social media context. Specifically, in determining whether a government official's social media activity amounts to state action, courts have focused on two main factors; namely, 1) whether the official uses the account in furtherance of their official duties, and 2) whether the presentation of the account is connected with the official's position. *Charudattan*, 834 F. App'x at 481–82; *Knight First Amendment Inst.*, 928 F.3d at 235–36.

However, Defendant asks this Court to adopt what he characterizes as a different standard based on the Eighth Circuit's holding in *Campbell v. Reisch*. ECF No. 75. (citing 986 F.3d 822, 825–28 (8th Cir. 2021)). In *Campbell*, the court found that a state legislator's social media activity did not constitute state action because

the account was used "overwhelmingly for campaign purposes." *Id*. at 826. The court noted that its decision followed the Second Circuit's opinion in *Trump* because the state legislator's account fell into the kind of unofficial account the *Trump* court envisioned would be private action. *Id*. ("We hold that Reisch's account is the kind of unofficial account that the *Trump* court envisioned."). The only difference in the Eighth Circuit's analysis was that it did not find the presentation of the state legislator's account relevant in determining state action. *Id*. at 827. The court referred to such presentation as "trappings." *Id*. at 827. However, the Eighth Circuit's decision recognized that "a private account can turn into a governmental one if it becomes an organ of official business." *Id*. at 826. That is all to say that the standards articulated in *Campbell*, *Trump*, and *Charudattan* are functionally equivalent. They differ only as to whether an account's "trappings" are relevant in determining state action. And under either formulation, this Court looks at the totality of the circumstances to determine whether the private account has transformed into an organ of official business. If it has, then the state action requirement is met.

The facts in this case are largely undisputed. What is, however, disputed is the inferences that can be drawn from the facts. During the telephonic hearing on the cross-motions, Defendant argued that the facts and the inferences from those facts are undisputed. When this Court questioned both sides about a particular activity on

Defendant's social medial account, Defendant argued that the post undisputedly showed that the account was used for campaign purposes. Unsurprisingly, Plaintiff argued the opposite—the post showed that the account was an organ of official business. This highlights what this Court made plain during the hearing—both motions must be analyzed independently, resolving all reasonable inferences in favor of the non-moving party.

This Court starts with Plaintiff's motion. Taking all reasonable inferences in Defendant's favor, this Court finds that Defendant's social media accounts do not meet the state action requirement because Defendant's actions on social media can reasonably trace back to a campaign purpose. For example, a fact finder could reasonably infer that the tele-town hall meeting posted on his account was not in furtherance of Defendant's official business. Instead, Defendant used the tele-town hall as a voter outreach tool in furtherance of his campaign. Similarly, it is reasonable to infer that all of Defendant's posts about his official business were updating the public of his work so that they could have enough information to re-elect him. Viewed in this light, Plaintiff cannot meet the state action requirement because all reasonable inferences show that Defendant's accounts never became an organ for Defendant's official business as a state legislator.

Conversely, in deciding Defendant's motion for summary judgment, all reasonable inferences must be resolved in Plaintiff's favor. Under this view, Plaintiff

meets the state action requirement because it is reasonable to find that Defendant's social media accounts transitioned from campaign accounts to organs of his official business as a state legislator. For example, Defendant posted a survey to his social media accounts, asking his constituents to relay their needs during the pandemic. A fact finder can reasonably infer that Defendant did this as a governance tool to gain information about how he could help his constituents during the pandemic. In other words, Defendant used his account as a state legislator rather than as a future candidate. Similarly, it is reasonable to infer that Defendant posted about his official business as a legislator to update the public on upcoming initiatives and public benefits coming from his office. Lastly, it is reasonable to infer that the tele-town hall meeting was created as an avenue for constituents to talk to their state legislator about his official business. Accordingly, drawing all reasonable inferences in Plaintiff's favor, as this Court must, Plaintiff meets the state action requirement because Defendant used his social media accounts as an organ of his official business.

As for Plaintiff's motion, Plaintiff is not entitled to summary judgment on his individual capacity § 1983 claim because this Court concludes that a reasonable fact finder could find that Defendant's social media activity did not constitute state action. Therefore, for Plaintiff's motion, this Court need not undergo forum analysis and determine whether Defendant's restriction unconstitutionally burdens Plaintiff's

speech. Plaintiff's motion for summary judgment as it relates to his individual capacity § 1983 claim is **DENIED**.

Conversely, for Defendant's motion, drawing all inferences in Plaintiff's favor, this Court concludes that a reasonable fact finder could find that Defendant's social media activity constituted state action. But the inquiry does not end there. In order to determine whether Defendant is entitled to summary judgment, this Court must also address which class of forum Defendant's social media accounts constitute and whether Defendant's restriction of Plaintiff's speech is consistent with the class of forum identified.

### 2. Forum Analysis

In deciding Defendant's motion for summary judgment, this Court must decide whether Defendant's restriction was permissible. To do this, this Court must first determine which type of forum Defendant's social media accounts constitute when the facts are viewed in the light most favorable to Plaintiff. *See Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 797 (1985) ("[T]he extent to which the Government may limit access [to protected speech] depends on whether the forum is public or nonpublic.").

Before conducting the forum analysis, this Court must address Defendant's argument that forum analysis should not apply to social media or the Internet based on Supreme Court precedent and Congress's policy choices. ECF No. 69 at 28–29

19

(citing 47 U.S.C. § 230(b)(2); *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998)). Specifically, Defendant analogizes the Supreme Court's holding in *Forbes* to this case, essentially arguing that politicians should have similar editorial freedom as public television broadcasters. *Id*. at 29 (citing *Forbes*, 523 U.S. at 672–75). Defendant asserts that this analogy is strengthened by 47 U.S.C. § 230(b)(2), which shows that "Congress articulated a hands-off policy for public TV stations," choosing to "leave the internet unfettered by Federal or State regulation." *Id*. (quoting 47 U.S.C. § 230(b)(2)) (internal quotations omitted)). This Court disagrees.

Defendant correctly points out that courts should not extend the public forum doctrine in a "mechanical" way and should first analyze whether the doctrine should even apply. *Id*. (citing *Forbes*, 523 U.S. at 672–73). Here, there are three reasons why the public forum doctrine applies.

First, social media provides infinite space for expressive activity, does not inherently require government actors to restrict speech, and is distinguishable from other fora, including the realm of awarding artistic grants. Ordinarily, government actors are not subject to strict scrutiny or traditional forum analysis when the government is dealing with finite resources or when the nature of the action requires content discrimination. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, (1998); *Forbes*, 523 U.S. at 672–74. For example, in *National Endowment*, the

Supreme Court declined to apply forum analysis to a content restriction dealing with the artistic grants. *See* 524 U.S. 586. Specifically, the Court noted that the government was dealing with finite resources and was forced to suppress speech by the very nature of choosing one art project over another. *Id*. (distinguishing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995)). Similarly, in *Forbes*, the Court noted that forum analysis should typically not apply to television broadcasters because the nature of broadcast television requires editorial discretion due to finite airtime. 523 U.S. at 673. Nonetheless, in that case, the Court applied forum analysis to the public television broadcaster, carving out a narrow exception for political debates. *Id*. at 674. The Court reasoned that the political debates created a public forum for third party's expressive activity that had nothing to do with the broadcaster's editorial discretion. *Id*.

Social media is quantitatively different from art endowments and television broadcasting because social media does not involve finite resources. The number of potential posts or comments on Defendant's page is practically unlimited, whereas someone choosing which art project to fund is constrained by the funds available. Here, Defendant chose not to have any privacy settings or content restrictions on his page. Instead, Defendant opened his social media accounts for public discourse. This case is like *Forbes*, where the Court applied forum analysis to a public debate because the broadcaster opened the forum to third-party expressive activity.

21

Second, Supreme Court precedent supports applying forum analysis to social media. The Supreme Court has yet to determine whether a state official's social media account is a public forum. However, the Supreme Court has recognized that the "most important place[] . . . for the exchange of views" is the "vast democratic forums of the Internet." *Packingham v. North Carolina*, --- U.S. ---, 137 S. Ct. 1730, 1735, 198 L. Ed. 2d 273 (2017) (quoting *Reno v. ACLU*, 521 U.S. 844, 868 (1997)) (internal quotations omitted). The Court has also stated that public forums do not need to be "spatial or geographic" because the same public forum analysis applies to "metaphysical" forums. *Rosenberger*, 515 U.S. at 830. The Court has recognized that "social media in particular" is entitled to the same First Amendment protections as other forms of media. *Packingham*, 137 S. Ct. at 1735. Therefore, applying public forum analysis to social media is consistent with Supreme Court precedent.

Third, Congress's policy choices do not prevent the public forum doctrine from applying to social media. Specifically, Congress has provided that "[i]t is the policy of the United States . . . to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State Regulation . . . ." 47 U.S.C. § 230(b)(2). Section 230(b) is a part of a larger legislative policy to allow private social media companies and private users to censor violent or obscene content from social media without fear of civil liability. *Id.* § 230(c)(2). Congress has chosen to allow *private* companies

and *private* users to censor. Section 230 is devoid of any language allowing a state official acting under color of state law to censor individual speech in a public forum. The statute means what it says and nothing more. Congress writes statutes, this Court does not. Without Congress's *express* intent, this Court will not abrogate established principles of forum analysis.

This Court, therefore, concludes that forum analysis applies. The next step is to determine what category of forum Defendant's accounts fall into. There are four types of forums; namely, 1) traditional public forums, 2) designated public forums, 3) limited public forums, and 4) non-public forums. *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1226 (11th Cir. 2017). As set out below, this Court concludes that Defendant's social media accounts are designated public forums when the facts are viewed in the light most favorable to Plaintiff.

Defendant's social media accounts are not traditional public forums. "[T]raditional public for[ums] are open for expressive activity regardless of the government's intent." *Forbes*, 523 U.S. at 678. Moreover, traditional public forums "have immemorially been held in trust for the public" to use to assemble and communicate expressive ideas. *Perry Educ. Ass'n. v. Perry Local Educators' Ass'n.*, 460 U.S. 37, 45 (1983) (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)) (internal quotations). Sidewalks are publicly owned areas intrinsically open for expressive activity without the government having to act. In contrast, social media accounts are

23

inherently private spaces that can only become public spaces for expressive activity once the government opens it accordingly. Also, social media platforms are a relatively new medium for expressive activity. *See Cornelius*, 473 U.S. at 802 ("Traditional public for[ums] are those places which by long tradition or by government fiat have been devoted to assembly and debate."). Thus, such platforms cannot be characterized as immemorially held in the public trust for expressive activity.

Neither are Defendant's social media accounts nonpublic forums. The government does not manage the internal operations of the social media platform. Instead, private companies manage these platforms' internal operations. *Walker*, 135 S. Ct. at 2251 (stating that a forum is considered a nonpublic forum "where the government is [acting as] a proprietor, managing its internal operations.") (quoting *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992)) (internal quotations omitted). Unlike airport terminals, which were created for travel, *see Lee,* 505 U.S. at 679, social media platforms are inherently perfect places for expressive activity because they were created for expressive activity. *See Cornelius*, 473 U.S. at 800. The central question, then, becomes whether Defendant's social media accounts are designated public forums or limited public forums.

"A designated public forum is 'government property that has not traditionally been regarded as a public forum' but that has been 'intentionally opened up for that

purpose." *Bloedorn v. Grube*, 631 F.3d 1218, 1231 (11th Cir. 2011). Thus, a designated public forum is functionally like a traditional public forum, but the designated public forum lacks the "historical pedigree of a traditional public forum." *Barrett*, 872 F.3d at 1224. Additionally, unlike a traditional public forum, in a designated public forum the government can limit expressive activity "to a particular class of speakers instead of being opened to the general public." *Id*. (citing *Forbes*, 523 U.S. at 677–80). However, once the government limits the speakers to a particular class, "all members of that class must receive general access." *Id*. (citing *Forbes*, 523 U.S. at 679–80). Lastly, in designated public forums, government restrictions on speech "are subject to the same strict scrutiny as restrictions in a traditional public forum." *Pleasant Grove City*, 555 U.S. at 470 (citing *Cornelius*, 473 U.S. at 800).

A limited public forum is created when the government opens a forum for expressive activity but has reserved the forum "for certain groups or for the discussion of certain topics." *Walker*, 135 S. Ct. at 2250 (quoting *Rosenberger*, 515 U.S. at 829) (internal quotations omitted). Thus, a limited public forum "cannot, by definition, be open to the public at large for discussion of any and all topics." *Barrett*, 872 F.3d at 1224. A limited public forum grants only selective access to the designated class, whereas a designated public forum grants general access to that class. *Id*. (citing *Forbes*, 523 U.S. at 679–80). Additionally, for a member of the

designated class to speak in a limited public forum, "each individual member must obtain permission from the governmental proprietor of the forum, who in turn has discretion to grant or deny permission." *Id*. (citing *Forbes*, 523 U.S. at 679–80). The government can restrict expressive activity in a limited public forum if the restriction is reasonable based on the forum and is viewpoint neutral. *Bloedorn*, 631 F.3d at 1231 (citing *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, --- U.S. ---, 130 S. Ct. 2971, 2984 n.11, 177 L. Ed. 2d 838 (2010)).

The key distinction between a designated public forum and a limited public forum is the extent of selective access given to the designated class. For example, in *Widmar v. Vincent*, the Supreme Court held that a state university created a designated public forum when it made its facilities open to registered student groups. 454 U.S. 263, 267 (1981). However, a forum is not considered a designated public forum "when the government allows selective access for individual speakers . . . ." *Forbes*, 523 U.S. at 679. For example, in *Bloedorn*, a university campus's sidewalks were considered a limited public forum because the university limited access to only certain groups who obtained permits to speak in these places, showing "no intention to open these areas to the general public for expressive conduct." 631 F.3d at 1232.

Here, Defendant's social media accounts are public accounts with no privacy restrictions or explicit content restrictions. Social media users are a specific class of

speakers, similar to the student groups in *Widmar*. Given Defendant's account settings, his social media accounts are generally available for all social media users to interact with Defendant's posts, also like the university's facilities in *Widmar*. Other users can freely comment and interact with Defendant's posts without Defendant's permission to access the forum, unlike the groups in *Bloedorn*. Moreover, in *Bloedorn*, a key element in the court's analysis was that the university never expressed an intent to open the sidewalks to the public for expressive activity. But in this case, Defendant's social media settings and absence of any explicit restriction limiting discourse to certain speech shows that Defendant provides unrestricted access to the public for expressive activity. Therefore, this Court concludes that Defendant's social media accounts are designated public forums.[4]

### 3. Constitutional Scrutiny

Having decided that Defendant's social media accounts are designated public forums for the purpose of Defendant's motion for summary judgment, this Court must next decide whether Defendant's restrictions are permissible when the facts are viewed in the light most favorable to Plaintiff. As discussed above, content restrictions in a designated public forum are subject to strict scrutiny. *See, e.g.*, *Minn.*

---

[4] Even if this Court were to find that Defendant's social media accounts are limited public forums, Defendant's act of blocking Plaintiff would be unconstitutional. This is because, as explained below, *infra* section III(B)(3), when the facts are viewed in the light most favorable to Plaintiff, Defendant's actions amount to viewpoint discrimination. *See Bloedorn*, 631 F.3d at 1231.

*Voters All. v. Mansky*, --- U.S. ---138 S. Ct. 1876, 1885, 201 L. Ed. 2d 201 (2018) (citing *Perry*, 460 U.S. at 46). There are two issues this court must decide. First, whether Defendant's actions amount to content restriction. If so, whether such restrictions survive strict scrutiny.

Government restriction on speech is content based if the restriction is based on the "topic discussed or the idea or message expressed." *Reed v. Town of Gilbert, Az.*, 576 U.S. 155, 162 (2015) (citations omitted). When the restriction targets particular views taken by the speaker rather than the topic, it is called viewpoint-based restriction. *Rosenberger*, 515 U.S. at 829. Such restrictions "favor some viewpoint or ideas at the expense of others." *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984). Viewpoint-based restriction is an egregious form of content restriction because the rationale of the restriction is based on suppressing the speaker's ideology, opinion, or perspective. *Rosenberger*, 515 U.S. at 829.

Both, content-based and viewpoint-based, restrictions are subject to strict scrutiny; however, the government will have more difficulty in surpassing constitutional review for viewpoint-based restriction because of its egregious nature. *Otto v. City of Boca Raton*, 981 F.3d 854, 864 (11th Cir. 2020) (construing Supreme Court precedent to mean that viewpoint based restrictions are not per se

unconstitutional but are subject to strict scrutiny that will be difficult to surpass given the egregious nature of viewpoint discrimination).

Defendant argues that he blocked Plaintiff based on Plaintiff's propensity for profanity. This Court need not decide whether such a restriction is constitutionally permissible.[5] This is because the record, when viewed in the light most favorable to Plaintiff, supports a reasonable inference that Defendant blocked Plaintiff based on Plaintiff's disagreement with Defendant's viewpoint. Specifically, Defendant blocked Plaintiff on Twitter shortly after Plaintiff expressed his disapproval of Defendant's vote on a controversial bill and subsequently blocked Plaintiff on Facebook after Plaintiff posted criticism on Defendant's Facebook account. The substance of Defendant's own statements supports this inference; namely, that he found Plaintiff's initial tweet "aggressive" and that he has blocked others based on viewpoint in the past. ECF Nos. 15 ¶ 11 & 66-1 at 82–83. A reasonable fact finder could find that Defendant's explanation that he blocked Plaintiff because of Plaintiff's propensity for profanity is a pretextual, post-hoc justification and that, in reality, Defendant blocked Plaintiff because he disagreed with Plaintiff's viewpoint. In other words, the timing of the block coupled with Defendant's own statements

---

[5] Based on Supreme Court precedent, restricting speech in a designated public forum based solely on a propensity for profanity is arguably unconstitutional. *See Reno*, 521 U.S. at 870; *Cohen v. California*, 403 U.S. 15, 26 (1971). But this Court need not address this issue here because, as explained below, Defendant's actions, when viewed in the light most favorable to Plaintiff, constitute viewpoint discrimination.

29

allows a reasonable fact finder to conclude that Defendant's actions were not viewpoint neutral.

Because Defendant's actions arguably constitute viewpoint discrimination, this Court must next determine whether Defendant has a compelling interest in blocking Plaintiff. He does not. When the facts are viewed in the light most favorable to Plaintiff, the only interest in blocking Plaintiff is to suppress Plaintiff's criticism of Defendant's viewpoint. Put another way, the only interest Defendant has in blocking Plaintiff is to ensure that Plaintiff's opposing viewpoints are not shared on his account. Such an interest is not compelling. Indeed, it runs afoul of the First Amendment. As such, Defendant's actions do not survive strict scrutiny review when the facts are viewed in the light most favorable to Plaintiff.

Alternatively, Defendant points out that Plaintiff has alternate social media accounts that are not blocked, which he can still use to interact with Defendant's accounts. ECF No. 69 at 28. According to Defendant, these alternative accounts inoculate Defendant's decision to block Plaintiff's personal account from constitutional challenge. *Id*. This Court disagrees. This Court finds the Second Circuit's analysis in *Knight First Amendment Institute* persuasive here. In that case, the government argued that users could get around the block in various ways, including making new unblocked accounts. *Knight First Amendment Inst.*, 928 F.3d at 238. But the court held that blocking accounts, even if the account holders could

create another account, is a burden on speech. *Id.* "[B]urdens to speech as well as outright bans run afoul of the First Amendment." *Id.* (citing *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011)). Therefore, the fact that there are ways to get around a social media block does not cure what would otherwise be a First Amendment violation. *Id.* at 239. Similarly, in this case, the fact that Plaintiff has an alternate account to get around the block does not cure Defendant's constitutional violation.

Accordingly, Defendant's motion for summary judgment is **DENIED** as to Plaintiff's § 1983 individual capacity First Amendment claim.

## C. State Constitutional Law Claims

Plaintiff's final two claims are state constitutional claims. ECF No. 4 at 10–11. First, Plaintiff alleges that Defendant's actions violated article I, section 4 of the Florida Constitution by imposing a viewpoint-based restriction in a public forum. *Id.* ¶¶ 43–46. Second, Plaintiff alleges that Defendant's actions violated article I, section 5 of the Florida Constitution by imposing "a viewpoint-based restriction on Plaintiff's ability to petition the government for redress of grievances." *Id.* ¶¶ 48.

Defendant argues that both state constitutional claims should be dismissed either through abstention or through a ruling on the merits. ECF No. 69 at 34. First, Defendant argues that this Court should decline to rule on the state law claims because they "involve novel questions of Florida constitutional law." ECF No. 69 at 34 (citing 28 U.S.C. § 1367(c)(1); *Ameritox, Ltd. v. Millenium Labs., Inc.*, 803 F.3d

518, 541 (11th Cir. 2015)). Specifically, Defendant points out that Plaintiff's claims raise "significant separation-of-powers issues between the legislative and judicial branches." *Id.* (citing *Citizens for Strong Sch., Inc. v. Fla. State Bd. of Educ.*, 232 So. 3d 1163, 1170 (Fla. 1st DCA 2017)). Second, Defendant argues that the claims should be dismissed for the same reasons the First Amendment claim should be dismissed and because federal courts should not "impose an unprecedented state constitutional requirement" when plaintiff "could have sought the same relief in state court." ECF No. 69 at 35 (citing *Pearson v. John Hancock Mut. Life. Ins. Co.*, 979 F.2d 254, 259 (1st Cir. 1992)).

This Court finds Defendant's arguments unpersuasive. A district court *may* decline to exercise supplemental jurisdiction when "(1) the claim raises a novel or complex issue of state law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c) (emphasis added). In deciding whether to exercise supplemental jurisdiction, "[t]he court should consider 'judicial economy, convenience, fairness and comity.' " *Smith v. Tallahassee*, 789 F. App'x 783, 789 (11th Cir. 2019) (quoting *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1288 (11th Cir. 2002)).

As to Plaintiff's state law claims, "[t]he scope of the protection accorded to freedom of expression in Florida under article I, section 4 is the same as is required under the First Amendment." *Dep't of Educ. v. Lewis*, 416 So. 2d 455, 461 (Fla. 1982). Similarly, the expressive political activities protected in article I, section 5 of the Florida Constitution are identical to those protected by the First Amendment. *See State of Fla. v. J.P.*, 907 So. 2d 1101, 1111 (Fla. 2004) ("The First Amendment and article I, section 5 of the Florida Constitution protect the rights of individuals to associate with whom they please and to assemble with others for political or for social purposes.") (citing *Wyche v. State*, 619 So. 2d 231, 234 (Fla. 1993); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 466 (1958)). Plaintiff's state law claims are for all practical purposes identical to his First Amendment claims and are based on the same facts. As such, there is no complex issue of state law that this Court should avoid, and the notion of judicial economy weighs in favor of this Court reviewing the matter. This Court, therefore, chooses to continue exercising supplemental jurisdiction over Plaintiff's state law claims. In doing so, the same analysis from Plaintiff's First Amendment claim applies to Plaintiff's state constitutional claims.

Accordingly, Plaintiff is not entitled to summary judgment on his state law claims, and Defendant is only entitled to summary judgment to the extent Plaintiff alleges state constitutional violations in Defendant's official capacity.

D. Attorneys' Fees

Plaintiff requests reasonable attorneys' fees and costs. ECF No. 4 at 11. If a plaintiff prevails on a § 1983 claim, a court may award fees and costs to Plaintiff as the prevailing party. *See* 42 U.S.C. § 1988. However, since the only remaining claim is against Defendant in his individual capacity, Defendant argues that qualified immunity would bar attorneys' fees and costs. ECF No. 69 at 33. This Court agrees.

When a state official is sued in his individual capacity, the official is entitled to qualified immunity from monetary damages "if their conduct violates no 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *D'Aguano v. Gallagher* 50 F.3d 877, 881 (11th Cir. 1995) (quoting *Lassiter v. Ala. A & M Univ.*, 28 F.3d 1146, 1149 (11th Cir. 1994)). "Damages" includes awards for attorneys' fees and costs. *Id*. ("We hold that, for qualified immunity purposes, the term 'damages' includes costs, expenses of litigation, and attorneys' fees claims by a plaintiff against a defendant in the defendant's personal or individual capacity."). And § 1988 does not interfere with a state official's right to assert qualified immunity. *Id*. (analyzing the text and legislative history of § 1988).

For qualified immunity to apply, Defendant's conduct must not violate clearly established rights at the time of the violation. *Id*. Normally, courts follow a two-step analysis when determining whether qualified immunity applies; namely, 1) whether

the plaintiff's rights were violated, and 2) whether the right violated was clearly established at the time of the violation. *Harper v. Lawrence Cnty., Ala.,* 592 F.3d 1227, 1233 (11th Cir. 2010). However, it is within this Court's "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2010).

This Court begins with the second prong of the qualified immunity analysis. A right is not clearly established unless it "would be clear to a reasonable defendant that his conduct was unlawful in the situation he confronted." *Harper*, 592 F.3d at 1233 (quoting *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1306 (11th Cir. 2006)) (internal quotations omitted). There are "three sources of law that would put a government official on notice of statutory or constitutional rights: specific statutory or constitutional provisions; principles of law enunciated in relevant decisions; and factually similar cases already decided by state and federal courts in the relevant jurisdiction." *Id*. (quoting *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1330 (11th Cir. 2007)). Additionally, a right can be clearly established when there is "obvious clarity" that the officer's conduct is so unreasonable that he "had to know he was violating the Constitution without case law on point." *Jay v. Hendershott*, 579 F. App'x 948, 950–51 (11th Cir. 2014) (quoting *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000) (internal quotations omitted).

First, in this case, Plaintiff has not pointed to, nor has this Court found, any specific constitutional provisions that clearly establish Plaintiff's right to freely speak on Defendant's social medial accounts. Second, neither the Supreme Court nor the Eleventh Circuit nor the courts in Florida have ruled on a factually similar case that would clearly establish such a right. Lastly, as apparent in this Order, Defendant's actions are not so unreasonable to constitute an obviously clear violation of the Constitution because it is unclear whether Defendant is acting under color of state law. Thus, a reasonable person would not be on notice that blocking Plaintiff in this instance would violate a clearly established constitutional right.

Alternatively, Plaintiff argues that his rights were clearly established because "the principle that a public official may not engage in viewpoint discrimination in a public forum" has been clearly established for years. ECF No. 70 at 9 (citing *Rosenberger*, 515 U.S. at 830). However, "[t]o overcome the qualified immunity defense, citing precedent which established a general right will not do." *D'Aguano*, 50 F.3d at 880. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)) (internal quotations omitted). In this case, the line between private

and state action is too blurred to say that the Defendant's conduct violates Plaintiff's clearly established right to speak on Defendant's social media accounts.[6]

Therefore, qualified immunity applies, and Plaintiff is not entitled to attorneys' fees under § 1988. Accordingly, Defendant's motion for summary judgment is **GRANTED** as to attorneys' fees.

## IV.    Conclusion

In deciding the cross-motions, this Court does not prejudge the final merits of Plaintiff's individual capacity claims. This is because, at the summary judgment stage, this Court does not weigh facts. During the bench trial, however, this Court will be the fact finder and will weigh the facts. In denying cross-motions for Plaintiff's individual capacity claim, this Court notes that, contrary to Defendant's contention, there is no magic shield that protects a state legislator from constitutional scrutiny for alleged First Amendment violations merely because he is a state official. Instead, the inquiry is highly fact intensive and turns on the totality of circumstances.

---

[6] This Court understands that applying qualified immunity is not appropriate where there is a material factual dispute as to whether the right Defendant allegedly violated was clearly established. *See, e.g.*, *White v. Walker*, 950 F.2d 972, 976 (5th Cir. 1991); *see also Bender v. Baylor*, No. 2:09cv789-CSC, 2012 WL 1868011, at *1, *7 (M.D. Ala. May 22, 2012). However, in this case, there is no material factual dispute regarding this issue. Therefore, it is appropriate to address qualified immunity at this stage. *See, e.g.*, *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988) ("[T]hese factual disputes do not preclude a grant of summary judgment premised on a defendant's qualified immunity if the legal norms allegedly violated were not clearly established at the time of the challenged actions.").

Accordingly,

1. Defendant's Motion for Summary Judgment, ECF No. 69, is **GRANTED in part** and **DENIED in part**. Specifically, Defendant's motion as it relates to (1) Plaintiff's official capacity claim under § 1983 and the Florida Constitution and (2) Plaintiff's request for attorneys' fees is **GRANTED**. Defendant's motion as it relates to (1) Plaintiff's individual capacity claim under § 1983 and (2) Plaintiff's individual capacity state-law claims is **DENIED**.

2. Plaintiff's Motion for Summary Judgment, ECF No. 67, is **DENIED** in toto.

3. The Clerk is directed to set this matter for a bench trial on an expedited basis. Given that Defendant is a state legislator, the Clerk shall ensure that the dates for the bench trial do not overlap with the dates the Florida State Legislature is in session. The legislative session ends on April 30, 2021.

4. This Court does *not* direct partial entry of judgment pursuant to Federal Rule of Civil Procedure 54(b).

**SO ORDERED on March 17, 2021.**

<u>**s/Mark E. Walker**</u>
**Chief United States District Judge**